**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | |
|---|---|
| ISRAEL SANCHEZ, Individually and On Behalf of All Others Similarly Situated,<br><br>             Plaintiff,<br><br>    v.<br><br>CENTENE CORP., MICHAEL F. NEIDORFF, and JEFFREY A. SCHWANEKE,<br><br>             Defendants. | Case No. 4:17-cv-00806-AGF |

<u>**CONSOLIDATED CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENTS

Page

I.      INTRODUCTION ............................................................................................. 1

II.     JURISDICTION AND VENUE ...................................................................... 5

III.    THE PARTIES.................................................................................................. 5

        A.      Plaintiff ............................................................................................... 5

        B.      Defendants .......................................................................................... 6

IV.     SUMMARY OF THE ACTION ...................................................................... 7

        A.      Leading Up To The Merger Announcement, Health Net Incurred
                Escalating Claims............................................................................... 7

        B.      Centene's Due Diligence Began By June 2015 ................................... 9

        C.      The Merger Announcement ............................................................... 10

        D.      Centene's Integration With Health Net Continued While Health
                Net Responded To Rising Claims In California And Arizona ........... 12

                1.      Health Net Systematically Restricted Payments For
                        Substance Abuse-Related Claims ......................................... 12

                2.      Centene's Integration With Health Net Proceeded In Late
                        2015 And Early 2016 ............................................................ 14

                3.      Defendants Were Particularly Focused On Health Net's
                        California Business ............................................................... 16

        E.      During The Class Period, Defendants Represented Health Net's
                Liabilities .......................................................................................... 18

                1.      Centene's Form 10-Q Reported The Purported "Fair
                        Value" Of Health Net's Liabilities ....................................... 18

                2.      Centene Assured Investors That Health Net's Reserves
                        Were Adequate...................................................................... 20

        F.      Centene Disclosed The Truth About Health Net's Massive
                Liabilities And Unfavorable Reserves Developments........................ 28

V.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND
        OMISSIONS ................................................................................................... 36

        A.      False And Misleading Statements In Investor Conferences And
                Presentations .................................................................................... 36

        B.      Financial Statements ......................................................................... 44

1. Defendants' Responsibilities Under GAAP And SEC Rules And Regulations................................................................. 44

2. Defendants' False And Misleading Financial Statements ....................... 50

VI. ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER ............................ 51

VII. LOSS CAUSATION.................................................................................... 55

VIII. PRESUMPTION OF RELIANCE .................................................................. 56

IX. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................................ 57

X. CLASS ACTION ALLEGATIONS ................................................................ 58

XI. CLAIMS FOR RELIEF ............................................................................... 60

COUNT I  For Violations Of Section 10(b) Of The Exchange Act And SEC Rule 10b-5 Promulgated Thereunder (Against All Defendants)............................................... 60

COUNT II  For Violations Of Section 20(a) Of The Exchange Act (Against Defendants Neidorff and Schwaneke) ................................................................ 62

XII. PRAYER FOR RELIEF ............................................................................... 64

XIII. JURY DEMAND ....................................................................................... 64

Lead Plaintiff Louisiana Sheriffs' Pension & Relief Fund alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters.  Lead Plaintiff's information and belief are based on the investigation of their undersigned counsel.  This investigation includes review and analysis of: (i) Centene Corporation ("Centene" or the "Company") and Health Net, Inc. ("Health Net") public filings with the U.S. Securities and Exchange Commission ("SEC"); (ii) research reports by securities and financial analysts; (iii) transcripts of Centene's and Health Net's conference calls with analysts and investors; (iv) Centene and Health Net presentations, press releases, and reports; (v) Centene and Health Net marketing material; (vi) news and media reports concerning Centene, Health Net, and other facts related to this action, including Health Net's cessation of payments to substance abuse treatment facilities; (vii) video interviews of Centene executives; (viii) Centene's and Health Net's filings with state regulatory bodies; (ix) accounting rules, standards and concepts, including Generally Accepted Accounting Principles ("GAAP"); (x) price and volume data for Centene securities; (xi) information from consultations with experts; (xii) pleadings in lawsuits arising from Health Net's insurance policies; and (xiii) additional material and data concerning the Company, as identified herein.

## I.  **INTRODUCTION**

1.      Centene sells health insurance, including Medicaid policies and individual policies on the exchanges established under the Affordable Care Act ("ACA").  Lead Plaintiff brings this class action against the Company and two of its top officers, Michael Neidorff (its long-time CEO, Board Chairman, and President) and Jeffrey Schwaneke (Centene's CFO and former Chief Accounting Officer).  The case arises from Defendants' false and misleading statements regarding Centene's merger with California-based Health Net, and the Company's understatement of Health Net's liabilities by approximately $400 million.  Lead Plaintiff asserts claims pursuant to Sections

10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of itself and all other purchasers of Centene common stock between April 26, 2016 and July 25, 2016 (the "Class Period").

2.      On July 2, 2015, Centene announced that it had entered into a merger agreement with Health Net whereby Centene would purchase all of Health Net's outstanding stock.  At the time, Health Net was a health insurance company that offered policies principally in California and Arizona.  Centene repeatedly emphasized to investors that the acquisition of Health Net would help Centene expand its business into such new markets – particularly in California.

3.      Both before and after the merger announcement, Centene, its lawyers and its accountants conducted extensive due diligence into all aspects of Health Net's business and finances.  The due diligence and Centene's integration with Health Net began no later than June 2015 and proceeded for months as the companies worked to obtain necessary regulatory approval for the merger from state insurance departments, including in California and Arizona.  While Defendants initially expected that the merger would close by February 1, 2016, the merger was delayed pending approval from California insurance regulators.  The merger closed on March 24, 2016, just days after California regulators approved the merger subject to at least 10 specific conditions.

4.      Throughout the nine-month period starting from Centene's pre-merger due diligence in Health Net's offices until the merger's close, Centene issued abbreviated statements of  Health Net assets and the liabilities that Centene had agreed to acquire in the merger.  Centene included in these abbreviated accounting figures statements indicating that Centene did not have "full access to information about Health Net's intangible assets."  By April 2016, however, the Company had full access to information.  On April 26, 2016, over a month after the merger's close, Centene reported a full accounting of the acquired assets and liabilities.

5.     After reporting the value of the acquired Health Net business, Defendants repeatedly assured investors that the Company had set aside adequate monetary reserves to pay insurance claims, including on Health Net's policies.  As late as June 17, 2016, Defendants stated that investors should not have "any concerns . . . regarding Health Net's reserves prior to the March 24[, 2016] closing date," that Defendants "ensure[d] the adequacy of medical claims reserves," and that the Company had not experienced "unfavorable development" on Health Net's reserves as Defendants had not "seen any development on anything prior to [March] 24[, 2016]." Defendant Schwaneke stated that "[w]e were obviously focused on [the] opening balance sheet and what we acquired" and Defendant Neidorff insisted that "the Health Net reserve issue stops at March 24[, 2016]."  Defendants further indicated that they were improving Health Net's business, "implementing some best practices of Centene in terms of claims and medical management with a particular focus on California."

6.     Unknown to investors at the time, however, Centene's statements regarding Health Net's value and reserves were false and misleading.  In 2014 and throughout 2015, Health Net had experienced dramatic increases in claims on its policies that caused its liabilities to balloon.  Health Net policies were losing millions of dollars because the policies featured generous allowances for claims that patients accessed throughout this time period.  In response, Health Net and Centene took drastic measures leading up to the merger.  In approximately November 2015, Health Net's payments to substance abuse treatment centers became sporadic.  In January 2016, Health Net halted payments to numerous health providers in an effort to stem the tide of rising liabilities. Before the merger closed in March 2016, Centene's executives recognized "obvious" design flaws in Health Net's insurance policies that led to increased liabilities, and asked California regulators for permission to re-design the policies so that Health Net would not suffer such large policy losses.

7. On July 26, 2016, the truth was revealed. Centene was forced to disclose **$390 million** in liabilities in the Health Net business which existed as of the March 24, 2016 merger date, but which Centene had concealed throughout the Class Period. The increased liabilities were massive in context, dwarfing Health Net's entire annual pre-tax earnings in recent years, and reducing Centene's cash flows by the same amount. As analysts noted, "the simple math" was that "Health Net's earnings really were overstated . . . when [Centene] bought it." Defendants also admitted that they had long known of the issues disclosed on July 26, 2016. Defendant Neidorff admitted that "[t]his is something we inherited. And it was prior to the 24th [of March] when those things were set." Neidorff stated that he had "personally been involved in and pushing and discussing" changes to the policy plan design, as Centene had been "working with the states at the highest levels to redesign" the policies. During a televised interview on Jim Cramer's *Mad Money* program, Neidorff admitted that "***before [Defendants] closed***" the merger, Defendants "knew" that the California policies "had a bad product design" and ***"knew this when we bought [Health Net]."***

8. Defendants attempted to diminish the impact of the disclosures by accounting for the increased liabilities using "purchase accounting," but Defendants' disclosures on July 26, 2016 revealed that Defendants' financial statements were false, and that Defendants had violated GAAP rules and standards as well as SEC regulations.

9. Centene's stock plunged in response to the disclosures. On July 26, 2016, the stock price declined by approximately 8.5%, erasing over $1 billion in shareholder value. Analysts also responded to the disclosures, calling into question Defendants' "credibility" and noting that it was "troubling" that Centene had made "no mention of the challenges or pricing steps taken to rectify the issues" that caused the increased liabilities. Analysts further concluded that the Company's

"disclosures . . . reveal that [Health Net] was likely descending towards a much tougher earnings situation on a standalone basis than previously suggested by [management]."

10.     By this action, investors seek redress for Defendants' violations of the federal securities laws.

## II.     JURISDICTION AND VENUE

11.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  In addition, because this is a civil action arising under the laws of the United States, this Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

12.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.  Centene is headquartered and conducts business in this District, and many of the acts and transactions that constitute violations of law complained of herein, including the dissemination to the public of false and misleading statements of material facts, occurred in this District.

13.     In connection with the acts alleged herein, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the mails, interstate telephone communications, and the facilities of a national securities exchange.

## III.     THE PARTIES

### A.     Plaintiff

14.     On May 1, 2017, the Court appointed Louisiana Sheriffs' Pension & Relief Fund ("Louisiana Sheriffs") as Lead Plaintiff pursuant to 15 U.S.C. § 78u-4(a)(3)(B).  Louisiana Sheriffs is a multi-employer, defined benefit, governmental retirement plan providing retirement, disability and death benefits to approximately 20,000 active and retired employees of the sheriff's offices in all 64 Louisiana parishes. As set forth in the certification previously filed with the Court, Louisiana Sheriffs purchased Centene common stock during the Class Period and suffered

damages as a result of the violations of the federal securities laws.

**B.     Defendants**

15.     Defendant Centene Corporation is incorporated in Delaware and maintains its headquarters at 7700 Forsyth Boulevard, St. Louis, Missouri 63105.  The Company's common stock traded in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "CNC."  Centene sells health insurance in several states in the United States, including Medicaid contracts, Medicare Advantage offerings, Medi-Cal, and certain commercial policies.

16.     Defendant Michael F. Neidorff is, and was at all relevant times, Centene's Chief Executive Officer ("CEO"), Chairman, and President.  Defendant Neidorff signed Centene's annual reports on Form 10-K for the fiscal years 2014 to 2016, and also signed the Company's interim quarterly financial reports on Form 10-Q during the Class Period.

17.     From 2008 until March 24, 2016, Defendant Jeffrey A. Schwaneke was Centene's Chief Accounting Officer, Corporate Controller, and Senior Vice President.  On March 24, 2016, Schwaneke was appointed Centene's Chief Financial Officer, Executive Vice President, and Treasurer.  Defendant Schwaneke signed Centene's annual reports on Form 10-K for the fiscal years 2014 to 2016.  Schwaneke also signed the Company's Form 10-Q dated April 26, 2016, identifying himself as the Company's "principal financial and accounting officer."  On April 28, 2016, the Company announced the appointment of Christopher Isaak as Centene's Chief Accounting Officer, effective immediately.  Schwaneke also signed the Company's Form 10-Q filed on July 26, 2016.

18.     Defendants Neidorff and Schwaneke are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants possessed the power and authority to control the contents of Centene's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and investors.  Each of the Individual Defendants was

provided with copies of the Company's reports, press releases, and videos alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.

## IV.   SUMMARY OF THE ACTION

### A.   Leading Up To The Merger Announcement, Health Net Incurred Escalating Claims

19.     Before it was acquired by Centene, Health Net was a publicly-traded company that sold health insurance policies.  As of December 31, 2015, Health Net provided and administered health benefits to approximately 6.1 million individuals in the United States.  Health Net offered behavioral health, substance abuse and employee assistance programs and managed health care products related to prescription drugs.  Health Net's business was largely concentrated in California.

20.     By 2013, the Affordable Care Act ("ACA") imposed certain requirements on health insurance sellers such as Health Net.  One requirement was that certain individual health insurance policies include coverage for medical conditions related to substance abuse.  Calendar year 2014 was the first full calendar year of full ACA market reform implementation.

21.     In 2014 and 2015, Health Net experienced dramatic increases in claims for substance abuse-related treatments on EPO and PPO ("exclusive provider organization" and "preferred provider organization") individual health insurance policies that Health Net offered in California (the "California Substance Abuse Policies").  The California Substance Abuse Policies included individual insurance policies sold on and off the ACA exchanges.  In 2014, Health Net earned $232 million in premiums on the California Substance Abuse Policies, but incurred approximately $352 million in claims on those policies – a loss of $120 million.  In 2015, Health

Net's losses on the policies became more extreme, as Health Net earned only $189 million in premiums while incurring over $475 million in claims – a loss of $286 million.

22.     These large shortfalls were due to the fact that the California Substance Abuse Policies allowed high amounts of claims.  For instance, they had generous provisions allowing expensive claims by out-of-network providers.  Defendant Neidorff later explained that the PPO was "the most liberal PPO out there" as "[t]here were some design flaws that were just so obvious to those of us who have been doing it for a long time" and "[w]e knew that when we bought the company."

23.     Health Net also explained that in relation to out-of-network "spending for drug testing and substance abuse facilities, [Health Net] PPO plans saw *a 6,359 percent increase* year-over-year from 2013 to 2014 (with 2014 reflecting the first year of full ACA market reform implementation), and *a 2,674 percent increase* in year-over-year spending from 2014 to 2015."

24.     During 2015, the increase in claims was gradual, with extremely elevated claim levels already in the first quarter of 2015 and continuing through the calendar year.  For instance, by February 2015, Health Net was recording a 1,089% trend increase in paid substance abuse claims, and by April 2015 that figure had risen to 1,500% – which was close to the overall annual increase of 1,577.4% for 2015.  As shown below, Health Net's recorded costs on its poorly designed California policies were consistently high throughout 2015:

| Month | Members | Medical Claims (non-Substance Abuse) | | Substance Abuse Claims | | Pharmacy Claims | |
|---|---|---|---|---|---|---|---|
| | | Paid | Yr over Yr Paid Trend | Paid | Yr over Yr Paid Trend | Paid | Yr over Yr Paid Trend |
| Jan-15 | 35,653 | 554.19 | 19.3% | 102.75 | 777.4% | 83.04 | 116.0% |
| Feb-15 | 35,927 | 508.01 | 9.7% | 156.75 | 1089.4% | 81.51 | 90.5% |
| Mar-15 | 38,239 | 559.37 | 20.9% | 314.81 | 1400.3% | 87.32 | 81.3% |
| Apr-15 | 37,546 | 502.14 | 16.5% | 291.79 | 1500.5% | 96.67 | 62.8% |
| May-15 | 37,214 | 515.94 | 17.6% | 270.38 | 1219.0% | 94.02 | 64.2% |
| Jun-15 | 37,004 | 540.70 | 14.0% | 280.03 | 1180.8% | 106.01 | 70.7% |
| Jul-15 | 36,912 | 509.75 | 10.5% | 389.75 | 1532.1% | 116.58 | 85.4% |
| Aug-15 | 36,929 | 469.44 | 3.1% | 463.59 | 2113.8% | 108.74 | 82.8% |
| Sep-15 | 36,810 | 545.60 | 21.9% | 626.69 | 2471.4% | 108.93 | 71.3% |
| Oct-15 | 36,508 | 593.12 | 30.4% | 1,003.15 | 2785.1% | 107.49 | 47.9% |
| Nov-15 | 36,548 | 521.78 | 28.0% | 935.35 | 1644.5% | 103.60 | 48.4% |
| Dec-15 | 36,188 | 532.99 | 12.3% | 826.04 | 1345.9% | 118.15 | 35.1% |
| CY 2014 | 638,521 | 452.14 | | 28.09 | | 62.33 | |
| CY 2015 | 441,478 | 529.38 | 17.1% | 471.12 | 1577.4% | 101.01 | 62.1% |

Over this same time period, Health Net also incurred dramatically increasing substance abuse-related claims on its health insurance policies sold in Arizona.

**B.    Centene's Due Diligence Began By June 2015**

25.    During this period of increasing claims on Health Net's policies in California and Arizona, Health Net and Centene negotiated and worked to complete a merger of the two companies.  Assisted by numerous financial analysts, and with Health Net's approval, Centene conducted extensive due diligence of Health Net's business.  Health Net and Centene began discussing a potential business combination in November 2014.  Following several telephone conversations and in-person meetings between the companies' top executives, on June 16, 2015, Centene and Health Net commenced weeks of formal due diligence regarding a business combination.

26.    Centene engaged McKinsey & Company, Evercore, and Allen & Company as advisors regarding financial and business considerations.   Centene's management and

representatives from these firms participated in the extensive due diligence.  During the merger negotiations, Evercore and Allen & Company provided to Defendants a business and financial analysis of Health Net and an analysis of the potential pro forma financial impact of the proposed transaction on Centene.  Centene's accounting firm, KPMG, LLP, reviewed Health Net's audit work papers from Deloitte & Touche.  The Centene Board of Directors, which included Defendant Neidorff, discussed the due diligence on June 23, 2015 and June 30, 2015.  On June 30, 2015, members of Centene's Board reviewed the status of Centene's due diligence review.  On July 1, 2015, Evercore presented a financial analysis of Health Net to Centene's Board.

### C.      The Merger Announcement

27.      On July 2, 2015, Centene announced its intention to acquire Health Net for an estimated total transaction value of approximately $6.8 billion.  Under the terms of the agreement, Health Net shareholders would receive 0.622 shares of Centene common stock and $28.25 in cash for each share of Health Net common stock.  Upon completion of the transaction, Centene shareholders would own approximately 71% of the combined entity, with Health Net shareholders owning approximately 29%.  Centene published a press release on July 2, 2015 announcing the merger.  In the press release, Defendant Neidorff specifically highlighted "Health Net's presence in California" as motivation for entering into the transaction.  Similarly, a Morgan Stanley report dated July 6, 2015 stated that "[t]he addition of HNT will bolster CNC's commercial platform and increase its footprint in California, which we suspect were part of the key strategic rationale for the deal."

28.      Also on July 2, 2015, Defendant Neidorff and Jay Gellert, the president and CEO of Health Net, hosted a conference call to discuss the planned merger.  During the call, Defendant Neidorff stressed that "Centene maintains a disciplined approach to M&A" and that "first and foremost" the merger had to "meet [Centene's] financial criteria."  He stated that "this transaction

10

is especially compelling because of the attractive shareholder returns" and the Company expected the transaction to increase "adjusted earnings per share by more than 20% in the first full year following closing."  Gellert highlighted "the opportunities presented by the ACA," stating that "2014 was a banner year for Health Net" amid increased numbers of customers of Health Net's policies on "the individual exchanges."  In response to a question from securities analyst Matthew Borsch from Goldman Sachs regarding whether there was "a reason to anticipate that we might have some special issues to resolve with respect to California approval" of the merger, Gellert identified no such issues, stating that "this is an approval process that can move expeditiously."

29.     Defendants repeatedly emphasized that Centene intended to merge with Health Net due in part to Health Net's business in California.  On July 14, 2015, for instance, Defendants posted on Centene's corporate website and filed with the SEC a PowerPoint presentation that listed Health Net's "deeper penetration in California" as the first "growth driver[]" of the merger.  The presentation further stated that the merger was expected to be "greater than 20% accretive to adjusted EPS in the first full year."  Defendants repeated these statements on July 15, 2015, September 9, 2015, and November 10, 2015.

30.     On August 19, 2015, Centene filed a Form S-4 registration statement that included a joint proxy statement/prospectus regarding the proposed merger.  The Form S-4 listed the "Centene Board of Directors' Recommendations and Its Reasons for the Transaction."  Centene's stated reasons for the merger included "[t]he review of Centene's and Health Net's business, strategy, current and projected financial condition, current earnings and earnings prospects, and the current and prospective regulatory environment," as well as the assertion that "[t]he combination of Health Net and Centene would maintain and enhance Health Net's strong commercial business in California, which could also serve as a model for other states in which

similar opportunities can be identified."  The Form S-4 cited the Centene Board's "consult[ation] with Centene's management and legal and financial advisors" as a basis for the merger.

### D.     Centene's Integration With Health Net Continued While Health Net Responded To Rising Claims In California And Arizona

#### 1.     Health Net Systematically Restricted Payments For Substance Abuse-Related Claims

31.     After the merger was announced, Health Net reacted to its increasing liabilities for claims related to substance abuse treatment.  *See* ¶¶20-24.  In the second half of 2015, Health Net began systematic efforts to reduce its payments for submitted substance abuse-related claims in California and Arizona.  In approximately November 2015, Health Net's payments to substance abuse treatment centers became sporadic.  By January 2016, Health Net had instituted a special investigation unit ("SIU") "audit" that involved all or substantially all drug and alcohol treatment centers in California that submitted claims to Health Net.  As part of the SIU "audit," Health Net ceased reimbursing most, if not all, of these drug and alcohol treatment centers for treatments rendered after January 15, 2016.  Leading up to the March 24, 2016 merger date, Defendants were well aware of the "audit," which was reported in industry press at the time and is currently the subject of litigation in courts in California and Arizona.  Third-party payers whom Health Net refused to pay during the "audit" have sued Centene to recover for the unpaid claims.

32.     In conjunction with Health Net's cessation of payments, Health Net sent the drug and alcohol treatment facilities form letters from the Health Net Director of SIU, Matthew Ciganek.  The form letters imposed onerous burdens on the drug and alcohol treatment centers while suspending payments.  Among other things, the form letters (i) failed to identify any specific misconduct by treatment centers, yet mentioned Health Net's "right to institute legal proceedings" and "seek appropriate sanctions from the court"; (ii) requested extensive and unusual amounts of

documentation in a short time frame, including "all documents" related to various categories of documents within fifteen days of the facility receiving the letter; (iii) were followed by numerous duplicate letters requesting copies of the treatment centers' licenses and other information, at times even after such information had already been provided to Health Net; and (iv) imposed substantial costs of compliance in terms of administrative burden and delivery costs, as, among other things, Defendants failed to provide street addresses for delivery and initially refused to receive any of the requested records electronically.

33.     The SIU "audit" and Health Net's delayed payments for substance abuse-related claims extended for months in late 2015 and early 2016.  During and after this time, the treatment centers refused to accept Health Net patients, driving down Health Net's incurred claims.  Health Net also unilaterally changed treatment codes billed by medical professionals in order to lower costs, even though Health Net policies did not permit such unilateral changes.  In or about May 2016, Health Net began to remit payment on overdue reimbursements.  The payments, however, were frequently incorrect and insufficient.

34.     On May 31, 2016, the California Department of Insurance announced that it had begun an inquiry into whether Health Net had failed to properly submit payment for insurance claims to over 118 addiction treatment centers in California and Arizona.  The treatment centers had reported to the California Department of Insurance that they would be unable to accept future Health Net policyholders unless Health Net reimbursed them for claims.  Similarly, treatment centers in Arizona reported to the Arizona Department of Insurance that Health Net had failed to reimburse the treatment centers.

35.     In sum, the SIU "audit" provided Health Net a means to artificially and temporarily drive down the actual costs of its poorly designed California Substance Abuse Policies.

### 2.    Centene's Integration With Health Net
Proceeded In Late 2015 And Early 2016

36.    Following the merger announcement, and at the same time that Health Net systematically restricted its payments to substance abuse facilities, Centene stated that it was making progress on its integration of the Health Net and Centene businesses.  On September 9, 2015, Defendants presented at the Wells Fargo Healthcare Conference in Boston, Massachusetts. During the presentation, Defendant Neidorff stated that Centene was "look[ing] at some of the upside" of the merger "as we go through the integration, and that's going incredibly well – working very well."  Neidorff stated that "Health Net will give us great penetration to California," that Health Net would contribute to Centene's growth in the short term, and that "I said at the time we did this deal, we have good visibility into 2016, we have pretty good visibility into 2017."  Neidorff repeated that, regarding Health Net's financials, "we have good visibility on 2016."

37.    On September 21, 2015, Centene filed its definitive proxy statement for the special meeting of shareholders to vote on the Health Net merger.  On October 23, 2015, Centene's shareholders voted to approve the merger.

38.    On October 27, 2015, during a quarterly investor conference call, Defendant Neidorff reassured Centene investors regarding the integration with Health Net.  Responding to a question from analyst Michael Baker of Raymond James & Associates, Inc. regarding "who's heading up the integration effort," Neidorff responded that "Cindy Brinkley is heading up the integration," "the Health Net people are fully engaged in participating," and "speaking on behalf of the whole management team, the Board, we are very pleased with the progress at how it's going."  Cindy Brinkley was Centene's Executive Vice President of International Operations and Business Integration.

39.     On December 9, 2015, Centene presented at the Oppenheimer Healthcare Conference in New York, New York.  During the presentation, Defendant Neidorff stated that "[t]here's probably no time in [Centene's] history or in its future that will be more transitional than what we've just done with Health Net.  It has taken us from an also-ran to one of the big four.  It has given us a critical mass and a capability and size that builds a lot of stability into what we're doing."  Neidorff stated regarding the Health Net merger that "[w]e have good growth and have good visibility into 2016, 2017, a little bit of 2018."  Neidorff stated that "Health Net had some . . . 14 [or] 15 payables or receivables we'll write off . . . at the time we close."

40.     On December 18, 2015, Defendants held an investor conference call regarding the Company's financial guidance for 2016.  During the call, Cindy Brinkley stated that, in anticipation of the merger closing in February 2016, the Company "embarked upon a very, very robust planning process."  She stated that Centene hired McKinsey & Company for the integration, and that as part of the "joint process," Centene formed a ten-person (five from each company) integration management office that, among other things, worked to "capture the value and . . . synergies."  Brinkley stated that "we are making significant progress on our integration plans and where we are with the entire transaction."

41.     During the December 18, 2015 conference call, Brinkley further noted that Centene was at the time working with the California regulators regarding the merger and that Centene would have a hearing with the California regulators on January 22, 2016.  Brinkley stated that Centene was in the process of "realizing the growth opportunities and putting the company together."

### 3. Defendants Were Particularly Focused On Health Net's California Business

42.    In the months leading up to the closing of the merger on March 24, 2016, Defendants were particularly focused on Health Net's California policies as part of Centene's efforts to obtain approval from California's insurance regulators.  Centene originally planned to complete the merger in February 2016, but the transaction was delayed because California regulators had not yet approved the merger.  In a press release and Form 8-K published on February 9, 2016, Centene stated that "[t]he Health Net transaction remains subject to California regulatory approval."

43.    In numerous SEC filings and other public statements in late 2015 and early 2016, Defendants repeatedly stressed the need for regulatory approval as a precondition to the merger's closing.  For instance, Defendants stated in Centene's Forms S-4 and S-4/A Registration Statements filed on August 19, 2015 and September 17, 2015 that "[p]ursuant to the insurance laws and, in some instances, the health care laws of Arizona [and] California[,] . . . applicable regulatory authorities must approve of . . . Centene's acquisition of control of Health Net's health maintenance organization and insurance companies."  Defendants stated that "[t]he parties expect to complete the merger after all of the conditions to the merger in the merger agreement are satisfied . . . including . . . all required regulatory approvals."

44.    Until regulatory approval was obtained and the merger closed, Defendants refused to provide certain financial information regarding the Health Net acquisition.  On December 18, 2015, during a Company Investor Day, Schwaneke stated that "[w]ith regulatory approvals pending, we will not be able to provide additional details associated with the 2016 guidance other than what is presented here today.  Once all regulatory approvals have been received and the transaction has closed, we will provide full details of our 2016 guidance."  On January 11, 2016,

Neidorff told investors during a JPMorgan Healthcare Conference that "the closing is subject to regulatory approval. And until we receive the final approval, we're going to limit what information we provide to what we did at our Investor Day in terms of revenue and earnings."

45. The ongoing approval requirements from regulators in California allowed Centene to avoid reporting revenue as a consolidated company with Health Net. During a Company conference call with investors on February 9, 2016, Defendant Schwaneke stated that "one month of Health Net revenue is approximately $1.3 billion" and as "the transaction remains subject to regulatory approval in California," the "actual closing date of the Health Net transaction will determine the number of months and days of Health Net results that will be included in our consolidated financial statements for 2016." As analysts at UBS noted, "[a] one-month delay [in the merger] would impact 2016 revenue outlook by roughly $1.3 [billion]."

46. In March 2016, Centene obtained regulatory approval to consummate the transaction from the California Department of Managed Health Care (DMHC) and the California Department of Insurance (CDI). Morgan Stanley issued a report dated March 22, 2016 discussing the scrutiny that regulators were applying to the proposed merger:

> Both of California's insurance regulators held hearings in December and January about the proposed CNC/HNT deal. However, Commissioner Dave Jones from CDI appeared to be more critical of the merger. According to California Healthline, Jones spent six hours in a hearing Jan. 22 grilling executives and industry experts on the proposed Centene-Health Net merger.

47. Defendants were further focused on Health Net's California insurance policies in the months leading up to the merger because the CDI subjected its merger approval to a number of conditions regarding those policies. In a report dated March 22, 2016, Morgan Stanley described ten conditions on CDI's approval of the merger, including a "commitment to growing [Health Net's] commercial business in the state [of California] including participation on the

exchange."  In a report dated March 22, 2016, Sterne Agee noted additional CDI requirements, including that Centene was required to "maintain and grow [Health Net's] commercial business in the state," "provide sufficient provider networks," "continue to offer products on the California exchange," "improve the quality of care to consumers," and "certify that no costs of the merger will be passed along to consumers."

48.     On March 24, 2016, Centene announced that it had completed its acquisition of Health Net.

**E.     During The Class Period, Defendants
       Represented Health Net's Liabilities**

**1.     Centene's Form 10-Q Reported The
       Purported "Fair Value" Of Health Net's Liabilities**

49.     On April 26, 2016, Defendants filed a Form 10-Q with the SEC that reported the purported value of the Health Net assets that Centene had acquired, and the Health Net liabilities that Centene had assumed, in the merger (in millions of dollars):

**Assets acquired and liabilities assumed**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 1,422 |
| Premium and related receivables (a) | | 1,076 |
| Short term investments | | 40 |
| Other current assets | | 670 |
| Long term investments | | 1,965 |
| Restricted deposits | | 36 |
| Property, software and equipment, net | | 43 |
| Intangible assets (b) | | 1,500 |
| Other long term assets | | 203 |
| Total assets acquired | | 6,955 |
| | | |
| Medical claims liability | | 1,370 |
| Borrowings under revolving credit facility | | 285 |
| Accounts payable and accrued expenses | | 1,928 |
| Return of premium payable | | 375 |
| Unearned revenue | | 117 |
| Long term deferred tax liabilities (c) | | 415 |
| Long term debt (d) | | 418 |
| Other long term liabilities | | 369 |
| Total liabilities assumed | | 5,277 |
| | | |
| Total identifiable net assets | | 1,678 |
| Goodwill (e) | | 3,601 |
| Total assets acquired and liabilities assumed | $ | 5,279 |

50.     Centene represented that these figures showed the "fair value" of Health Net's assets and liabilities as of the March 24, 2016 merger date. *See* April 26, 2016 Form 10-Q ("The acquisition of Health Net has been accounted for as a business combination using the acquisition method of accounting which requires assets acquired and liabilities assumed to be recognized at fair value as of the acquisition date.").

51.     Defendants' assurances regarding the valuation of Health Net in the April 26, 2016 Form 10-Q gave the impression that the valuations were predicated on "full access" to information about Health Net's assets.  In Centene's prior SEC filings on September 17, 2015, September 21,

2015 and January 26, 2016, before the merger closed, Defendants accompanied the Company's

valuation of Health Net with the following language:

> **At this time, Centene does not have sufficient information as to the amount, timing and risk of cash flows of all of Health Net's identifiable intangible assets to determine their fair value**. Some of the more significant assumptions inherent in the development of intangible asset values, from the perspective of a market participant, include: the amount and timing of projected future cash flows (including revenue and profitability); the discount rate selected to measure the risks inherent in the future cash flows; and the assessment of the asset's life cycle and the competitive trends impacting the asset. However, for purposes of these unaudited pro forma condensed combined financial statements and using publicly available information, such as historical revenues, Health Net's cost structure, industry information for comparable intangible assets and certain other high-level assumptions, the fair value of Health Net's identifiable intangible assets and their weighted-average useful lives have been estimated . . . .
> . . . .
> **Once Centene has full access to information about Health Net's intangible assets, additional insight will be gained** . . . .

These statements, however, were omitted from Centene's Form 10-Q dated April 26, 2016,

because, having merged in March 2016, Centene now had "sufficient information" and "full access

to information" regarding the value of Health Net's liabilities. In fact, Centene had full access to

all of Health Net's financial information by no later than March 24, 2016, when Health Net became

wholly owned by Centene, if not sooner during pre-merger diligence and the integration process.

### 2. Centene Assured Investors That Health Net's Reserves Were Adequate

52.     On April 26, 2016, the same day that Centene reported the value of Health Net (*see*

¶49), Centene held a quarterly investor conference call. During the call, Defendant Neidorff

discussed the merger and stated that there were "no surprises" during "the regulatory process in

California." Analyst Matthew Borsch from Goldman Sachs asked whether the "large book at

Health Net [of] ACA exchange members[] – is it profitable now? . . . And what level of

profitability is that?" Centene's EVP of Markets, Rone Baldwin, responded that "the exchange

business at . . . Health Net has been profitable. The one area of challenge with respect to the

exchange business at Health Net has been Arizona."  By contrast, Baldwin stated, for Health Net's policies in "California, [Health Net] pursue[s] a strategy . . . [t]hat has worked well for them."

53.     On May 10, 2016, Ed Kroll, SVP of Finance and Investor Relations, presented at the Bank of America Merrill Lynch Health Care Conference.  In response to a question by Kevin Fischbeck, an analyst at Bank of America Merrill Lynch, regarding the finances associated with the merger, Kroll stated that "I think you have a very attractive financial transaction that also lengthens out the sustainability of our superior growth, and it enhances all those diversification imperatives . . . So I think it all adds up to a really, really good transaction for our shareholders."

54.     On May 24, 2016, Defendants gave a presentation at the UBS Global Healthcare Conference.  In response to an analyst's question regarding whether there had been any surprises or challenges associated with the merger, Neidorff responded that "I think it's all been where we expected, and it's probably a little bit – it's been fine.  We officially closed on the 24th, but we had nine months ahead of that, in round numbers, working on the integration as anyone would do.  So the day that we closed, we were just implementing things we've been planning for nine months." Neidorff stated that "our mentality is you really start your integration when you're doing diligence even before you sign the contract.  That's when you're learning things about the Company.  You should be thinking at that point what are we going to do if we consummate this deal?  And so that's been going on for a year, and it's come – if anything, I think we're ahead of schedule."

55.     During the May 24, 2016 presentation, analyst A.J. Rice from UBS asked whether there were "any other things" that Centene had done "to bring [Health Net] . . . up to snuff in [Defendants'] accounting and balance sheet?"  Defendant Neidorff responded "No, and we'll talk more about this . . . at our Investor Day coming up" on June 17, 2016, but assured investors that

"in reality, after about 60 days you have a significant development of reserves, in the 90s.  So everything we're seeing says it's fine."[1]

56.     On June 17, 2016, Centene held an Investor Day attended by seven of Centene's executives, including Defendants Neidorff and Schwaneke.  During the presentation, Defendant Neidorff stated that "Health Net is Centene's California health plan" and presented a slide stating that Centene had applied its "reserving methodologies to Health Net's book of business":

## Health Net Integration







Centene Market

**Applied Centene's Reserving Methodologies to Health Net's Book of Business**

• • • • • • • • • • • • • • • • • • • • • •

**IT Infrastructure Alignment to Improve Operating Efficiencies**

10

---

[1] Insurance claims "reserves" are monies that insurance companies earmark for payment of insurance policy claims. Reserves are generally established by simultaneously recording an income statement expense (which reduces earnings) and a balance sheet liability (which represents a future payment, *i.e.*, negative cash flow).

57.     Neidorff stated that during the Investor Day, Defendant Schwaneke would provide investors "with details on [Centene's] reserving methodologies and how they differ from Health Net's previous practice" and "***will help mitigate any concerns [investors] have regarding Health Net's reserves prior to the March 24[, 2016] closing date***."  During his subsequent presentation, Defendant Schwaneke stated that "[w]e ensure the adequacy of medical claims reserves by utilizing detailed reserve calculations by market and product that are reviewed by multiple levels within the finance department."  Schwaneke explained that the "key" was that Defendants "apply[] a consistent reserving methodology" and "get two independent actuarial reviews each quarter and monitor prior-period development."  Schwaneke further emphasized the Company's specific reserve levels, stating that they "have developed favorably" and that "[s]o far this year we have seen positive development of $226 million from our 2015 reserves."

58.     In providing an "update on the Health Net finance transaction," Defendant Schwaneke further stated that "[s]ince the acquisition we have faster visibility into financial information" and that "[o]n a monthly basis[,] Centene's finance team has been reviewing and monitoring the medical claims reserves and development."  In discussing the "Health Net finance transition," Schwaneke also presented the following slide, highlighting the "adequacy of medical claims reserves":



59.     Schwaneke further highlighted Centene's visibility into Health Net's financial information, including reserves, using the following slide:



60.   Schwaneke stated that "[a]s of May 31, 2016, there has been no unfavorable development on the acquired Health Net medical reserves," and presented the following slide:



61.     Rone Baldwin, Centene's EVP of Markets, highlighted the Health Net policies in California that the Company had acquired.  Baldwin stated that there was "clearly a major increase in the membership in California."  Baldwin further stated that "we have a big focus in California in margins on both the individual and group commercial business as part of the 2016 plan," that "we're implementing some best practices of Centene in terms of claims and medical management with a particular focus on California," and that "we're investing to revitalize our products in the individual space including in the individual PPO product in California."

62.     During the Q&A portion of the Investor Day, Defendant Schwaneke was asked about the Company's visibility into claims on Health Net policies.  Schwaneke stated that roughly two months after a merger, an acquiring company has "paid 85% of the claims that you ultimately

think you're going to pay," so "two months out you have 85% of the claims already paid and out the door. . . .  In three months, it's over 90%" so that "give[s] you a flavor for how much information we had" regarding Health Net's claims.

63.    Analyst Dave Windley from Jefferies asked about Schwaneke's statement that there had been "no unfavorable development on the acquired Health Net medical reserves."  In response, Schwaneke reassured investors that there was merely a "potential for adjustment," but that "we haven't seen any unfavorable development" since the Company's accounting for Health Net provided on April 26, 2016.  *See* ¶49.  Analyst Christine Arnold from Cowen and Company again asked about the Health Net insurance reserves, stating "I'm sorry to beat up on it, but it's something that's really on people's minds.  You said that the reserves, there was no negative development, and is that related to both the first quarter and 2015?  Or how did 2015 develop?"  Mark Brooks, Centene's SVP and Chief Information Officer, responded that "***That's really just the opening balance sheet so that's as of the time of the transaction. . . .  [T]he March 24 reserve balance includes all prior activity***."  Brooks reassured investors again that "***in total we haven't seen any development on anything prior to [March] 24[, 2016]***."  Adding to this point, Defendant Neidorff stated "That's an important point that . . . the Health Net reserve issue stops at March 24 . . . ."

64.    Analyst Brian Wright from CRT Capital Group followed up on Defendants' statements, asking "what Health Net's reserve development was into 2015."   Defendant Schwaneke responded that "I don't have that level of detail with me here today . . . .  We were obviously focused on [the] opening balance sheet and what we acquired."  Wright followed up again, asking about Centene "having the auditors look at Health Net's reserves."  Schwaneke stated that "[t]hat's the work we're doing right now" and there were only "potential adjustments" to be made, as there was "no unfavorable development."

27

65.     Following a break in the Investor Day presentation, Defendant Neidorff introduced a different segment of the Investor Day, referring to the Health Net reserves as "hav[ing] now found a comfortable bed."  He stated, "I think it's that kind of issue; it's one that's behind us at this point."

### F.     Centene Disclosed The Truth About Health Net's Massive Liabilities And Unfavorable Reserves Developments

66.     On July 26, 2016, Defendants disclosed that the "fair value" of Health Net's liabilities was far higher than Centene had reported on April 26, 2016.  In a Form 10-Q that the Company filed with the SEC on July 26, 2016, Defendants *increased Health Net's medical claims liability reserves by approximately $90 million*.   The Company admitted during an investor conference call on July 26, 2016 that this increase was "really . . . for prior issues" that were "as of March 24," 2016 and were "associated with disputed substance abuse treatment center claims." When analyst Chris Rigg from Susquehanna Financial Group asked whether "the $90 million is basically for the 27-ish month of really 2014, 2015 and about three months of 2016," Defendant Schwaneke confirmed that the $90 million increase in reserves was for "everything prior to March 24[, 2016.]"  Centene further disclosed on July 26, 2016, that all of the $90 million in increased liabilities related to the substance abuse-related claims in California.

67.     On July 26, 2016, the Company further disclosed that it had also recognized *additional* liabilities in the Health Net business of "*approximately $300 million . . . based on costs trends existing prior to the acquisition date*."  The Company filed a Form 8-K on July 26, 2016 further explaining the composition of the $300 million in recognized liabilities and admitting that because Defendants had known of the issues underlying the $300 million adjustment for many months, the Company had already been taking corrective action to remedy the known, increased liabilities:

- $125 million associated with the California commercial business, $50 million of which is associated with substance abuse treatment facilities.  We have filed for a combination of price increases and benefit design changes including reductions in reimbursement for out of network services.  We are in the final stages of approval with the California Department of Insurance, which will be concluded by the end of the third quarter of 2016.

- $70 million associated with the Arizona individual commercial business. We will exit the entire individual PPO business, effective January 1, 2017.  We are reducing our participation in the health insurance marketplace business to one county for 2017 and have taken significant rate actions.

- $70 million associated with the Medicare business.  The 2017 bids have been submitted and should return the business to profitability in 2017.

- $15 million associated with the Arizona Medicaid business.  We have fully transitioned this business to Centene's operating platform as of July 1, 2016, and we have taken appropriate actions to improve performance.

- $20 million of other smaller items including the Arizona small group and Oregon individual business.  We have filed for rate increases and taken other appropriate actions to address these for 2017.

68.     Centene's massive July 26, 2016 accounting changes significantly impacted Centene's accounting for the Health Net assets acquired and liabilities assumed in the merger. Centene reported that Health Net's medical claims liabilities were $92 million higher, its accounts payable and accrued expenses were $102 million higher, its total liabilities were $211 million higher, and its net assets $245 million lower than Centene had reported on April 26, 2016.  In particular, and in contrast to the figures presented in ¶49 above, Centene accounted for Health Net as follows:

**Assets acquired and liabilities assumed**

| | | |
|---|---|---:|
| Cash and cash equivalents | $ | 1,368 |
| Premium and related receivables (a) | | 1,086 |
| Short term investments | | 82 |
| Other current assets | | 638 |
| Long term investments | | 1,966 |
| Restricted deposits | | 36 |
| Property, software and equipment, net | | 41 |
| Intangible assets (b) | | 1,500 |
| Other long term assets | | 204 |
| Total assets acquired | | 6,921 |
| | | |
| Medical claims liability | | 1,462 |
| Borrowings under revolving credit facility | | 285 |
| Accounts payable and accrued expenses (c) | | 2,030 |
| Return of premium payable | | 375 |
| Unearned revenue | | 117 |
| Long term deferred tax liabilities (d) | | 349 |
| Long term debt (e) | | 418 |
| Other long term liabilities | | 452 |
| Total liabilities assumed | | 5,488 |
| | | |
| Total identifiable net assets | | 1,433 |
| Goodwill (f) | | 3,850 |
| Total assets acquired and liabilities assumed | $ | 5,283 |

69.     The $390 million in increased liabilities were massive in context, greatly eclipsing the pre-tax earnings of the entire Health Net company in recent years.  In 2013 and 2014, Health Net averaged only $235 million annually in pre-tax earnings.[2]  The over $300 million in increased liabilities for 2016 greatly outstripped those annual earnings figures.

70.     Centene accounted for the approximately $300 million in increased liabilities for the period March 25, 2016 through December 31, 2016 using a "premium deficiency reserve," or

---

[2] These years are appropriate for comparative purposes, as some undisclosed portion of the reserves effectively reduced Health Net's reported 2015 pre-tax earnings.

"PDR."  PDRs are required when there is a probable loss on unearned insurance premiums.  As explained further below, Centene's use of purchase accounting rules to record the PDR violated GAAP.  *See* ¶¶95-110.

71.     Before the market closed on July 26, 2016, Centene executives made further admissions that they knew of the Health Net reserve issues before the March 24, 2016 merger, and thus before filing the April 26, 2016 Form 10-Q.  In response to analyst questions regarding the extent to which the PDR was related to substance abuse issues and "how much of the PDR is actually really resolved," Defendant Neidorff stated that "*we knew some of this was there*" and that "*[t]his is something we inherited.  And it was prior to the 24th [of March] when those things were set*."  Defendant Schwaneke stated that the $300 million PDR "was based on information as of March 24."

72.     Defendants further explained that the substance abuse issue with Health Net's California individual business was due to known policy "plan design."  Neidorff stated that he had "*personally been involved in and pushing and discussing*" changes to the policy plan design, as Centene had been "*working with the states at the highest levels to redesign the PPO product*" and "[t]here were major flaws in it."  Neidorff stated that Centene had been working on the plan design "for the past several months" and that the increased liabilities recognized on July 26, 2016 regarded "a whole list of issues that have been dealt with very aggressively."  Neidorff stated "I've had several meetings personally with Commissioner Jones," the Commissioner of the California Department of Insurance.  Neidorff continued, "We've talked about it . . .  We've talked about the actions we are taking" and "we are being very aggressive in fixing it."  Defendants stated that "the issue we had in the PPO is isolated to the PPO products in California" and "[w]e have taken steps

to mitigate the substance abuse treatment center costs in the individual commercial business in California, including modifications to plan design."

73.     Analysts reacted to the news.  Analysts at Cowen and Company reported on July 26, 2016 that it was "troubling" that at Centene's "[I]nvestor [D]ay on June 17, there was ***no mention of the challenges or pricing steps taken to rectify the issues***" that caused the increased liabilities, particularly because Centene's actions to mitigate the issues "would have had to been filed in early June."  In a report dated July 26, 2016, analysts at Jefferies stated that Centene management's "***credibility took a step back today*** as the $390 [million] of reserves were significantly higher than [Centene] suggested in June at our health care conference" as there was "scant mention at the June Investor Day."  "***Why didn't the Company disclose the issues then?***" the Jefferies analysts asked.  In a report also dated July 26, 2016, analysts at Credit Suisse stated that the Company's "disclosures . . . reveal that ***[Health Net] was likely descending towards a much tougher earnings situation on a standalone basis than previously suggested by [management]***."  Credit Suisse noted that the balance sheet changes were "material."  Analysts at Susquehanna Financial Group published a report on July 26, 2016 noting that "we understand investor frustration" regarding the disclosures of Health Net's "core performance."

74.     Because Centene accounted for $300 million of the $390 million in increased liabilities on July 26, 2016 using purchase accounting rules (albeit, in violation of the rules, as described in ¶¶95-110), there was no impact on Centene's income statement.  *See* ¶¶99-100 & page 22 footnote 1.  However, Centene executives admitted that without the Company's use of purchase accounting regarding the material PDR changes, Centene's quarterly pre-tax earnings would have been reduced by $300 million (84%), severely impacting the "earnings per share" metric that the Company reported to analysts and investors.  *See id.*  Analyst Matthew Borsch from Goldman

Sachs asked whether "if you hadn't taken the PDR, does that mean that your earnings for that period would be by your estimate $300 million lower than what your guidance states?"  "Yes," Schwaneke replied.  Moreover, and regardless of Defendants' accounting, the July 26, 2016 disclosures meant that Centene's previously expected cash flows were overstated by approximately $300 million.

75.     In response to the disclosures on July 26, 2016, the price of Centene common stock declined.  On July 26, 2016, the stock price declined by $6.39 per share, or approximately 8.5%, erasing over $1 billion of shareholder value on high trading volume.  A Morgan Stanley report dated July 27, 2016 stated that "[w]e understand the ~8% downward move in CNC given material deterioration in 2016 legacy [Health Net] business."  The business publication *Modern Healthcare* noted that "[i]nvestors sold off shares of Centene Tuesday because of the Health Net worries, pushing the company's stock price down as much as 15% during morning trading."

76.     Following the July 26, 2016 disclosures, Defendants reiterated that the $90 million and $300 million increased liabilities were due to claims experience that had increased long before the Class Period.  On July 27, 2016, Defendant Neidorff was interviewed by securities analyst Jim Cramer regarding the July 26, 2016 accounting changes.  Cramer stated that it was a "red flag" that Centene had "increased its substance abuse treatment cost reserves by $90 million as well as recording a $300 million premium deficiency reserve for its business in Arizona, California, and Oregon – that's what upset people."  Cramer noted that Centene had disclosed the increased liabilities just weeks after its June 17, 2016 Investor Day and cited Defendants' statements in their PowerPoint presentation during the Investor Day that there had been "no unfavorable development on the acquired Health Net medical reserves" through May 2016.  Cramer stated that during the Investor Day, Centene had claimed it was "really unbelievable at figuring out reserves" and had

"applied Centene's reserving methodology to Health Net's book of business."  Neidorff responded that there had been "some issues in California with the individual plan, there were problems in Arizona with non-profitable business," and admitted that *"[w]e knew this when we bought it*." Neidorff admitted that "*before [Defendants] closed*" the merger, Defendants "knew" that the California policies "had a bad product design" and Defendants were "working very closely with the Department of Insurance" regarding it.

77.     During Cramer's interview of Neidorff, Cramer further highlighted the Jefferies analyst report noted above in ¶73, above, stating that "credibility took a step back today as the $390 [million] of reserves were significantly higher than [Centene] suggested in June at our health care conference."  Cramer asked incredulously, "Jefferies didn't catch it and it was their health care conference?!"  Neidorff responded that Centene was "dealing with losses" and also claimed during the interview that the increased liabilities from the Health Net acquisition were "misunderstood."

78.     On September 7, 2016, Centene gave a presentation at the Wells Fargo Securities Healthcare Conference in Boston, Massachusetts, in which Ed Kroll, Centene's Senior Vice President, Finance & IR, participated.  During the presentation, Kroll stated that the increased liabilities reported on July 26, 2016 derived from Health Net's "den[ial of] a lot of claims that [Centene] . . . determined should be on the books [because] . . . they were owed."  Kroll also explained that the non-substance-abuse-related policies "were actually producing losses in 2015 for Health Net, already, so I think *those were really not surprises for us*."  Analyst Peter Costa from Wells Fargo Securities pointed out that "*the simple math*" was that "*Health Net's earnings really were overstated . . . when [Centene] bought it*," and asked whether Centene had "regrets about buying Health Net."  In response, Kroll stated that Centene had "no regrets" about

purchasing Health Net, but confirmed that "**all of th[e] products**" that related to the PDR, including the California PPO, "**were all losing money in 2015**."

79.     On September 13, 2016, Kroll and Defendant Neidorff presented at the Morgan Stanley Global Healthcare Conference in New York, New York.  The first question during the presentation was from analyst Cornelia Miller from Morgan Stanley, who asked regarding the $300 million PDR whether Defendant Neidorff could "give us a little bit of insight into how much insight you had into the underperforming businesses when you announced the acquisition of Health Net in 2015."  Neidorff responded that "We had spent . . . a lot of time confirming the medical costs, the prior-year period expenses on it."  He confirmed that "[w]e knew that we had the Arizona PPO and some other costs there."  During the presentation, Neidorff also discussed the obviousness of the Health Net California PPO's design flaws, stating "[t]here were some design flaws that were just so obvious to those of us who have been doing it for a long time."  Neidorff continued to discuss the role of the Health Net California PPO liabilities in the July 26, 2016 accounting adjustments, stating that:

> A PPO is designed to give people an option to go out of network, but really it should be designed to encourage people to stay in network.  [Health Net's California PPO policies] had none of that.  There were no caps on maximum allowances.  We had the most liberal – or Health Net had the most liberal PPO out there, which encouraged adverse selection.  We knew that when we bought the company.  We had done our homework.

Neidorff further stated regarding the increased liabilities that "the things that were the issue have been dealt with, and had been planned to be dealt with when we announced it.  We are well underway.  These were not things that came up, and we just all of a sudden decided to do.  We had been working on it and fixed it, taking those steps beforehand."  Neidorff further explained, regarding the issues with Health Net's Arizona policies captured in the PDR, that Centene had "exited Arizona."

80.    On December 16, 2016, Centene held an "Investor Day" during which Defendant Schwaneke summed up the actions Centene had taken to remedy the Health Net book of business that Centene had acquired, stating that "[s]pecifically we redesigned the individual PPO product in California, we will exit underperforming businesses in 2017 and have filed for rate increases in the individual, commercial and Medicare businesses commensurate with expected profitability." He continued, "there's still work to be done."

V.    **DEFENDANTS' FALSE AND**
      **MISLEADING STATEMENTS AND OMISSIONS**

   A.    **False And Misleading Statements**
         **In Investor Conferences And Presentations**

81.    On April 26, 2016, Centene held an investor conference call in which Defendants Neidorff and Schwaneke; Ed Kroll, Centene's SVP of Finance and Investor Relations; Rone Baldwin, Centene's EVP of Markets; Jesse Hunter, Centene's EVP of Products; and Ken Yamaguchi, Centene's Chief Medical Officer, participated. During the call, Defendant Neidorff stated regarding the merger with Health Net that there were "no surprises" during "the regulatory process in California."  Analyst Matthew Borsch from Goldman Sachs asked whether the "large book at Health Net [of] ACA exchange members[] – is it profitable now? . . .  And what level of profitability is that?"  Centene's EVP of Markets, Rone Baldwin, responded that "the exchange business at . . . Health Net has been profitable.  The one area of challenge with respect to the exchange business at Health Net has been Arizona."  Baldwin stated Health Net "pursue[s] a strategy. . . [t]hat has worked well for them" regarding Health Net's policies in California.

82.    Defendants' statements identified above in ¶81 were false and misleading. Defendants' statements that the "one area of challenge with respect to the exchange business at Health Net" was in Arizona, that Health Net's strategy in California was "work[ing] well," and that there were "no surprises" during the "regulatory process in California" omitted Health Net's

material increased liabilities on its California Substance Abuse Policies as well as the remedial measures that Health Net took to avoid payments to substance abuse treatment facilities and the efforts to re-design the flawed PPO product that was losing money.  *See* ¶¶19-24, 31-35, 72; *see also* ¶¶76, 78-79.  Defendants also omitted that Centene's valuation of Health Net's business materially understated Health Net's liabilities, and that Defendants had known of such issues since before the merger closed on March 24, 2016.  *See* ¶¶25-26, 66-72; *see also* ¶¶76-79.

83.  On May 24, 2016, Defendant Neidorff gave a presentation at the UBS Global Healthcare Conference in New York.  In response to a question from analyst A.J. Rice at UBS regarding whether there had been any surprises or challenges associated with the merger, Neidorff responded that "I think it's all been where we expected" and that "[w]e officially closed on the 24th, but we had nine months ahead of that, in round numbers, working on the integration as anyone would do.  So the day that we closed, we were just implementing things we've been planning for nine months."  Neidorff stated that "our mentality is you really start your integration when you're doing diligence even before you sign the contract.  That's when you're learning things about the company.  You should be thinking at that point what are we going to do if we consummate this deal?  And so that's been going on for a year, and it's come – if anything, I think we're ahead of schedule."  Analyst A.J. Rice from UBS also asked whether there were "any other things" that Centene had done "to bring [Health Net] . . . up to snuff in [Defendants'] accounting and balance sheet?"  Defendant Neidorff responded "No" and assured investors that "in reality, after about 60 days you have a significant development of reserves, in the 90s.  So everything we're seeing says it's fine."

84.  Defendants' statements identified above in ¶83 were false and misleading.  Neidorff's statements about Centene's "diligence even before" the merger contract was signed and

"nine months" of due diligence thereafter, as well as his assertion that "everything . . . [was] fine" regarding the balance sheet, omitted that this same due diligence by Defendants had identified numerous issues with Health Net's policies that, as Defendants knew, required that Health Net policies be redesigned in order to avoid losing money and that the Company make material changes to the valuation of Health Net reported on April 26, 2016.  *See* ¶¶19-26, 31-35, 66-72; *see also* ¶¶76, 78-79.  Defendants omitted the remedial measures that Health Net took to avoid payments to substance abuse treatment facilities and the efforts to re-design the flawed PPO product design that was losing money, and that Centene's valuation of Health Net's business materially understated Health Net's liabilities.  *See* ¶¶31-35, 72; *see also* ¶¶76, 78-79.

85.     On June 17, 2016, Centene held an Investor Day attended by seven of Centene's executives, including Defendants Neidorff and Schwaneke.  Defendant Neidorff presented the following PowerPoint slide:



Neidorff stated during the presentation that Defendant Schwaneke "will help mitigate any concerns you have regarding Health Net's reserves prior to the March 24[, 2016] closing date."  During his presentation, Defendant Schwaneke stated that "[w]e ensure the adequacy of medical claims reserves by utilizing detailed reserve calculations by market and product that are reviewed by multiple levels within the finance department.  We get two independent actuarial reviews each quarter and monitor prior-period development.  The key is applying a consistent reserving methodology."  Schwaneke further emphasized the Company's specific reserve levels, stating that they "have developed favorably" and that "[s]o far this year we have seen positive development of $226 million from our 2015 reserves."

86.    In providing an "update on the Health Net finance transaction," Defendant Schwaneke stated during the Investor Day that "[s]ince the acquisition we have faster visibility into financial information" and that "[o]n a monthly basis, Centene's finance team has been reviewing and monitoring the medical claims reserves and development."  In discussing the "Health Net finance transition," Schwaneke also presented the following slide highlighting the "adequacy of medical claims reserves":



87.    Schwaneke further highlighted Centene's visibility into Health Net's financial information, including reserves using the following slide:



88.     Schwaneke also stated that "[a]s of May 31, 2016, there has been no unfavorable development on the acquired Health Net medical reserves," and presented the following slide:



89.     Rone Baldwin, Centene's EVP of Markets, stated that "we have a big focus in California in margins on both the individual and group commercial business as part of the 2016 plan."  Baldwin stated that "[w]e're implementing some best practices of Centene in terms of claims and medical management with a particular focus on California" and that "we're investing to revitalize our products in the individual space including in the individual PPO product in California."

90.     During the Q&A portion of the Investor Day, Defendant Schwaneke was asked about the Company's visibility into claims on Health Net policies.  Schwaneke stated that roughly two months after a merger, an acquiring company has "paid 85% of the claims that you ultimately think you're going to pay," so "two months out you have 85% of the claims already paid and out

the door. . . .   In three months, it's over 90%" so that "give[s] you a flavor for how much information we had" regarding Health Net's claims.

91.     Analyst Dave Windley from Jefferies asked about Schwaneke's statement that there had been "no unfavorable development on the acquired Health Net medical reserves."  In response, Schwaneke reassured investors that there was merely a "potential for adjustment," but that "we haven't seen any unfavorable development."  Analyst Christine Arnold from Cowen and Company asked about the Health Net insurance reserves, stating "I'm sorry to beat up on it, but it's something that's really on people's minds.  You said that the reserves, there was no negative development, and is that related to both the first quarter and 2015?  Or how did 2015 develop?"  Mark Brooks, Centene's SVP and Chief Information Officer, responded that "That's really just the opening balance sheet so that's as of the time of the transaction. . . .   [T]he March 24 reserve balance includes all prior activity."   Brooks stated that "in total we haven't seen any development on anything prior to [March] 24[, 2016]."  Defendant Neidorff added, "That's an important point that . . . the Health Net reserve issue stops at March 24 . . . ."

92.     Analyst Brian Wright from CRT Capital Group followed up on Defendants' statements, asking "what Health Net's reserve development was into 2015."   Defendant Schwaneke did not answer the question, stating that "I don't have that level of detail with me here today . . . .  We were obviously focused on [the] opening balance sheet and what we acquired." Wright followed up again, asking about Centene "having the auditors look at Health Net's reserves."  Schwaneke stated that "[t]hat's the work we're doing right now" and there were only "potential adjustments" to be made, as there was "no unfavorable development."

93.     Defendants' statements identified above in ¶¶85-92 were false and misleading. Defendants' statements highlighting Centene's practices to ensure the "adequacy of medical

claims reserves," "how much information [Centene] had" at the time, and that (i) Centene had "applied Centene's reserving methodologies to Health Net's book of business; (ii) "[o]n a monthly basis, Centene's finance team has been reviewing and monitoring the medical claims reserves and development"; (iii) reserve levels "have developed favorably" in 2016; (iv) there had been "no unfavorable development on the acquired Health Net medical reserves through May" 2016, the Company had not seen "any development on anything" prior to March 24, 2016, and "the Health Net reserve issue stops at March 24"; and (v) there was merely a "potential for adjustment" to an unidentified aspect of Centene's accounting – all of which were expressly made to "mitigate any concerns regarding Health Net's reserves" – misled investors regarding the business and liabilities of Health Net.  By the time of the merger on March 24, 2016, Defendants had identified numerous issues with Health Net's policies that, as Defendants knew, required both (i) material changes to the valuation of Health Net reported on April 26, 2016, including to the Health Net reserves for Health Net losses prior to March 24, 2016, as well as the PDR for the periods after March 24, 2016; and (ii) remedial actions to avoid continuing to lose money on policies at issue.  *See* ¶¶19-35, 66-72; *see also* ¶¶76, 78-79.  Defendants omitted the remedial measures that Health Net took to stall its payments to substance abuse treatment facilities and the efforts to re-design the flawed PPO product design that was losing money, and that Centene's valuation of Health Net's business materially understated Health Net's liabilities.

94.     Defendants' statements that Centene was "implementing some best practices . . . in terms of claims and medical management with a particular focus on California" and that "we're investing to revitalize our products in the individual space including in the individual PPO product in California," omitted that Centene was implementing these changes, investing in the PPO product in California, and had a "particular focus on California," because Centene had known for months

that the California Substance Abuse Policies suffered from severe shortfalls in reserves and that

the California PPO's flawed product policy design was "obvious" to Centene internally at the time.

### B.   Financial Statements

#### 1.   Defendants' Responsibilities Under
GAAP And SEC Rules And Regulations

95.     Generally Accepted Accounting Principles ("GAAP") are the authoritative

standards, interpretations, rules, and underlying concepts established and relied on throughout the

United States as the best and most reliable financial reporting and accounting practices.   SEC

Regulation S-X, to which Centene (and Health Net, prior to its acquisition) is subject as a registrant

under the Exchange Act, provides that annual and interim financial statements[3] filed with the SEC

that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate,

regardless of accompanying disclosures.   *See* 17 C.F.R. § 210.4-01(a)(1) and § 210.10-01(a)

(regarding annual and interim financial statements, respectively).   The SEC recognizes the

financial reporting and accounting standards of the Financial Accounting Standards Board

("FASB") as GAAP.   *See* SEC Release Nos. 33-8221, 34-47743, and FR-70.   SEC Rule 12b-20

requires that periodic reports contain such information as is necessary to make the required

statements, in light of the circumstances under which they are made, not misleading.

96.     "Management is responsible for adopting sound accounting policies and for

establishing and maintaining internal control," and "[t]he fair presentation of financial statements

in conformity with generally accepted accounting principles is an implicit and integral part of

management's responsibility."   Public Company Accounting Oversight Board Auditing Standard

---

[3] "The term 'financial statements' as used in this part shall be deemed to include all notes to the statements and all related schedules."   *See* SEC Regulation S-X, Article 1, Rule 1-01(b), Application of Regulation S-X.

No. 1, AU § 110.03, Distinction between Responsibilities of Auditor and Management; *see also* Sarbanes-Oxley Act of 2002, §§ 302, 401, and 404.

97.     FASB Accounting Standards Codification 805 ("ASC 805") governs business combinations under GAAP.  ASC 805 requires that an acquirer value acquired assets and liabilities at "fair value as of the acquisition date."  Such reporting informs investors of the acquired business's worth.

98.     In certain circumstances, ASC 805 permits companies to publish preliminary estimates of certain assets and liabilities of an acquired company, then later revise those estimates "as of" the acquisition date to account for "new information obtained about facts and circumstances that existed as of the acquisition date that, if known, would have affected the measurement of the amounts recognized as of that date." ASC 805-10-25-13.  ASC 805 makes clear that such revisions are only available for "new information" that was not known by the acquirer as of the acquisition date. *See id.*; ASC 805-10-25-16; ASC 805-10-55-16.

99.     Such post-acquisition revisions allow for favorable accounting of acquired liabilities.  Post-acquisition increases in acquired liabilities "as of" the acquisition date do ***not*** directly impact the company's income statement in the post-acquisition accounting period; instead, the company records the increased liabilities by means of an increase in the acquired company's "goodwill."  *See* ASC 805-10-25-16.  A company attempting to hide liabilities acquired in an acquisition may thus attempt to use such acquisition accounting by reporting artificially low liabilities at the time of acquisition, then later accounting for the true liabilities by adjusting reported "goodwill."  Such accounting tactics distort a company's balance sheet and understate a company's financial obligations as the company underreports liabilities at the time of acquisition.

100.    ASC 805 does not permit such tactics, however. It imposes a strict prerequisite on any company using acquisition accounting that, in order to later account for material increased liabilities "as of" the acquisition date by adjusting "goodwill," the company must provide adequate notice.  ASC 805-20-50-4A, entitled "Disclosure," states that when an acquirer provides initial accounting estimates "as of" the time of the acquisition, "the acquirer shall disclose . . . [t]he assets, liabilities, equity interests, or items of consideration for which the initial accounting is incomplete."  Such revisions can be made only for "***particular*** assets, liabilities, noncontrolling interests, or items of consideration" that are so identified.  *Id.*  Because "goodwill" revisions under ASC 805 are available only for initial accounting estimates that specify the "particular" assets, liabilities, interests, or items that may be revised, ASC 805 provides readers of the financial statements notice as to which accounting estimates may be revised, and thus, by exclusion, which accounting estimates as of the acquisition date are not subject to change.  *See also* ASC 805-10-55-29 (requiring "[i]n accordance with paragraph 805-20-50-4A" that the acquirer make specific disclosures as to particular asset classes of "property, plant, and equipment").

101.    As the SEC has made clear in public comment letters, under ASC 805-20-50-4A, preliminary accounting statements must specify "on an item by item basis" the "specific" assets or liabilities "that remain preliminary and what the[y] . . . relate to," as well as "provide summarized disclosures that discuss the potential impact of changes in the preliminary purchase price allocations to the acquired assets and liabilities assumed from th[e] acquisition."  SEC Comment Letter to Stericycle Inc. dated June 13, 2016 ("SEC Stericycle Letter") (citing ASC 805-20-50-4A).  Similarly required is a statement of the "nature of any assets or liabilities that may ultimately be recorded as part of the purchase price allocation that [the Company is] aware of and [is] currently evaluating but waiting on additional information."  *Id.*  The SEC has repeatedly noted

these basic requirements, including that such financial statements should include "item by item" explanations.  SEC Comment Letter to Olin Corporation dated March 28, 2016 ("SEC Olin Letter") (citing ASC 805-20-50-4A).  The SEC's Financial Reporting Manual further states that "[i]f the [company] is awaiting additional information that may impact the measurement of a contingency of the acquired company," then "[i]n this circumstance, the registrant should:

1.  Describe clearly the nature of the contingency;
2.  Discuss the reasons why the allocation is preliminary/provisional (e.g., identify the information that the registrant has arranged to obtain);
3.  Indicate when the allocation is expected to be finalized; and
4.  Furnish other available information which will enable a reader to understand the magnitude of any potential adjustment.

SEC Financial Reporting Manual, Division of Corporation Finance.  The SEC Reporting Manual concludes that "[i]n the absence of such disclosure, investors may assume reasonably that the purchase price allocation is final and that all future revisions of estimated fair values of assets and liabilities acquired will be reflected in income."

102.     Further strict notice requirements of ASC 805 also apply.  ASC 805-20-50-4A also requires that acquirers reporting initial estimates must disclose "[t]he reasons why the initial accounting is incomplete" for the particular assets or liabilities at issue.  The reasons must be specific to the assets or liabilities for which the initial accounting is incomplete.  *See* ASC 805-10-55-29 (requiring disclosure "[i]n accordance with paragraph 805-20-50-4A" that initial accounting is preliminary "because the appraisal of property, plant, and equipment has not yet been received").  The SEC has repeatedly emphasized the importance of these provisions to securities issuers.  *See* SEC Stericycle Letter ("Your disclosures should include the reasons the accounting is incomplete and a discussion of the information precluding the accounting from being complete on an item by item basis."); SEC Olin Letter (same).

103.    Additional accounting rules required that Centene's reported financial statements be accurate and up to date.  ASC 954-450-30-4, *Health Care Entities, Contingencies, Initial Measurement*, states that "[l]osses under prepaid health care services contracts shall be recognized when it is probable that expected future health care costs and maintenance costs under a group of existing contracts will exceed anticipated future premiums and stop-loss insurance recoveries on those contracts."   ASC 954-450-35-1, *Health Care Entities, Contingencies, Subsequent Measurement*, states that "[e]stimated losses are reviewed and changed, if necessary, at each reporting date.  The amounts of the changes are recognized currently as additional expense or as a reduction of expense."

104.    Fundamental accounting principles and concepts underlying GAAP also required that Centene's financial statements be accurate and up to date, including:

- The principle that financial reporting should provide information about an enterprise's economic resources and future cash flows, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources, because investors and creditors depend on information about past performance to help develop and assess expectations about the enterprise's future performance.  Statement of Financial Accounting Concepts No. 8, *Conceptual Framework for Financial Reporting* ("SFAC 8") ¶¶OB16, 18;

- The principle that financial reporting should provide information that is useful to present and potential investors and creditors and others in making rational investment, credit and similar decisions.  SFAC 8, ¶BC1.25;

- The principle that to be useful, financial reporting should be relevant, timely and provide faithful representation of the underlying facts.  "Timeliness means having information available to decision makers in time to be capable of influencing their decisions."  SFAC 8 ¶QC29.  "To be useful, financial information not only must represent relevant phenomena, but it must also faithfully represent the phenomena that it purports to represent."  *Id.* ¶QC12; and

- The principle of completeness: "A complete depiction includes all information necessary for a user to understand the phenomenon being depicted, including all necessary descriptions and explanations. . . .  For some items, a complete depiction also may entail explanations of significant

facts about the quality and nature of the items, factors and circumstances that might affect their quality and nature, and the process used to determine the numerical depiction."  SFAC 8, ¶¶QC13.

105.    In addition to the specific rules and principles under GAAP, SEC regulations require that certain disclosures supplement a company's quarterly and annual financial statements to help investors better understand a company's financial condition.  SEC Regulation S-K, Item 303(b), *Interim Periods* (17 C.F.R. § 229.303), requires registrants to include a management's discussion and analysis in all interim period financial statements filed with the SEC, "so as to enable the reader to assess material changes in financial condition and results of operations" for the most recent quarter and year-to-date periods for both the current and prior year.  SEC Regulation S-K, Item 303, required that Centene:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  If the registrant knows of events that will cause a material change in the relationship between costs and revenues (such as known future increases in costs of labor or materials or price increases or inventory adjustments), the change in the relationship shall be disclosed.[4]

106.    The Instructions to Item 303 state that company financial statements "shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results or of future financial condition."  SEC Guidance No. 36, Management's Discussion and Analysis of Financial Condition and Results of Operations ("FR 36"), makes clear that disclosure is required for "known uncertaint[ies] reasonably likely to have material future effects on [the company's] financial condition."  Item 303 "give[s] investors an opportunity to look at the [company] through the eyes

---

[4] 17 C.F.R. § 229.303(a)(3)(ii).

of management by providing a historical and prospective analysis of the [company]'s financial condition and results of operations, with particular emphasis on the registrant's prospects for the future."

107.    SEC Release 33-8040, Cautionary Advice Regarding Disclosure about Critical Accounting Policies (codified as FRR.T.501.14), instructs registrants to comply with Regulation S-K, Item 303(a), Management's Discussion and Analysis of Financial Condition and Results of Operations.  When estimates are susceptible to material change, the company must discuss not just the possibility that its estimates may turn out differently, but also (i) the factors that may cause different outcomes, and (ii) the potential amount of variability in its significant estimates: "Companies should provide quantitative as well as qualitative disclosure when quantitative information is reasonably available and will provide material information for investors."  SEC Release 33-8350.

### 2.    Defendants' False And Misleading Financial Statements

108.    On April 26, 2016, Defendants filed a Form 10-Q with the SEC.  In the Form 10-Q, Defendants stated that the purported "fair value" of certain Health Net liabilities that Centene acquired in the merger were as follows as of March 24, 2016:

| Medical claims liability | $1.37 billion |
| Accounts payable and accrued expenses | $1.928 billion |
| Total liabilities assumed | $5.277 billion |
| Total identifiable net assets | $1.678 billion |

109.    Defendants' statements in the Form 10-Q, identified above in ¶108, were false and misleading.  On July 26, 2016, Centene admitted that the valuations reported on April 26, 2016 were false, and reported the following "fair value" of certain Health Net liabilities that Centene

acquired in the merger as of March 24, 2016:

| Medical claims liability | $1.462 billion |
|---|---|
| Accounts payable and accrued expenses | $2.030 billion |
| Total liabilities assumed | $5.488 billion |
| Total identifiable net assets | $1.433 billion |

In addition, Defendants admitted that the revised, increased liability figures were not based on "new information," but instead were based on plan deficiencies and increased liabilities that were known to Defendants before the merger closed. *See* ¶¶66-72, 76-79. Defendants also failed to provide the notice required under GAAP for future material revisions to preliminary estimates under acquisition accounting. *See* ¶¶100-02. For example, Defendants did not specify the "particular" assets and liabilities subject to revision or "the reasons why" the initial accounting was incomplete. *See id.* For these reasons, GAAP acquisition accounting under ASC 805 was unavailable to Defendants for the changes made on July 26, 2016.

110. Defendants' financial statements on April 26, 2016 also omitted the required disclosures of "known trends or uncertainties" and "known uncertainties reasonably likely to have material future effects on the Company's financial condition." *See* ¶¶105-07. Defendants further omitted Health Net's material increased liabilities on its California Substance Abuse Policies, as well as the remedial measures that Health Net took to stall its payments to substance abuse treatment facilities and the efforts to re-design the flawed PPO product design. *See* ¶¶19-35, 72; *see also* ¶¶76-79. Defendants' various omissions and misrepresentations violated Item 303, ASC 805, ASC 954-450-30-4, ASC 954-450-35-1, and SFAC 8. *See* ¶¶95-107.

## VI.   ADDITIONAL ALLEGATIONS OF DEFENDANTS' SCIENTER

111. Numerous facts in addition to those discussed above further support a strong inference that Defendants knew, or were severely reckless in disregarding, the omitted facts about

51

Health Net's liabilities, when making the false and misleading statements identified above.

112. *Defendants admitted their knowledge of Health Net's rising liabilities and the efforts to control costs.* During the Class Period, Defendants attempted to "mitigate any concerns [investors] have regarding Health Net's reserves prior to the March 24[, 2016] closing date" and stated that there were "no surprises" during the regulatory process in California. As Defendants later admitted, at the same time that Defendants made these statements and omitted the known issues with Health Net's policies, including Health Net's poorly designed California policies, Defendants knew of the issues, "spent . . . a lot of time confirming the medical costs," and "all of th[e] products" that related to the PDR, including the California PPO, "were all losing money in 2015." *See* ¶¶78-79. Defendants admitted that they "personally" worked with regulators to re-design costly policies, and that Centene had been working on the plan design "for the past several months." *See* ¶72.

113. *Defendants engaged in extensive due diligence on Health Net leading up to the Class Period.* Defendants' due diligence of Health Net began before the July 2, 2015 merger announcement and continued in the months leading up to the March 24, 2016 merger closing. Defendant Neidorff, who was a member of Centene's Board of Directors, discussed and reviewed Centene's due diligence on June 23, 2015 and June 30, 2015. *See* ¶¶25-26. On July 1, 2015, Evercore presented a financial analysis of Health Net to Centene's Board. *Id.* Neidorff also stressed Centene's "disciplined approach" to the merger and that Centene would not consummate the merger unless Health Net "meet[s] [Centene's] financial criteria." *See* ¶28. Defendants further emphasized that Centene's integration with Health Net spanned numerous months after the initial due diligence, highlighting the integration during the "nine months" that elapsed between the merger announcement and its closing. *See* ¶54. Centene's review of Health Net's business and

financial information led to the July 26, 2016 disclosures, and Defendants' extensive due diligence further raises a strong inference of their scienter.

114.     *Defendants were focused on Health Net's California policies.*     Defendants repeatedly emphasized the importance of Centene's policies in California as a motivation for the merger.  *E.g.*, ¶¶42-48.  In the Company press release announcing the merger on July 2, 2015, Defendant Neidorff highlighted "Health Net's presence in California," and on July 14, 2015, Defendants filed with the SEC a presentation noting Health Net's "deeper penetration in California" as the merger's first "growth driver."  *See* ¶¶27, 29.  Given that the overwhelming majority of Health Net policies were in California, Neidorff characterized Health Net as "Centene's California health plan."   ¶56.   Defendants worked with California regulators "personally" on re-designing the California policies to cut costs.  ¶72.  During the Class Period, Defendants further stated that Centene was focused on the margins on Health Net's California policies, as "we have a big focus in California in margins on both the individual and group commercial business" and Centene was focused on the "individual PPO product in California." ¶61.  As Defendants later disclosed, $215 million of the $390 million in Health Net liabilities recognized on July 26, 2016 was due to increased liabilities on the California policies.  ¶¶66-67. Defendants' focus on Health Net's California policies before and during the Class Period further raises a strong inference of their scienter.

115.     *Defendants frequently updated their assessment of policy liabilities.*     Centene's financial reports filed with the SEC show that the Company frequently updated its accounting for policy reserves.  For instance, the Company's Form 10-K filed with the SEC on February 22, 2016, stated that the Company developed medical claims liability figures in "a continuous process which [the Company] monitor[s] and refine[s] on a monthly basis as [additional] claims receipts and

payment information becomes available."   Defendant Schwaneke similarly stated during the June 17, 2016 Investor Day that "[o]n a monthly basis, Centene's finance team has been reviewing and monitoring the medical claims reserves and development."   ¶58.   Regarding "how much information [Defendants] had" about Health Net's liabilities, Schwaneke also stated that roughly two months after a merger, an acquiring company has "paid 85% of the claims that you ultimately think you're going to pay" and "[i]n three months, it's over 90%."   ¶62.   Despite Defendants' access to and analysis of such recent claims data, Defendants continued to understate the liabilities that Centene assumed in the merger.   Defendants frequently updated analyses of Health Net's policy liabilities further raise a strong inference of their scienter.

116.   *Defendants spoke repeatedly about the purported adequacy of the Health Net reserves, and their focus on Health Net's "opening balance sheet."*   On several occasions during the Class Period, Defendants Neidorff and Schwaneke discussed the supposed adequacy of the reserves and liabilities reported for Health Net's business.   Defendant Schwaneke stated that Defendants were "focused on [the] opening balance sheet and what we acquired."   ¶64.   In an effort to "mitigate any concerns . . . regarding Health Net's reserves," Defendants Neidorff and Schwaneke made a series of statements highlighting "the adequacy of medical claims reserves" and the Company's "detailed reserve calculations by market and product that are reviewed by multiple levels within the finance department."   ¶¶56-65.   Defendants also claimed during the Class Period that reserve levels "have developed favorably," that "there has been no unfavorable development on the acquired Health Net medical reserves," and that "we haven't seen any unfavorable development."   *Id.*   Defendants knew, or were severely reckless in not knowing, the truth about Health Net's deficient reserves and increasing liabilities.

117.     *Defendants knew that investor and analyst attention was focused on the Health Net acquisition and Health Net's reserve levels.*  During the Class Period, securities analysts repeatedly asked Defendants about the adequacy of the reserves established for Health Net's policies, and whether there had been any unfavorable development on the policies.  For instance, on May 24, 2016, analyst A.J. Rice from UBS told Defendant Neidorff that the Health Net deal was "very much front and center still on a lot of investors' minds" and asked about the integration of Health Net into Centene's balance sheet.  During the Company's Investor Day in June 2016, analysts asked numerous questions about the Health Net reserves, and Christine Arnold from Cowan and Company said that she was "sorry to beat up on it, but it's something that's really on people's minds."  ¶63.  She asked whether Defendants' statements that there had been no negative development on the Health Net reserves was "related to both the first quarter and 2015?  Or how did 2015 develop?"  *Id.*  Defendants again omitted the known reserve issues and increased liabilities.  Given the intense interest from analysts, the Individual Defendants were well aware that the market was heavily relying on the accuracy of their statements.

118.     *Defendants were motivated to conceal the truth from California regulators while seeking approval for the merger.*  At the same time that Health Net reacted to rising costs for claims related to substance abuse treatment facilities by refusing to pay such claims, Defendants and Health Net failed to inform California regulators of such actions during the ongoing discussions with the California regulators.  Full and accurate disclosures of these issues, and the related financial impacts, would have risked action by the regulators to delay or deny their approval of the merger, or to extract additional conditions from Centene.  *See* ¶¶31-35, 42-47.

## VII.   LOSS CAUSATION

119.     Defendants' materially false and misleading statements and omissions artificially inflated the price of Centene common stock and maintained inflation in the stock price.  The

disclosures on July 26, 2016 revealed the relevant truth and removed the artificial inflation from the stock price.

120.   On July 26, 2016, Defendants disclosed that the "fair value" of Health Net's liabilities was far higher than Centene had reported on April 26, 2016.  Defendants reported increased reserves of $390 million based on experience and cost trends "existing prior to the acquisition date" and admitted that they "knew" of the needed reserves before the merger as "it was prior to the 24th [of March] when those things were set."  Defendants further explained that reserve increases were due to deficient insurance policy "plan design" and that Defendant Neidorff had "personally been involved in and pushing and discussing" changes to the policy plan design, as Centene had been "working with the states at the highest levels to redesign the PPO product" for "the past several months."

121.   The Company's disclosures caused Centene's stock price to decline.  On July 26, 2016, the stock price declined by $6.39 per share, or approximately 8.5%, erasing over $1 billion in market value on high trading volume.

## VIII.   PRESUMPTION OF RELIANCE

122.   At all relevant times, the market for Centene's common stock was efficient for the following reasons, among others:

(a)   Centene's stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange, a highly efficient and automated market;

(b)   As a regulated issuer, Centene filed periodic reports with the SEC and the New York Stock Exchange;

(c)   Centene regularly communicated with public investors via established market communication mechanisms, including through regular

56

dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Centene was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public market place.

123.    As a result of the foregoing, the market for Centene's common stock reasonably and promptly digested current information regarding Centene from all publicly available sources and reflected such information in the price of Centene's common stock. All purchasers of Centene's common stock during the Class Period suffered similar injury through their purchase of Centene's common stock at artificially inflated prices, and a presumption of reliance applies.

124.    A Class-wide presumption of reliance is also appropriate in this action under the United States Supreme Court holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the claims asserted herein against Defendants are predicated upon omissions of material fact for which there is a duty to disclose.

## IX.     INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

125.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint. The statutory safe harbor does not apply to statements "included in a financial statement prepared in accordance with generally accepted accounting principles." 15 U.S.C. § 78u-5. Moreover, none of the statements complained of herein was a

forward-looking statement.  Rather, they were historical statements or statements of purportedly current facts and conditions at the time the statements were made.

126.    To the extent that any of the false and misleading statements alleged herein can be construed as forward-looking, those statements were not accompanied by meaningful cautionary language identifying important facts that could cause actual results to differ materially from those in the statements.  Then-existing facts contradicted Defendants' statements regarding the financial condition of Health Net and related insurance reserves.  Given the then-existing facts contradicting Defendants' statements, any generalized risk disclosures made by the Company were not sufficient to insulate Defendants from liability for their materially false and misleading statements and omissions.

127.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the particular speaker knew that the particular forward-looking statement was false, and the false forward-looking statement was authorized and approved by an executive officer of Centene who knew that the statement was false when made.

## X.    CLASS ACTION ALLEGATIONS

128.    Lead Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased the common stock of Centene during the Class Period (the "Class").  Excluded from the Class are (i) Defendants; (ii) members of the immediate family of each Individual Defendant; (iii) any person who was an officer or director of Centene; (iv) any firm or entity in which any Defendant has or had a controlling interest; (v) any person who participated in the wrongdoing alleged; (vi) Defendants' liability insurance carriers; (vii) any affiliates, parents, or subsidiaries of Centene; (viii) all Centene plans that are

covered by ERISA; and (ix) the legal representatives, agents, affiliates, heirs, beneficiaries, successors-in-interest, or assigns of any excluded person or entity, in their respective capacity as such.

129.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Centene shares were actively traded on the New York Stock Exchange.  Throughout the Class Period, there were approximately 170.5 million shares of Centene stock outstanding.   While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds of thousands of members of the proposed Class.  Class members who purchased Centene common stock may be identified from records maintained by Centene or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

130.    Lead Plaintiff's claims are typical of Class members' claims, as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal laws as complained of herein.

131.    Lead Plaintiff will fairly and adequately protect Class members' interests and has retained competent counsel experienced in class actions and securities litigation.

132.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members.  Among the questions of fact and law common to the Class are:

> (a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

      (b)    whether Defendants made statements to the investing public during the Class Period that were false, misleading or omitted material facts;

      (c)    whether Defendants acted with scienter; and

      (d)    the proper way to measure damages.

133. A class action is superior to all other available methods for the fair and efficient adjudication of this action because joinder of all Class members is impracticable. Additionally, the damage suffered by some individual Class members may be relatively small so that the burden and expense of individual litigation make it impossible for such members to individually redress the wrong done to them. There will be no difficulty in the management of this action as a class action.

## XI. <u>CLAIMS FOR RELIEF</u>

**COUNT I**

**For Violations Of Section 10(b) Of The Exchange Act And
SEC Rule 10b-5 Promulgated Thereunder
<u>(Against All Defendants)</u>**

134. Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

135. This Count is asserted on behalf of all members of the Class against Defendants Centene, Neidorff, and Schwaneke for violations of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

136. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew were, or they deliberately disregarded as, misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

137.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Centene common stock during the Class Period.

138.    Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Lead Plaintiff and the Class; made various untrue and/or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Centene common stock, which were intended to, and did: (a) deceive the investing public, including Lead Plaintiff and the Class, regarding, among other things, the financial condition of Health Net and related insurance reserves; (b) artificially inflate and maintain the market price of Centene common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase Centene common stock at artificially inflated prices and suffer losses when the true facts became known.

139.    Defendants Centene, Neidorff, and Schwaneke are liable for all materially false and misleading statements made during the Class Period, as alleged above.

140.    As described above, Defendants acted with scienter throughout the Class Period, in

that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness. The misrepresentations and omissions of material facts set forth herein, which presented a danger of misleading buyers or sellers of Centene stock, were either known to the Defendants or were so obvious that the Defendants should have been aware of them.

141.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Centene common stock, which inflation was removed from its price when the true facts became known.  Lead Plaintiff and the Class would not have purchased Centene common stock at the prices they paid, or at all, if they had been aware that the market price had been artificially and falsely inflated by these Defendants' misleading statements.

142.    As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiff and the other members of the Class suffered damages attributable to the material misstatements and omissions alleged herein in connection with their purchases of Centene common stock during the Class Period.

## COUNT II

### For Violations Of Section 20(a) Of The Exchange Act
### (Against Defendants Neidorff and Schwaneke)

143.    Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

144.    This Count is asserted on behalf of all members of the Class against Defendants Neidorff and Schwaneke for violations of Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a).

145.    During their tenures as officers and/or directors of Centene, each of these Defendants was a controlling person of the Company within the meaning of Section 20(a) of the Exchange Act.  *See* ¶¶16-18.  By reason of their positions of control and authority as officers and/or

directors of Centene, these Defendants had the power and authority to direct the management and activities of the Company and its employees, and to cause the Company to engage in the wrongful conduct complained of herein.  These Defendants were able to and did control, directly and indirectly, the content of the public statements made by Centene during the Class Period, including its materially misleading financial statements, thereby causing the dissemination of the false and misleading statements and omissions of material facts as alleged herein.

146.    In their capacities as senior corporate officers of the Company, and as more fully described above in ¶¶16-18, Defendants Neidorff and Schwaneke had direct involvement in the day-to-day operations of the Company, in reviewing and managing its regulatory and legal compliance, and in its reporting functions.  Defendants Neidorff and Schwaneke signed the Company's SEC filings during the Class Period, and were directly involved in providing false information and certifying and approving the false statements disseminated by Centene during the Class Period.  As a result of the foregoing, Defendants Neidorff and Schwaneke, as a group and individually, were controlling persons of Centene within the meaning of Section 20(a) of the Exchange Act.

147.    As set forth above, Centene violated Section 10(b) of the Exchange Act by its acts and omissions as alleged in this Complaint.

148.    By virtue of their positions as controlling persons of Centene and as a result of their own aforementioned conduct, Defendants Neidorff and Schwaneke are liable pursuant to Section 20(a) of the Exchange Act, jointly and severally with, and to the same extent as, the Company is liable under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, to Lead Plaintiff and the other members of the Class who purchased or otherwise acquired Centene securities.  As detailed above, during the respective times these Defendants served as officers

and/or directors of Centene, each of these Defendants was culpable for the material misstatements and omissions made by Centene.

149.    As a direct and proximate result of these Defendants' conduct, Lead Plaintiff and the other members of the Class suffered damages in connection with their purchase or acquisition of Centene common stock.

## XII.    PRAYER FOR RELIEF

150.    WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

(a)    Declaring the action to be a proper class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

(b)    Awarding all damages and other remedies available under the Exchange Act in favor of Lead Plaintiff and all members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

(c)    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

(d)    Such other and further relief as the Court may deem just and proper.

## XIII.   JURY DEMAND

151.    Lead Plaintiff demands a trial by jury.

Dated:  July 17, 2017                        Respectfully submitted,

                                             /s/ David R. Stickney
                                             _____

                                             **BERNSTEIN LITOWITZ BERGER**
                                                **& GROSSMANN LLP**
                                             David R. Stickney (*pro hac vice*)
                                             (Bar No. 188574CA)
                                             davids@blbglaw.com
                                             Brandon Marsh (*pro hac vice*)
                                             (Bar No. 268316CA)
                                             brandon.marsh@blbglaw.com
                                             Julia E. Johnson (*pro hac vice pending*)

(Bar No. 315625CA)
Julia.Johnson@blbglaw.com
12481 High Bluff Drive, Suite 300
San Diego, CA 92130
Tel: (858) 793-0700
Fax: (858) 793-0323

*Counsel for Lead Plaintiff Louisiana Sheriffs'
Pension & Relief Fund and Lead Counsel for the
Class*


**CUNEO GILBERT & LADUCA, LLP**
Michael J. Flannery (Bar No. 52714MO)
mflannery@cuneolaw.com
7733 Forsyth Boulevard, Suite 1675
Clayton, MO 63105
Tel: (202) 2789-3960
Fax: (202) 789-1813

*Liaison Counsel for Lead Plaintiff Louisiana
Sheriffs' Pension & Relief Fund*

## CERTIFICATE OF SERVICE

I hereby certify that on the 17th day of July 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing to the registered participants as identified on the Notice of Electronic Filing.


*/s/ David R. Stickney*
 David R. Stickney