<pre>
 1              UNITED STATES DISTRICT COURT FOR THE
      EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION, ST. LOUIS
 2

 3   ISRAEL SANCHEZ,                     )
                                         )
 4                   Plaintiff,          )
                                         )
 5   v.                                  )   No. 4:17-CV-00806-AGF
                                         )
 6   CENTENE CORP. ET AL,                )
                                         )
 7                   Defendant.          )

 8

 9                         ORAL ARGUMENT

10
             BEFORE THE HONORABLE AUDREY G. FLEISSIG
11                  UNITED STATES DISTRICT JUDGE

12                       FEBRUARY 22, 2018

13   APPEARANCES:

14   For Plaintiff:        Joseph P. Conran
                           HUSCH BLACKWELL, LLP
15                         190 Carondelet Plaza, Ste. 600
                           St. Louis, MO 63105
16
                           Peter Bradley Morrison
17                         SKADDEN ARPS SLATE MEAGHER & FLOM
                           300 S. Grand Ave., Ste. 3400
18                         Los Angeles, CA 90071

19   For Defendant:        Brandon Marsh
                           BERNSTEIN LITOWITZ BERGER
20                         12481 High Bluff Dr., Ste. 300
                           San Diego, CA 92130
21
     REPORTED BY:          PATTI DUNN WECKE, RMR, CRR, CMRS
22                         Official Court Reporter
                           United States District Court
23                         111 S. Tenth Street
                           St. Louis, MO 63102
24                         314-244-7984

25      PRODUCED BY COURT REPORTER COMPUTER-AIDED TRANSCRIPTION
</pre>

1     (THE FOLLOWING PROCEEDINGS WERE HAD ON FEBRUARY

2  22, 2018, AT APPROXIMATELY 1:45 P.M., IN OPEN COURT:)

3     THE COURT:  We are here in the matter of Israel

4  Sanchez v. Centene Corp et al.  It is Case No.

5  4:17CV806-AGF.  And do we have folks here on the telephone

6  today or is everyone here present in the courtroom?

7     MR. CONRAN:  Everyone is here present.

8     THE COURT:  All right.  On behalf of the

9  plaintiffs, can you tell me who is arguing here on behalf

10  of plaintiffs today?

11     MR. MARSH:  That will be me, Brandon Marsh.

12     THE COURT:  All right.  And on behalf of the

13  defendants?

14     MR. CONRAN:  Your Honor, Peter Morrison is here

15  and will do the argument here today.

16     MR. MORRISON:  Good afternoon, Your Honor.

17     THE COURT:  And you are here on behalf of all

18  defendants today?

19     MR. MORRISON:  Yes, I am.

20     THE COURT:  So this matter is scheduled before

21  the Court today on the motion to dismiss that was filed by

22  the defendants in this matter.  The parties -- we have the

23  briefing that has been done by the parties, including a

24  brief in opposition as well as a reply brief filed by the

25  defendants, and I don't remember who but somebody requested

1    oral arguments, and that is what we are here for today.  I

2    don't know how long you all anticipated you would have for

3    oral argument, and I apologize to you, normally I put a

4    time frame in the order, but I just went and looked at my

5    order and I didn't do that this time.  So, shame on me, but

6    I'm assuming for each party we are talking about fifteen to

7    twenty minutes.  Is that what you all were anticipating?

8    I'm sure you didn't anticipate you would have all

9    afternoon.

10            MR. MORRISON:  I was anticipating 20 minutes.

11            THE COURT:  So, if I give each side approximately

12   20 minutes, is that going to take care of everyone?

13            MR. MARSH:  That should be fine.

14            THE COURT:  All right.  So, we should begin first

15   with the defendants since they are the movant here.

16            Sorry we are so late.  Everything was just kind

17   of running over today.

18            MR. MORRISON:  Not a problem, Your Honor.

19            THE COURT:  You may proceed.

20            MR. MORRISON:  Good afternoon, Your Honor.

21   Peter Morrison with Skadden Arps on behalf of the

22   defendants.  Thank you for having us in your courtroom this

23   afternoon.  I thought I would start with the big picture,

24   Your Honor, because it's important for this particular

25   matter.  As Your Honor knows, this case arises out of

1  Centene's $6.8 billion acquisition.  Plaintiffs theory of

2  fraud here is that Centene did a purchase price accounting

3  after the acquisition, in which it fair valued Health Net's

4  assets and liabilities and published preliminary estimates

5  after the first quarter of 2016.

6        It continued its valuation work and then

7  published updated estimates after the second quarter of

8  2016 in which it increased its liabilities.  There was a

9  stock price movement following that second quarter

10 announcement.

11       From that, Your Honor, plaintiffs now claim that

12 the first quarter estimates must have been false because of

13 the second quarter update as well as any statement in

14 between the first and second quarters in connection with

15 the purchase price accounting, and the fair value estimate

16 of liabilities estimates.

17       In considering that theory, Your Honor, the

18 Supreme Court and the Eighth Circuit mandate that the Court

19 consider competing inferences in connection with

20 considering a securities fraud case.  That's rare because

21 it's not known as a pleading standard, Your Honor.  The

22 Court actually has to consider both inferences in favor of

23 fraud as well as inferences in favor of the defendants that

24 are innocent explanations for what's happened.

25       As the Eighth Circuit has said, Your Honor,

1  weighing competing inferences, quote, is an inquiry that

2  must be made in the pleading stage because it has been

3  mandated by Congress and, Your Honor, yourself in the K-V

4  Pharmaceuticals case has said, quote, in determining

5  whether the pleaded facts give rise to a strong inference

6  of scienter, the Court must take into account plausible

7  opposing inferences.  A complaint will survive only if a

8  reasonable person would deem the inference of scienter

9  cogent, and at least as compelling as any opposing

10 inference one can draw from the fact alleged.

11          I submit to you, Your Honor, in weighing these

12 competing inferences, plaintiffs' theory of this case

13 simply makes no sense.  What they would have the Court

14 believe, Your Honor, is that Centene deliberately overpaid

15 for Health Net, secretly knowing that it was not as

16 valuable as advertised, only to reveal the truth, quote/

17 unquote, and admit quote/unquote, the fraud one quarter

18 later.

19          Worse, Your Honor, they don't allege any motive

20 for why Centene would do that.  Why would Centene

21 deliberately overpay for Health Net, Your Honor, lie about

22 it and not take advantage of the fraud.  It simply makes no

23 sense.  The opposing inference is far more compelling.

24 Plaintiffs' own allegations create a far more compelling

25 inference for the defendants.  Centene simply engaged in a

1  complex accounting for a $6.8 billion merger and regularly

2  updated the market on its estimates as it completed more

3  of its valuation.

4        Now, Your Honor, given that their theory makes

5  very little sense, and the opposing inference is far more

6  compelling, it should come as no surprise, Your Honor, that

7  this case has none of the hallmarks of a securities fraud.

8  None.

9        First, Your Honor, the stock price after the

10  alleged corrected disclosure, remained higher than

11  virtually -- than the stock price on virtually all of the

12  days of the class period up to the very end.

13        THE COURT:  I'm sorry.  Step back and tell me --

14  I just missed something that you said.

15        MR. MORRISON:  The stock price, Your Honor, it

16  didn't drop all the way below all of the prices during the

17  class period.  The price even after the alleged corrected

18  disclosure was above the majority of the stock prices on

19  the days of the class period, indicating there's been no

20  disaster here.

21        In fact today, Your Honor, Centene stock price

22  trades over a hundred dollars a share, which is way more

23  than the sixty and seventy dollars per share we were

24  talking about during this period of time.

25        In fact, in the second quarter, Your Honor --

1        THE COURT:  But there was an immediate drop.

2        MR. MORRISON:  There was an immediate drop.  It

3   came back and it's still above the majority of the class

4   period prices which we think is indicative.

5        For that quarter, the second quarter, Your Honor,

6   and again this is weighing inferences, Centene beat

7   consensus estimates by two cents.  It had a great quarter.

8   There's been no restatement of earnings here.  There's no

9   SEC investigation.  There's no qualified audit opinion.

10  There's no allegation that auditors refused to sign off on

11  financials.  There's no allegations of insider trading or

12  any elicit motives.  There's no confidential witnesses in

13  the complaint.  There's no whistle blowers in the

14  complaint.  There's no allegations of any contemporaneous

15  internal meetings, internal documents, or any internal

16  information that contradicts plaintiffs' public statements

17  at the time.

18        Your Honor, the increase in the reserve, the

19  liability reserves that we're talking about don't even drop

20  down to the bottom line.  They don't even affect the income

21  statement.  It's just a charge against the balance sheet,

22  doesn't even affect dollars and cents.

23        So, Your Honor, there is just no hallmark here of

24  a securities fraud case, and as the Eighth Circuit

25  requires, when you weigh inferences that weighs heavily

1   against the finding of fraud at the pleading stage.  On the

2   flip side unfortunately --

3          THE COURT:  But haven't the plaintiffs alleged

4   that the defendants were attempting improperly to go and

5   allocate this to goodwill on the balance sheet?

6          MR. MORRISON:  They have alleged that there was a

7   GAAP violation.

8          THE COURT:  Right.

9          MR. MORRISON:  But their understanding is

10  incorrect.  What they are saying is, Your Honor, is that

11  under -- let me step back and explain how it works.

12         So, when you acquire a company Rule 805 requires

13  you to go through a purchase price accounting activity, and

14  as part of that you need to fair value both the assets and

15  the liabilities.  And what 805 says is when you come to the

16  end of quarter in which the transaction occurred, you are

17  obligated to put out interim or preliminary results of that

18  fair valuation exercise, even if you're not completed, and

19  805 says you have a full year to compete that process.

20         Centene put out its preliminary estimates at the

21  end of the first quarter.  When it did that it told the

22  market every which way from Sunday, that they were

23  preliminary, high level, incomplete because the merger

24  closed on March 24th, and the end of the quarter is only

25  eight days later.  It continued its work during the second

quarter.  At the end of the second quarter it then updated

its fair valuation of the assets and liabilities of Health

Net based on the continued valuation work it did during the

second quarter, just as it said it would.  And when it put

out its amended estimates at the end of the second quarter,

the liabilities were higher.

So what the plaintiffs are now saying is because

you increased your liabilities at the end of the second

quarter, you must have known that your liabilities during

the first quarter were false and misleading, because you

must have known as of April all the information you learned

between April and July.  That's classic fraud by hindsight.

Does that answer your question, Your Honor?

THE COURT:  Somewhat.

MR. MORRISON:  Here is how goodwill comes in.

What happens is when you do this fair valuation and when

you do this purchase price accounting, what happens is when

you create liability reserves it doesn't affect the bottom

line.  It doesn't affect the income statement.  It only

gets charged against goodwill, right?  That is a positive

fact for the company, Your Honor.  That doesn't give rise

to fraud.  And the reason is that by charging against

goodwill it only affects the balance statement and not the

income statement.  So, it doesn't drop to the bottom line.

It doesn't affect dollars and cents at all.  That's why --

 1   if their position is it's a bad thing to charges against

 2   goodwill as opposed to let it drop to the bottom line,

 3   that's just wrong.

 4           THE COURT:  I understood that that was part of

 5   the plaintiffs' argument and if I misunderstood, then

 6   plaintiffs obviously will correct me.

 7           MR. MORRISON:  Okay.  So, Your Honor, I began

 8   with competing inferences and how there are none of the

 9   hallmarks of a securities fraud case, no SEC investigation,

10   no restatement, no allegations of motive or opportunity,

11   none of that.

12           So when you compare competing inferences, clearly

13   that balancing weighs in favor of the defendants.  On the

14   flip side when you are considering whether this is a case

15   that the PSLRA, Private Securities Litigation Reform Act,

16   was intended to prohibit, unfortunately there are hallmarks

17   of that.  The one tiny motive allegation makes no sense,

18   and it's very telling of the flaws of the complaint which

19   I'll touch on in a little more detail.

20           Second, when they try to identify false

21   misleading statements, the plaintiffs cherry pick those

22   statements to create the illusion of a false statement when

23   there isn't one.  And I'm going to go through a few of

24   those.  And finally another hallmark is plaintiffs repeat

25   claims of a disputed material fact, rather than

1  substantively defend their position and that really infects
2  the entire pleading, Your Honor.

3        Let me give you one example which I think is
4  telling.  The one single motive allegation that they have
5  in the entire complaint, in other words the rationale for
6  why Centene would engage in this complex fraud allegedly is
7  because they say that Centene did this in order to convince
8  the regulators to approve the transaction.

9        Here is why that makes no sense and is very
10 telling of the weakness of the complaint, Your Honor.  The
11 transaction closed March 24th of 2016.  The first alleged
12 false misleading statement is April 26 of 2016.  It is an
13 extremely odd fraud, Your Honor, to lie in April to try to
14 close a transaction that it already closed thirty days
15 earlier.

16        The statements in April couldn't possibly affect
17 the closing of the transaction.  It had already closed.
18 So, the only motive allegation in their complaint makes no
19 sense.  It reveals the absurdity of this.

20        I want to make sure that I'm clear about that.
21 The first false misleading statement was alleged in April
22 of 2016.  The motive they said is they needed to get the
23 deal closed, that's why they would lie about Health Net's
24 liabilities, but the deal had already closed thirty days
25 earlier.  That couldn't possibly be a motive for the fraud.

1   And yet that's the only motive allegation that they have in

2   the entire complaint.  That illogic affects the entire

3   pleading, Your Honor, and given that, it should come as no

4   surprise that the complaint fails on at least two grounds.

5   One, they fail to plead a false misleading statement.  Two,

6   they fail to plea scienter, and I will take those in order.

7           With respect to false and misleading statements,

8   Your Honor, having read the cases you've issued I know you

9   are fully familiar with the pleading standards.  But as

10  Your Honor had recognized in the K-V Pharma case, the PSLRA

11  dictates special heightened pleading rules for securities

12  fraud cases.  And as you said, they are intended to

13  eliminate abusive securities litigation and put an end to

14  the practice of pleading fraud by hindsight.  In order to

15  meet the standard, Your Honor, as recognized in Cerner, the

16  Eighth Circuit case, the plaintiff must specify each

17  statement alleged to have been misleading.  The reason or

18  reasons why this statement is misleading and, quote, why

19  the alleged misstatements would have been false and

20  misleading at the time in which it is alleged they were

21  made.

22          And as Your Honor again said in the K-V Pharma

23  case, quote, pleadings falling short of the PSLRA's

24  heightened standard shall be dismissed.  There are three

25  buckets of false misleading statements, Your Honor, that

1  they allege in the complaint.  First, they say the

2  preliminary estimates in connection with the purchase price

3  accounting that were published at the end of the first

4  quarter on April 26th were false and misleading.

5        Second, they say that they were GAAP violations,

6  which we've talked about a little bit, and,

7        Third, they cherry picked certain qualitative

8  statements in April, May, and June of 2016.  And I would

9  address each of those three buckets, if I may.

10        With respect to the preliminary estimates in

11  April, their position is the preliminary estimates must

12  have been false because you updated those estimates in

13  July.  That's classic fraud by hindsight, Your Honor,

14  that's the very type of allegation that the Elam Court,

15  Eighth Circuit, rejected, and Elam coincidentally involved

16  Centene as well.  They don't allege a single fact that the

17  defendants knew, when they put out the preliminary

18  estimates in April, that contradicted what they put out in

19  April; not one.

20        No contemporaneous reports, no confidential

21  witnesses, no internal meetings about the supposedly true

22  value of those liabilities is discussed.  Nothing.  The

23  Eighth Circuit is clear in that circumstance, mere

24  allegations that statements in one report should have been

25  made in an earlier report, do not make out a claim of

1    securities fraud.  That's the K-tel case, Your Honor,

2    Eighth Circuit 2002.  That's all they are saying.

3          They are saying that because the statements in

4    July were not made in April, the April statements must have

5    been false.  That's nonsense.  In Elam, Your Honor, because

6    that's on all fours with this case, the Eighth Circuit case

7    in Elam involving Centene, the allegations in Elam were

8    that Centene would estimate certain liabilities toward the

9    end of a quarter, and the reason they did that was because

10    at times toward the end of a quarter services may have been

11    provided, but bills may not have been paid, so they needed

12    to estimate what their liabilities would be.

13          In the Elam case they did that.  Then one month

14    later they increased those estimates based on additional

15    work and information and a lawsuit ensued.  And they said,

16    well, your earlier statements must have been false because

17    thirty days later you updated those statements.  And the

18    Elam court affirmed the dismissal of the case, saying that

19    just because you update estimates based on new work here,

20    doesn't make the initial estimates false and misleading at

21    the time based on the information available at that time.

22    That's what Elam said and that is exactly this case.  What

23    they are trying to do is say because we updated our

24    estimates in July, our earlier estimates in April must have

25    been false.  That's on all fours with Elam, Your Honor.

1    Elam controls and is a reason to dismiss those first

2    statements.

3          In addition, Your Honor, plaintiffs would like

4    the Court to believe that the estimates put out in April

5    were the final purchase accounting estimates, as if no

6    other work had to be done.  We should have known in April

7    everything we needed to know to finalize our fair valuation

8    of assets and liabilities.  Except that's not what we told

9    the market, Your Honor, nobody could have been misled into

10   believing that, and here is why.  Look at what we said in

11   the 10Q from the first quarter when we put out our original

12   estimates, and this Exhibit 5 at page nine that we

13   submitted with our papers, Your Honor.  And I'm going to

14   quote, due to the timing of the acquisition date, the

15   company has performed limited valuation procedures, and the

16   valuation of nearly all assets and liabilities assumed is

17   incomplete, the company's preliminary allocation is as

18   follows.

19         How could anybody believe that the April

20   estimates were not subject to change?  When we put them out

21   we said exactly that they were subject to change.  That's

22   not a securities fraud.  That's telling the market exactly

23   what we are doing.

24         And in fact, in transcript of that day, the

25   earnings call, Jeff Schwaneke emphasized that very point.

1  During the first quarter we made, quote, provisional

2  estimates for the fair value of medical claims liabilities,

3  they are subject to change.  He says that the exercise

4  remains open, and then he said we look to complete the bulk

5  of the analysis in the second quarter.  There's no way that

6  those initial estimates could have been misleading when we

7  couched those estimates in all the cautionary language that

8  I have just described, Your Honor.

9        Even on June 17th, later in time we said the same

10 thing that our comments about the purchase price accounting

11 were provisional, and they do not take into account any

12 potential adjustment in the second quarter.  Jeff Schwaneke

13 again in June, we're still in mid process, I think

14 everything is quote/unquote provisional.  There is no

15 question, Your Honor, that the market understood that those

16 April estimates were going to change, because we told them

17 that 47 times.

18       We've put all of that in our papers.  I would

19 direct the Court to Exhibit 6, which is a transcript of the

20 first quarter earnings call, as well as the statements made

21 in the 10Q.  So, for those reasons, Your Honor, the idea

22 that the preliminary estimates in April were false and

23 misleading is just wrong as a matter of law.

24       Second, the other item I would add, and I'll be

25 brief, is estimates are by definition opinions, as a matter

1    of law, and the reason for that is any fair valuation

2    analysis is a question of opinion.

3         Plaintiffs don't contest law that we've cited,

4    Your Honor.  Now, we've cited the Fait v. Regions case and

5    the In Re First Union Corporation case.  The Fait case is

6    particularly apt, purchase price accounting estimates of,

7    quote, fair value of the assets required and liabilities

8    assumed, end quote, are, quote, opinions not matters of

9    objective fact.  And the First Union case that we cite,

10   Your Honor, says, quote, statements plaintiffs are

11   attacking are classic accounting estimates, where routine

12   changes of the estimate are necessary consequences of

13   periodic presentations of financial statements.  And here's

14   what's important, as many courts have noted estimates are

15   particularly untenable bases for fraud cases, because the

16   world recognizes that estimates, particularly fair

17   valuation estimates are opinion.

18        THE COURT:  What if plaintiff had evidence that

19   the defendants believed those estimates were incorrect?

20        MR. MORRISON:  That's a fair point, Your Honor.

21   Because they are opinions, plaintiffs are obligated to

22   allege that they're both objectively false and subjectively

23   false.  I don't believe they've plead objective falsity for

24   the reasons I've already talked about, but if they had pled

25   objective falsity, they would also have to plead subjective

1  falsity, and if they did that, one could argue that they

2  met the pleading standard.

3         THE COURT:  It's not that an estimate cannot

4  serve as the basis --

5         MR. MORRISON:  I would agree with you one hundred

6  percent, Your Honor.  I would submit that they have not

7  done either, but my point is that it's an extra defense and

8  it's an extra pleading burden that they have to bear, which

9  they haven't.

10        Second, category of the GAAP violation, Your

11  Honor, and we've talked about this a little bit, three

12  reasons why the GAAP violations do not give rise to a false

13  and misleading statements, the alleged GAAP violation.

14        THE COURT:  Do you agree with plaintiffs' initial

15  assessment that if something is not prepared in compliance

16  with GAAP, that it is presumed to be misleading?

17        MR. MORRISON:  I would say -- well, the law is

18  that if they've alleged a GAAP violation, it does not

19  automatically give rise to a securities fraud claim.  If

20  there was a GAAP -- so I'm not sure that I agree with their

21  position.

22        Maybe I can answer with an example, Your Honor.

23  In cases where there's been a restatement, for example, an

24  auditor comes in, looks at your books, and says I think

25  you've accounted for this wrong, you need to restate your

1 financials.  In many of those cases, defendants might

2 concede that the earlier statements were incorrect because

3 you've restated them as required by your auditor and then

4 the argument becomes about scienter.

5 Here there's been no restatement.  Nobody has

6 said that our books and records are wrong.  So, I would

7 quibble, Your Honor, with the premise, with Plaintiffs'

8 premise.  But there are three reasons why the GAAP

9 violations don't give rise to a fraud in any event, putting

10 aside that there's been no restatement.

11 Number one, the GAAP allegations rely on this

12 assumption, that the defendants had knowledge at the time

13 that the April 26th financial statements were published,

14 that contradicted those statements.  There's not a single

15 allegation that we had information that our preliminary

16 fair valuation was wrong at the time.

17 Therefore, there can't be any GAAP violations.

18 Secondly, Your Honor, if you look at the rules themselves,

19 defendants complied with all the rules that they were

20 obligated to comply with and let me explain.

21 So, when you acquire a company, Your Honor, Rule

22 805, ASC 805, that governs accounting for business

23 combinations, and what it requires as we talked about

24 briefly is, the acquiring company has to look at the

25 acquired company and over a course of a year has to do a

1  fair valuation analysis of the acquired company's assets

2  and liabilities.  And once it completes that analysis it

3  then adjusts the opening balance sheet as of the time of

4  the acquisition.

5  And so the goodwill comes in, right, the Centene

6  purchased Health Net for $6.8 billion.  It does it's fair

7  valuation analysis and gets a number and the difference

8  between the fair valuation analysis and the purchase price

9  would be the goodwill.  And the liabilities would be a

10  charge off against the goodwill, but it doesn't affect the

11  income or the cash of the company at all.  And there are

12  rules about how you are supposed to go about that exercise,

13  and it's an exercise.

14  The law provides acquired companies up to a year

15  to complete that process, and we followed exactly what 805

16  tells to us do.  What 805 says, and I'll read it.  It's

17  805-10-25-13 and we've put it in the record.  It's Exhibit

18  4 at nine.

19  It says if the initial accounting for a business

20  combination is incomplete by the end of the reporting

21  period in which the combination occurs, the acquirer,

22  Centene, shall report in its financial statements

23  provisional amounts for which the accounting is incomplete.

24  That's exactly what we did in April.

25  The deal closed in March, March 24th.  There was

1    eight days to the end of the quarter.  We have a year to

2    complete this process, we couldn't possibly complete it for

3    that eight-day period.

4              THE COURT:  But again and it's possible I am

5    misunderstanding the plaintiffs' argument, but I thought

6    the plaintiffs were asserting that for such provisional

7    amounts that the defendants were required to provide

8    greater specificity than was provided in order to take that

9    provisional accounting.

10             MR. MORRISON:  That's just wrong, Your Honor.  We

11   provided the exact specificity required.  If you look, Your

12   Honor, and we put it in the record, but if you look at what

13   we did, we included an entire chart in the 10Q explaining

14   exactly what we are doing.  And, Your Honor, in addition if

15   that were the case, if we had violated the rule you would

16   have seen a restatement.  You would have seen the auditors

17   say you can't do it that way.  That never happened.

18             So, Your Honor, after we put out the provisional

19   estimates, then the same rule goes on to say as you

20   continue your work, you need to update your numbers at the

21   next quarter, which is exactly what we did.

22             We've completely complied with 805 and in doing

23   so we told the market throughout exactly what we were

24   doing.  That's why, as talked about, Jeff Schwaneke and in

25   the 10Q repeatedly said these are provisional.  It's only

1  based on the eight days between the close and the end of

2  the quarter and that we're continuing our work and will

3  update them at the end of the second quarter.  That's not a

4  securities fraud, Your Honor, that's doing exactly what 805

5  requires.

6          With respect to Item 303, which is the other rule

7  they claim we violated, regulation S-K has Item 303 and

8  what that requires, Your Honor, is right in the rule.  It

9  says we have to describe any known trends or uncertainties

10  that have had or that the registrant reasonably expects

11  will have, a material favorable or unfavorable impact on,

12  quote, net sales or revenues or income from continuing

13  operations.  That rule just doesn't apply, Your Honor,

14  because as we discussed, the purchase price accounting

15  process and the fair valuation of liabilities doesn't hit

16  net sales revenues or income from continuing operations.

17  It's simply a charge against goodwill as of the date of the

18  acquisition.  So, Item 303 doesn't apply, Your Honor.

19          And I would just mention briefly, they also throw

20  in ASC-954.  That fails for the same reason.  That has to

21  do with revenue recognition and doesn't involve charges

22  against goodwill or purchase price accounting.

23          But let me finally give you the third reason why

24  none of these GAAP allegations work, and this is important

25  because even if you credit plaintiffs' nitpicking that even

though we followed the rule we weren't specific enough in
connection with what we were preliminarily valuing, the law
requires not just that there's a GAAP violation, Your
Honor, the law requires that not only is there a GAAP
violation but there are allegations of actual intent to
violate the GAAP provision.  There's no allegations of
actual intent to violate GAAP here, Your Honor.  To the
contrary, the record is clear we were doing everything we
can to try to follow ASC 805.  We identified them as
provisional estimates, like we were supposed to.  We
identified them as provisional.  We said the reasons why we
couldn't complete them because the transaction had just
closed.  There was no intent to get it wrong.  That's an
intent to get it right, and the law on this is clear.  The
Supreme Court, Your Honor, said, quote, financial
accounting is not a science.  It addresses many questions
as to which the answers are uncertain and is a process that
involves continuous judgments and estimates, and the Eighth
Circuit has echoed that in the Ceridian case, Your Honor.

It says, quote, because GAAP is an elaborate
hierarchy of sources that accountants consult, rather than
a canonical set of rules, pleading unrelated GAAP
violations without more does not give rise to a strong
inference of scienter and the K-tel case, again Eighth
Circuit, Your Honor, says the GAAP allegations must be,

1  quote, coupled with evidence of corresponding fraudulent

2  intent.  Your Honor repeated that refrain in the Scott

3  case.  There's no allegations that any individual

4  defendants or anyone at the company knew that we were

5  getting this wrong or deliberately so.  The allegations and

6  evidence in the record is to the contrary.

7           Last and finally, Your Honor, with respect to the

8  qualitative statements that plaintiffs try to identify.

9  Your Honor, the plaintiffs in their third bucket cherry

10  picked certain statements in the April earnings call, the

11  May 24th UBS conference, and the June 17th investor day,

12  all of these statements purportedly concern this purchase

13  price accounting exercise that we have been talking about.

14           But again, Your Honor, as a matter of Eighth

15  Circuit law, the plaintiffs need to identify why these

16  statements were false and misleading and they need to

17  identify contemporaneous facts that existed that would call

18  into question the truth of the statements.  The complaint

19  alleges zero internal reports, zero internal meetings, zero

20  confidential witnesses, nothing that you would typically

21  see in a securities case.

22           Instead they cherry picked the statements to try

23  to create the illusion that there's been a false misleading

24  statement where there isn't one.  And I'm going to give you

25  a prime example of this.  I can give you a concrete example

1   of why I call it cherry picking and why it's flawed as a

2   matter of law.

3          So, the plaintiffs harp on a statement by

4   Jeff Schwaneke.  And what he says in June, Your Honor,

5   according to plaintiffs, is that there were no unfavorable

6   developments on Health Nets' medical claim reserves.

7   That's what they allege, period, full stop.  They want the

8   Court and they want the reader and the Court to believe

9   that the CFO of Centene at the time, on June 17th, meant

10  that as of June 17th there have been no unfavorable

11  developments as if the company had completed its purchase

12  price accounting work and had a full blown estimate for

13  liabilities.

14         If we read what Jeff actually said it completely

15  puts the lie to that theory.  Here is what he actually

16  said.  In the very next breath he says to the world, this

17  comment referring to the no unfavorable developments, this

18  comment is based on the provisional amounts recorded in the

19  first quarter and does not take into account any potential

20  adjustment in the second quarter.

21         He's not saying we've completed the work as of

22  June and nothing bad has happened.  He's saying that our

23  work is continuing, the second quarter isn't over and to

24  the extent I'm commenting, I'm commenting about the first

25  quarter estimates that we published in April.  That is 180

1   degrees different than the inference they are asking you to

2   draw with their cherry picked statement.

3           THE COURT:  Well, but what if -- and I'm not

4   commenting on what is or is not alleged in the complaint --

5   but what if the CFO on that date knew that -- that by June

6   they were already aware of unfavorable developments related

7   to the medical claim reserves?

8           MR. MORRISON:  There's no such allegation in the

9   complaint.

10          THE COURT:  But are you asserting that that would

11  be unactionable just because the CFO is saying it doesn't

12  take into account potential adjustments?

13          MR. MORRISON:  If Jeff Schwaneke was aware in

14  June --

15          THE COURT:  That there were unfavorable

16  developments on the medical claim reserves.

17          MR. MORRISON:  Your Honor, I would say that that

18  would be a closer case, if that had been alleged because --

19  I understand your point.  I'm also saying it hasn't been

20  alleged.

21          THE COURT:  Like I said, I'm not commenting on

22  what is or is not in the complaint, but do you think the

23  mere statement that you're saying it doesn't take into

24  account potential adjustments in the second quarter would

25  make the statement as a matter of law not actionable?

1    MR. MORRISON:  I do, and let me explain why.

2  When you go through these valuations, it's a matter of

3  judgment and the Rules 805 require you to do it on a

4  quarter by quarter basis.  If I'm the CFO and I'm in the

5  middle of the quarter, and I know that the work is still

6  going on, notwithstanding your hypothetical, but I have

7  some information, I'm going to be hugely reluctant to make

8  any comments, hugely reluctant to make any comments  about

9  work that's not done particularly before the end of quarter

10  when we were supposed to announce.

11    THE COURT:  But the CFO then has several options

12  under that scenario.  One would be to say we are not in a

13  position to comment on it, and another is to say there are

14  no unfavorable developments, we are aware of no unfavorable

15  developments.  Those are two different things.

16    MR. MORRISON:  I agree with you, and then the

17  third option, which I think he took, or he could take even

18  in your hypothetical, our work is continuing, this is what

19  he said.  Our work is continuing in the second quarter.  I

20  am not commenting, he's essentially saying I am not

21  commenting on what's gone on in the second quarter.

22    THE COURT:  That's not what it ways.  It says

23  there are no unfavorable developments.

24    MR. MORRISON:  But you have to read that in

25  conjunction with the next sentence, Your Honor.  That's my

1    entire point.  What the phrase says is, there are no

2    unfavorable developments, but then he says, this comment is

3    based on the provisional amounts recorded in the first

4    quarter.  Nobody could believe when he says that, that it's

5    based on current information.  He says it's information

6    based on the first quarter.  They put that out in April.

7    So, when he says there's no unfavorable developments, he's

8    saying that as of April there are no unfavorable

9    developments and he's specifically saying that that

10   statement about no unfavorable developments, I'm quoting,

11   does not take into account any potential adjustment in the

12   second quarter.

13          So, let's assume he has some information but he's

14   not sure where it's going to fit, he's done exactly what he

15   should do which is, I'm not commenting on the second

16   quarter.  What I'm about to tell you doesn't involve

17   anything going on in the second quarter.  What I'm saying

18   is and what we've said is, based on the preliminary

19   estimates in April, we haven't seen any unfavorable

20   developments and that's why in the very same --

21          THE COURT:  Well, what does that mean, when

22   you're speaking in June, what does that mean based upon

23   April there are no unfavorable developments?

24          MR. MORRISON:  So, under 805 you have to do

25   initial estimates, April, and then you update your

1　estimates at the end of the next quarter.  So, what he's

2　saying is, based on the work that we're comfortable with,

3　that we have published to the world, we haven't seen

4　anything unfavorable, but then throughout the earnings call

5　he says our work is continuing.  So, these estimates and as

6　we said throughout the earnings call, are subject to

7　change, are preliminary, they don't account for any

8　additional work we've done in the second quarter because we

9　are not prepared to publish that to the world yet until

10　we're comfortable.  That's all he's saying.

11　　　　　Let me give you a couple of examples, other

12　examples, Your Honor.  It's the same Exhibit 7 at 24.  Jeff

13　Schwaneke, again he is not trying to mislead the market

14　here.  He's trying to be crystal clear.  Quote, so as I've

15　said previously, we haven't completed the fair valuation

16　exercise associated with the opening balance sheet.  Until

17　we complete that exercise, we are in mid process, so until

18　we complete that exercise everything is considered

19　provisional.

20　　　　　He's not trying to mislead the analysts during

21　that call to believe that everything is hunky dory as of

22　June 17th, he's expressly saying he doesn't know yet.  But

23　to read plaintiffs' complaint, they would have you believe

24　based on the cherry picked comments that we had done all

25　the work and that he had full information.  That's just not

1  the case and that's exactly what he told the listeners.

2  So, Your Honor, the cherry picked qualitative statements,

3  when read in context, aren't misleading at all and there's

4  zero allegations that at that time Jeff Schwaneke or

5  anybody else in the company was in possession of facts that

6  contradicted those public statements.

7  THE COURT: If you want to leave a few minutes

8  for reply, you're going to need to wrap it up.

9  MR. MORRISON: Really, very quickly. I'll save

10  that for reply. I'll save that for reply.

11  THE COURT: Don't save new stuff for reply.

12  MR. MORRISON: Fair enough. Briefly on scienter,

13  Your Honor, the law is crystal clear that if there's no

14  allegations of motive or opportunity the scienter

15  allegations, the intent allegations have to be particularly

16  strong. Eighth Circuit in the K-tel case, if there are no

17  allegations of motive and opportunity, quote, other

18  obligations would have to be particularly strong in order

19  to meet the reform act, and then, Your Honor, in the K-V

20  Pharmaceutical case said the same thing and I'm

21  paraphrasing now in the interest of time, but absent

22  allegations of insider trading and motive and opportunity,

23  the absence of those allegations undermines scienter is

24  what you said in the K-tel Pharmaceutical case. Here there

25  are no allegations of insider trading. The complaint is

1  bereft of any reason why Centene or other individual

2  defendants would engage in this fraud.  They didn't

3  personally financially benefit from anything.  That

4  requires a very high standard of scienter, absent those

5  types of allegations and the standard, Your Honor, is very

6  high, particularly without motive allegations.  To show

7  severe recklessness they have to show, quote/unquote,

8  highly unreasonable omissions or misrepresentations

9  amounting to an extreme departure from the standards of

10  ordinary care.  They don't come close to meeting those

11  standards, Your Honor, and again there are zero allegations

12  of any contemporaneous internal witness statements,

13  documents, meetings, anything, restatement of the

14  financials, anything that could lead the Court to believe

15  that the defendants were in possession of information that

16  contradicted their public statements, and would give rise

17  to scienter, just nothing.

18          Instead what they do, Your Honor, and I'm

19  wrapping up now, what they do instead, Your Honor, is they

20  throw the kitchen sink at the Court.  They say, well, you

21  did due diligence and you were focused on this.  So,

22  therefore you must have known.  That's not an allegation

23  that we knew our purchase price accounting was false.  That

24  was just a general statement because you do due diligence,

25  you must have known.  Courts reject those types of must

1  have known allegations all the time, and in fact the Elam

2  court rejects it, as does Espinoza v. Whiting which was

3  affirmed by the Eighth Circuit in 2015.

4         Again, we must have known because we were, quote,

5  focused on Health Net's reserves.  Of course, the Elam

6  Court rejects that type of allegation as does Espinoza.

7  Centene promoted the historical accuracy of its ability to

8  reserve, and because you were so good at it, you must have

9  known the reserves were wrong in April.  That's another

10  must have known allegation that gets rejected, and in fact

11  the Elam case, Eighth Circuit, rejects that very

12  allegation.

13         Listen to what the Elam court says, and this is

14  what they rejected.  It rejects as conclusory the

15  allegation that, quote, Centene must have known about

16  additional medical costs because Centene touts its ability

17  to predict medical costs.  That's exactly the same

18  allegation here that's been rejected by the Eighth Circuit.

19         Lastly, they identify Jeff Schwaneke's role as

20  CFO, you were CFO so therefore you must have known, the

21  courts routinely reject that, the Eighth Circuit rejected

22  that allegation in Ceridian.  The fact that the individual

23  signed Sarbanes-Oxley certificates vouching for their

24  financials, they claim somehow shows scienter.  It doesn't.

25  That's been rejected in the Ceridian case, Eighth Circuit.

1            Last two points, Your Honor, and then I'll sit

2      down.  Temporal proximity is another argument they make in

3      favor of scienter.  What they say is, well, you publish

4      your updated estimates on July 26, but you had this

5      investor conference on June 17th, that's only about five

6      weeks worth of time.  You must have known in June what you

7      put out in July.

8            Unfortunately for the plaintiffs, Your Honor, the

9      Eighth Circuit rejects that argument in two cases, in the

10      Elam case, Eighth Circuit, Your Honor, the Court rejected

11      that argument.  Despite the increase in information

12      plaintiffs again fail to allege any specific fact that

13      would render the earlier statements false, and in that

14      case, Your Honor, it was less than five weeks.  The initial

15      statement in Elam was on day one, the corrective statement

16      was thirty days later, less than the five-week period of

17      time here.  And, in fact, in Petroza, Your Honor, another

18      Eighth Circuit decision there, and I'm going to quote

19      because I think it's important, quote, proximity between

20      the May 8 forecast and its May 18 revision does not support

21      a strong inference of scienter.  It goes plaintiffs'

22      allegations rest on nothing more than hindsight.

23            THE COURT:  Mr. Morrison, I'm going to give you

24      30 more seconds because I'm going to run out of time here.

25            MR. MORRISON:  The last thing they say is the

1  magnitude of the revision.  They say because it was a 300

2  million dollar revision, you must have known, and that's

3  scienter, and that's rejected by Ceridian, Eight Circuit,

4  Your Honor and Petroza, Eighth Circuit.  Thank you for the

5  time, Your Honor.

6          THE COURT:  All right.  I'll hear from the

7  plaintiffs.

8          MR. MARSH:  Good afternoon, Your Honor.  Just

9  initially I would like to know, while I'm eager to respond

10 to many of the arguments that defendants have made today,

11 we're also here to answer any questions that the Court may

12 have so we can best assist the Court.

13          What this case is really about, Your Honor, is

14 defendant's knowing omission of highly material, adverse

15 information about Health Net's business throughout the

16 class period.  Defendants knew that Health Net's business

17 was suffering from massive rising liabilities on several

18 key policies in California and other states.  Before the

19 class period even began, defendants had confirmed the

20 magnitude of the rising liabilities.  They later stated

21 that they had confirmed the costs on the policies.

22 Obviously a central part of any acquisition is

23 understanding the company's liabilities, and defendant's

24 stated that they had done this ahead of time.

25          THE COURT:  Tell me where you have that in the

1    complaint.  Tell me what paragraph of the complaint sets

2    out the basis for these knowing omissions.

3            MR. MARSH:  Thank you.  Yes, there are several

4    paragraphs and I'd like to cite a few of them now, if I

5    may.  Paragraph 79 is relevant to what I just mentioned.

6    After these large 390 million dollar disclosures, an

7    analyst, I believe it was an analyst.  It was at an

8    investors' conference, asked defendant Neidorff directly,

9    this was in September of 2016.  Analyst said how much

10   insight you had into the underperforming businesses when

11   you announced the acquisition of Health Net.

12           So the question is about what Health Net knew --

13   I'm sorry, about what Centene knew, way back on July 2nd,

14   2015, many months before the class period begins.

15   Defendant Neidorff is unequivocal in his response,

16   indicating the intense amount of knowledge that they

17   possessed that early.  He stated that we had done our

18   homework.  The things that were issue have been dealt with,

19   had been planned to be dealt with when we announced it.

20   These were not things that came up and we just all of a

21   sudden decided to do.  He said, we had spent a lot of time,

22   Your Honor, again this is July 2 --

23           THE COURT:  But what is it in paragraph 79 that

24   says that the estimates that were contained in the first

25   quarter report were known to them to be false.  The mere

1 | fact that they've spent a lot of time looking at it, that

2 | they conducted due diligence, doesn't mean that they knew

3 | the number was this number instead of that number.  So,

4 | show me where that language is in paragraph 79.

5 | MR. MARSH:  Absolutely, if I may I'd like to

6 | respond with two points.  One, what defendant said they

7 | knew and what we are required to plead at this early stage

8 | of the proceedings.

9 | What I think the most relevant point to Your

10 | Honor's question in paragraph 79, is that they had spent a

11 | lot of time confirming the medical costs, the prior year

12 | period expenses on it, but there are many other paragraphs

13 | where defendants also stated to the public that they had

14 | known of these large increase in liabilities before the

15 | class period.  For instance, starting at paragraph 71,

16 | defendant Neidorff in July 26, when analysts were shocked

17 | by these disclosures, he said this is something we

18 | inherited and speaking specifically, Your Honor, about the

19 | 300 million dollars of the --

20 | THE COURT:  I'm sorry.  You're referencing

21 | paragraph 76?

22 | MR. MARSH:  71, Your Honor.  He said in specific

23 | reference to a question about the PDR, the 300 million

24 | dollars, he said it was prior to the 24th when those things

25 | were set, prior to the 24th of March, of course, which was

when the merger closed.

Similarly that same day on July 26th, defendant Schwaneke said that the PDR, the extra liabilities was based on information as of the merger date.

THE COURT: And what does that mean, it was prior to the 24th when those things were set; what does that mean?

MR. MARSH: He was speaking directly about the 300 million dollars in liabilities, and he was also asking -- I'm sorry, he was asked whether this would have an ongoing effect on the business, and he said that this is something we inherited. That's when it was set and then he went on to explain, to answer the other part of the question -- THE COURT: He said we knew some of this was there. So, we know that there are some issues with respect to reserves, right?

MR. MARSH: They absolutely knew that, yes.

THE COURT: So what is it that tells us that what they knew was that it should be this number instead of that number? I mean, what tells us that they knew the number that was set in that first 10Q was wrong?

MR. MARSH: They knew, they had in their possession, undisclosed material information showing that their statements were misleading at the time. These were material issues.

1          THE COURT:  What?

2          MR. MARSH:  They had extensive information about

3   the medical claims expenses at Health Net.  They had months

4   of due diligence that they had conducted.

5          THE COURT:  But you are again speaking to me in

6   generalities.  Tell me what specifically you have that

7   shows that they knew or were reckless in failing to

8   recognize that the disclosure made at the end of March was

9   wrong, as of the end of March.

10          MR. MARSH:  I think there are two questions Your

11   Honor is asking.  One is, specifically the 390 million,

12   exactly when did they know this figure; is that one of the

13   questions, Your Honor?

14          THE COURT:  Well, aren't you alleging that that

15   was wrong?  I mean, you have set out charts of the

16   accounting numbers.  You have said the medical liability

17   claim, the medical claims liability was 1.37 billion and

18   then that changed to 1.462 billion, right?

19          MR. MARSH:  Yes, indeed, but the question is not,

20   when did they know exactly what that precise number was,

21   and the Green Tree case is highly illustrative of this

22   point.  And in particular I'd like to direct the Court's

23   attention to the Green Tree District Court decision which

24   is 61 F.SUPP.2d 860.  This is a ruling by the District of

25   Minnesota that the Eighth Circuit later reversed.  The

1  facts in that case are highly similar to the facts in this

2  case.  If you'll indulge me one second.

3  In November of 1997 the defendant corporation in

4  Green Tree announced that it had some accounting issues.

5  It said we are conducting our analysis now.  Here are our

6  preliminary estimates, but we think it's about 125 to 150

7  million dollars in accounting, negative accounting news

8  that we're going to have to give you, but we haven't

9  completed our analysis.

10  THE COURT:  But that was of their own financials.

11  That was not an accounting of a merger that the rules

12  specifically give them a year to account for, right?

13  MR. MARSH:  Not quite, Your Honor.  For one thing

14  defendants are incorrect when they state to the Court that

15  in all circumstances they have a year --

16  THE COURT:  Okay.  But am I correct that the

17  Green Tree involved their own financials?

18  MR. MARSH:  That's true.

19  THE COURT:  Not the accounting for an entity that

20  they had acquired.

21  MR. MARSH:  That's true.

22  THE COURT:  Right?

23  MR. MARSH:  Yes.

24  THE COURT:  So, on their own financials you would

25  think they have a pretty good familiarity with their own

1    financial condition and what is going on with their own

2    company.  What they know about a company they are acquiring

3    they gain through due diligence.

4           MR. MARSH:  But let me -- if I may continue on

5    and explain why that's not quite right in the Green Tree

6    circumstance and where the Eight Circuit reversed the

7    district court.  In that case they said we think we'll have

8    125 to 150, they are preliminary figures.  Two months later

9    they came back and said, actually we were wrong, these are

10   very complex accounting issues.  One of our inputs was

11   wrong.  It's actually 190 million plus another 200 million.

12          Now, the district Court held that the case didn't

13   make sense along the lines that defendants are arguing here

14   today.  They said these are preliminary estimates, they

15   didn't mislead anyone.  That's essentially defendant's

16   message today, and the Court said there's no convincing

17   evidence of motive here.  Now, the Eighth Circuit reversed

18   and set out a very clear standard for what a plaintiff must

19   show or must allege in the pleading stage.  And the Court

20   said that one of the classic fact patterns giving rise to a

21   strong inference of scienter is defendants knew facts or

22   had access to information suggesting that the public

23   statements were materially inaccurate.  It was irrelevant

24   for the Eight Circuit that those November figures were

25   provisional.

1          Instead they focus on something that we have a

2    bevy of in this case, which is our defendants' own

3    statements that they knew that there was an input to their

4    financials which was materially inaccurate.  In that case,

5    it was one assumption of many assumptions, and it was

6    complex accounting, and all courts and all parties

7    recognized it was complex accounting.

8          Here we have much better facts.  This is not

9    complex accounting.  These are simple issues despite the

10   defendants' misstatements of what the GAAP centers are in

11   their briefs.  They don't contest that these are simple

12   issues.

13         Moreover, here we have numerous admissions of

14   what defendants knew.  They said that as of July 2015 they

15   had done the medical claims.  They said that -- and in this

16   case we also have, Your Honor, very --

17         THE COURT:  Show me specifically what statement

18   you are relying on?

19         MR. MARSH:  For that I was referring back to

20   paragraph 79, but also I'd like to make a few additional --

21   put on a few additional allegations not mentioned in

22   defendants' briefs.  For instance, at paragraph 78, one of

23   the Centene executives clarified for the markets that again

24   these were not new issues.

25         The senior vice-president of the investor

1 relations stated that all of these policies were actually

2 producing losses in 2015 for Health Net.  So, I think those

3 were really not surprises for us.  All of the products that

4 relate to this case, Your Honor, that relate to the PDR and

5 the $90 million in liabilities for very old claims were all

6 losing money in 2015.

7 　　　　　　　Defendants were keenly aware of what was going on

8 and yet what did they tell investors?  Multiple times they

9 reassured them explicitly that while overall the balance

10 sheet might be provisional, specifically the Health Net

11 reserves are in fine shape.  On June 17th during the class

12 period and just weeks before the truth was revealed

13 Neidorff made clear that the statements to investors were

14 to help mitigate any concerns that investors might have

15 regarding the Health Net reserves.  He said the Health Net

16 reserves issues stops at March 24th.  In other words, it's

17 over.  It's behind us at that point, he said.  It's got a

18 comfortable bed, and I'd like to amplify a little bit on

19 that, Your Honor, because the June 17th investors

20 conference is very important and the way defendants at this

21 podium just characterized some of the statements is simply

22 incorrect.

23 　　　　　　　Defendant Schwaneke's statements were not simply

24 that we haven't completed our accounting and this

25 unfavorable billing through April.  No, the statements were

1    quite different.  In fact, he said explicitly that as of

2    May 31, 2016, we have not seen any unfavorable development

3    on the Health Net reserves.

4           Investors were very interested in this as were

5    the analysts, so they followed up with questions, and then

6    in that same conference another Centene executive amplified

7    on the point.  The question was essentially you've seen no

8    unfavorable development.  Does that mean nothing before the

9    acquisition or since?  And as Defendant Schwaneke said, it

10   encompassed through May 31st.  Okay, so, not just through

11   April but all the way through May 31st.

12          And the other Centene executive at paragraph 91

13   also made clear that all of these losses that weren't being

14   told to investors in the 2015 period, the executive

15   basically denied that these existed and said that in terms

16   of the unfavorable development, that's really just the

17   opening balance sheet.  That's as of the time of the

18   transaction.  The March 24th reserve balance includes all

19   prior activity.  In total we haven't seen any development

20   on anything prior to March 24.  Defendant Neidorff

21   responded to this statement by his executive colleague and

22   said that's an important point.  The Health Net reserve

23   stops March 24th.

24          So, while they may have had general assurances on

25   their April 26th financial statements that these were

1  provisional or preliminary estimates, this case falls under

2  the Green Tree precedent in that those are not sufficient

3  to defeat the specific affirmations later as well that the

4  issue was over.  Yes, it's true and we pleaded --

5         THE COURT:  But does that statement mean anything

6  more than from an accounting period it stops at March 24?

7         MR. MARSH:  Absolutely.

8         THE COURT:  Such that any adjustment would be

9  with respect to goodwill -- I mean, does that statement

10  mean anything more than that?  I don't know what I -- I

11  don't know that I totally understand what meaning you are

12  ascribing to the statement that the reserve issue stops at

13  March 24th.  What are you saying that means?

14         MR. MARSH:  These cluster of statements on June

15  17th, including that statement that the reserve issue stops

16  and the investors should not have any concerns about the

17  Health Net reserves, indicate that at that point in time

18  there was no indication, there was no unfavorable

19  development that investors should worry about.  Essentially

20  there won't be adjustment and would also emphasize --

21         THE COURT:  But that doesn't make sense to me,

22  the language of the reserve issue stops at March the 24th.

23  How does that equate with what you are saying?  That

24  doesn't compute for me.

25         MR. MARSH:  Well, that is one of the statements,

1  Your Honor.  The other statements included that as of May

2  31, so after the 24th, there's been no unfavorable

3  development.  In truth there had been unfavorable

4  developments for a year and a half at least, and moreover

5  the statements are very substantive at that investor

6  conference.

7              THE COURT:  Health Net was a public entity, yes?

8              MR. MARSH:  Prior to this I believe they were a

9  public entity.

10             THE COURT:  And to the extent Health Net had

11 losses in 2015, I presume those losses were disclosed.  Is

12 there some reason to believe that the market was unaware of

13 the losses of Health Net in 2015?

14             MR. MARSH:  First of all, the details as to

15 Health Net's financial statements are outside of the four

16 corners of the complaint and have not been submitted.

17             THE COURT:  But you are now relying on them in

18 connection with your allegations.

19             MR. MARSH:  Right.  And to answer Your Honor's

20 question directly, there are indications that these issues

21 were not apparent to the public and certainly not the

22 severity of these issues, how material they were, apparent

23 to the public at the time.  So, for instance we allege --

24             THE COURT:  So, if that is the case what is the

25 basis for your allegation that the defendants had to know

1  of it?  What evidence are you relying on to establish, to

2  meet your burden to allege that the defendants were aware

3  of the magnitude of that in May?

4  MR. MARSH:  Yes.  I point to three things in

5  particular, in general.

6  THE COURT:  But this is really important, so make

7  sure you tell me everything you've got here.

8  MR. MARSH:  Okay.  Well, then I got more than

9  three, but the three biggest are, as Your Honor just

10  mentioned, the magnitude of the issue as the Green Tree

11  court said, the sheer size of a 390 million dollar

12  accounting issue contributes toward the scienter inference.

13  Number two, I would cite the long time line that

14  precedes the class period, a time line during which the

15  defendants integrated with Health Net.  They continued due

16  diligence.  They were aided by several firms in their due

17  diligence.  They stated that they had rather keen

18  knowledge, not only about the current status of Health

19  Net's business but that they could see -- they had

20  visibility into 2016, into 2017, and even 2018.  They said

21  we know there's about 13 or 14 accounts receivables and

22  accounts payables right off at the time of the merger.

23  They gave every indication that they were on top of the

24  books.  They weren't quite finished yet before the merger,

25  but they were on top of it.  And then when they made their

1  April 26th financial statements, they actually got rid of

2  information and this further shows their scienter.  They

3  got rid of cautions that they had given investors about not

4  having full access to Health Net's books.  They did have

5  full access to Health Net's books at the start of the class

6  period.

7           They also got rid of cautions to investors about

8  having sufficient information to conduct the fair value

9  analysis, and in this regard I point the Court to the 2004

10 decision by Judge Shaw in this district in the Charter

11 Communications case.  In that case the term "full access"

12 was key, and the Court held in ruling on whether Arthur

13 Anderson could face a securities fraud claim for fraud that

14 was conducted at Charter Communications, the Court held

15 that it does not necessarily follow that because Anderson

16 had access to Charter's operations, it was aware of the

17 alleged fraud at Charter, but it is also true that the

18 greater Anderson's access to Charter operations, the

19 greater possibility of an inference of scienter, and in

20 terms of this issue of access and how much defendants knew,

21 I would also remind the Court of the Rand-Heart case, a

22 2016 Eighth Circuit decision, that reversed dismissal on

23 recklessness grounds.  This case regarded company

24 statements about the business of one of its subsidiaries so

25 it could be potentially analogized to an acquisition case

1   like this.

2           In that case the defendants warned the investors

3   that our business was slowing, that we might, actually it's

4   probable that we're not going to be able to meet our debt

5   covenants and we might end up in bankruptcy.  And sure

6   enough a few months later they announced that they are

7   headed toward bankruptcy and investors brought suit.

8           But the district threw out the case because they

9   said there were insufficient allegations of motive.  But

10  the Eighth Circuit disagreed.

11          The Eighth Circuit said two things.  First of all

12  motive is unnecessary.  There is no need to plead that as

13  we know from the Supreme Court decision in Tellabs, the

14  Supreme Court's decision in Matrixx, the Eighth Circuit

15  decision in Green Tree, motive is simply unnecessary, and

16  furthermore plaintiffs had adequately pleaded a

17  recklessness case because they had pleaded that defendants

18  knowingly omitted a material fact that was important to the

19  company finances.  And what was that material fact?  Well,

20  even though they had cautioned that their business was

21  slowing, they had omitted that one of the prime customers

22  of their subsidiary had said for the time being we're not

23  giving you any more business.  This was a material fact

24  because I believe that the customer in that case had some

25  sixty percent of the customers.

1          THE COURT:  And what is the material omitted fact

2     here?

3          MR. MARSH:  The material omitted fact here, Your

4     Honor, are principally in regards to the massive rising and

5     frankly debilitating liabilities on these Health Net

6     policies.  It's very important to understand --

7          THE COURT:  Talking about California?

8          MR. MARSH:  And Arizona and elsewhere, too, but

9     it was primarily California, on paragraph 67 of the

10    complaint breaks out the PDR, largely California.

11    Paragraph 66 talks about $90 million from California as

12    well.  But these facts that these policies were so

13    disastrous, these facts were omitted from defendant's

14    statements during the class period, and they were unknown

15    to investors.  They had a duty to at a bare minimum mention

16    that there were these problematic policies.  And again, I

17    would like to just say as for the magnitude of these

18    policies, these were no small issues.  These were no

19    accounting issues to be lost in all of the paperwork.

20    390 million dollars relative to Health Net, that was more

21    than a year and a half of Health Net's entire earnings for

22    the entire company.  So, again as the Eighth Circuit held

23    in Green Tree, the magnitude of this issue was important.

24         And instead of disclosing -- they were given

25    every opportunity to disclose these issues, and what did

1  they do?  They denied any such issue.  They said that the

2  reserve issue had stopped, it's behind us.

3          THE COURT:  Why would they do that?

4          MR. MARSH:  Why would they do that?  Well, Your

5  Honor, is asking a question about motive, and as I

6  mentioned, at the pleading stage --

7          THE COURT:  Well, I understand, but don't --

8  forget about motive.  Tell me what advantage was gained to

9  the company by doing that, regardless of whether that's why

10  they did it.

11          MR. MARSH:  Okay, absolutely.  There's a couple

12  that come to mind very quickly.  One is, if we look at

13  paragraph 67 of the complaint, we see that when they

14  announce these issues on July 26th, when they first came

15  clean about what had actually happened, they had already

16  remedied, or were in the final stages they said of

17  remedying these issues.  So, it appears that they waited

18  until they had good news because they had been working on

19  this for several, several months.  They have admitted that

20  as much as, extensively allege in the complaint.  They had

21  been working on these issues, working -- defendant Neidorff

22  was personally working with the California insurance

23  commissioner, having meetings with them about what to do

24  about these very problematic policies.

25          So, by the time of the disclosures, they had

1   given themselves enough time to announce some good news,

2   and hope that investors and analysts wouldn't mind so much,

3   maybe the stock price wouldn't get hit so hard.

4            But how do the analysts really respond, Your

5   Honor.  A, they called into question defendant's

6   credibility explicitly.  They said it was troubling that

7   there was no mention of the challenges or pricing steps

8   taken to rectify the issues.  That is, they pointed out

9   what plaintiffs are alleging here today, that there were

10  material omitted facts.  They said the credibility took a

11  step back today as the 390 million dollars of reserves were

12  significantly higher than Centene suggested in June at our

13  health care conference.

14           They also amplified on this by pointing out the

15  large magnitude of the issue.  The analysts said that this

16  revealed that Health Net was likely descending towards a

17  much tougher earnings situation on a stand along basis than

18  previously suggested by management.  That is the material

19  realities that defendants didn't talk about, contradicted

20  their own statements.  Further analysts said we understand

21  investor frustration.  We understand why the stock dropped

22  a billion dollars today.  A billion dollars.  It's

23  obviously more than the reserves at issue here, of 390

24  million.

25           Well, in that regard we might want to pay

1    attention to the Eighth Circuit in Gebhardt v. ConAgra

2    Foods in 2003.  There were strong arguments of materiality

3    in that case, Your Honor, and the district court pointed

4    out that the earnings misrepresentation in question was

5    just .4 percent of the total company's revenues.

6            Well, the Eighth Circuit said ordinarily

7    materiality is a question for the jury, and it rejected

8    defendants' arguments that the amount of money was

9    immaterial.  It said that the integrity of management is

10   important to investors, among other things.

11           So, we think that in particular, Your Honor, I

12   think this is all in response to Your Honor's question

13   about all of the facts that contribute towards scienter.

14   I've said many of them.  There are many more enumerated in

15   our complaint.

16           In particular, starting at paragraph 111, we know

17   from their own statements, and I really need to emphasize

18   this, their own statements, because their own admissions

19   about what they knew when, is something that's really not

20   emphasized or even mentioned in defendants' briefing and it

21   really is a key to what they knew when, and how they knew

22   they were omitting material facts.  But as we allege in

23   paragraph 111 and beyond, defendants not only stated that

24   they had all this information early, but they were keenly

25   focused on the key area of Health Net's business where most

of these losses were occurring which was in the California geography.

Obviously they also conducted extensive due diligence. They were assisted by KPMG. They worked with Deloitte which was Health Net's auditor. They also worked with their investment bankers and financial consultants. And I'd like to draw a distinction here, if I may, because defense counsel said a lot about other Eighth Circuit decisions, where the Eighth Circuit affirms dismissal of securities case and in particular the defendants seem to believe that the Elam case is very important here.

But I think a simple citation to that case will illustrate why it is inapplicable. The Court held that plaintiffs asked this Court to infer that defendants' April and June statements must be false based solely on defendants' representation as to their ability to estimate claim costs. Well, that's obviously not the case here. The plaintiffs in that case simply said, you said you were good at doing this, you should have known earlier. That has echoes of this Court's decision in the Scott case, where the plaintiffs alleged you should have known about these issues earlier because you should have had the right software.

Obviously this case is very different, and we have defendants' own statements about what they knew very

1   early on.  What is very rare to see in a securities case is

2   a period of such lengthy due diligence, ahead of the class

3   period and it's also rare to see defendants' own statements

4   as to what they knew and when.  We know from Tellabs that

5   no smoking gun is required.  We know that it's irrelevant,

6   as defendants point out, that there's no internal report

7   that we allege, and so -- but it is rare that we even have

8   the strong admissions that we have in this case which show

9   that the defendants knew these materially omitted facts

10  very early on.

11          I'd also like to comment on a few of the remarks

12  the defendants made today.  Defendants made a lot of

13  strident statements that are simply contradicted by the

14  record.  They stated that we don't allege a single fact

15  that contradicted the April 26, 2016 financial statements.

16          Of course, we allege directly how those

17  statements were wrong.  It's alleged in the complaint

18  starting at paragraphs 81 and in particulars starting at

19  paragraph, I believe it's 100 where we show that they

20  admitted the figures were wrong.  So, that's a point on

21  falsity, obviously separate from scienter.  The defendants

22  also stated that when they revealed the truth on July 26 --

23  excuse me, to clarify that they were making these revisions

24  based on continuing valuation work that they had been

25  doing.  Well, that's not really what they said.  What they

1  said was this was based on information as of March 24th,

2  and indeed there's a point here I would like to make

3  regarding the accounting rules.

4        Defendants at length in their briefing and here

5  today are attempting to dispute plaintiffs allegations and

6  raise factual disputes as to what exactly the accounting

7  rules say and what they mean and whether anyone was misled.

8  All of these inquiries are premature of course because of

9  in terms of the element of falsity, the standard to be

10  applied here is plausibility, is the typical Rule 12

11  standard of whether we have plausibly alleged misleading or

12  false statements.

13        Defendants don't mention that this is the

14  standard in their brief, but it is as we know from the

15  Matrixx case, for instance, where the Supreme Court said

16  that in terms of falsity, we just have to allege plausible

17  misstatements or omissions.  But to get back to the GAAP

18  statements, Your Honor, as we alleged, there are clear

19  rules in particular under ASC 805.

20        THE COURT:  Are you saying that it's enough for

21  you to allege something plausible even if the arguments,

22  the contrary arguments of plausibility are more extensive?

23        MR. MARSH:  Pardon me for not being completely

24  clear.  In terms of the falsity element it is the typical

25  plausibility analysis, and there's no entertaining of

 1  defendants' inferences about what could possibly be true

 2  and what people could have possibly thought at the time.

 3  That's very clear.  Now scienter is a different case, yes

 4  and in regards to scienter, I would like to point out that

 5  in the Seminal Supreme Court decision in 2007, Tellabs,

 6  where they for the first time set down the pleading

 7  requirements for the PSLRA scienter requirement, they

 8  termed the scienter analysis, quote, they comport a court's

 9  comparative assessment of plausible inferences while

10  constantly assuming the plaintiffs' allegations to be true.

11          That's important.  Defendants seem to make a lot

12  of inferences for themselves here.  That's simply not

13  appropriate at this stage.  And in regards to, getting back

14  to GAAP violations, if I may, we allege that under ASC 805

15  20-50-4A a provision that I believe is omitted from

16  defendants' briefing, but is contained in the Exhibits that

17  they submitted, that defendants did not comply with the

18  purchase accounting rules.

19          This is amply alleged in the complaint,

20  particularly starting at paragraph 95, we explain that if

21  you want to -- that if you really are lacking information

22  when you put out your preliminary estimates, then you have

23  to put investors on notice of what is going on.  You have

24  to tell them the potential magnitude of any changes that

25  might occur.  You have to tell them on an item-by-item

1   basis what it is that's uncertain.  You have to tell them

2   the reasons that these things are uncertain.  Despite

3   defendants' contentions, they did none of these things, and

4   frankly defendants contentions here are relevant because

5   the facts alleged in the complaint are taken as true.  And

6   on the GAAP allegations, another important point, defense

7   counsel today said here several times that what happened

8   here doesn't effect dollars and cents they said.  Well, the

9   reason is as amply alleged in the complaint, defendants did

10  not properly account for the PDR when they took it.

11          They were required under the clear accounting

12  rules, as we've alleged, to take these 390 million dollars

13  as hits to the income statement, because that's when they

14  were recognized in that quarter, in the second quarter.

15  Instead they try to gambit and they try to get it into

16  goodwill, and that was the approach they took, but as we

17  alleged it's completely inappropriate and it was rather

18  transparent to analysts at the time, Your Honor, who

19  commented explicitly -- let me see if I can find this.

20          THE COURT:  Shouldn't that have required some

21  form of restatement of their financial statements?

22          MR. MARSH:  Thank you very much.  That's a great

23  question.  Restatements, Your Honor, there's a couple of

24  points here.  First of all, to have a restatement the

25  company's management has to agree that a restatement is

1  proper.  Many courts have held the fact that there is no

2  restatement is irrelevant at this point or at least

3  something not to be considered very highly.  The -- one of

4  dangers of the caring so much about a restatement is that

5  it takes the court's role in assessing that there might be

6  a case here, and gives it to the outside auditors and

7  holding that the restatement is essentially dispositive

8  would give auditors the power simply not to cause problems

9  with their client.

10          THE COURT:  But are you arguing that a

11  restatement should have been required?

12          MR. MARSH:  Yes, the answer is that their

13  accounting did misstate their financial statements and thus

14  a restatement would have been appropriate.  We don't

15  explicitly allege that in the complaint.  It is not

16  necessary but as we alleged in paragraphs 95 and 110, these

17  accounting misstatements are clear.  In addition they also

18  violated the SEC regulations in Item 303, and on that point

19  defense counsel says, well, you know, we accounted for this

20  in goodwill, but it didn't hit the income statement and

21  Item 303 doesn't apply.  We dealt with this in our briefs,

22  Your Honor.  It's simply not true because they should have

23  accounted for it on the income statement as we allege, and

24  they don't dispute these revelations impacted Centene's

25  cash flows by 300 million dollars.

1          And as is noted in the complaint, Item 303

2    regards trends, trends that the business has to disclose.

3    Well, when they disclose these issues, when they came clean

4    about it, they ultimately said that these were based on

5    trends that existed prior to the acquisition date, which

6    was, of course, prior to the beginning of the class period.

7          One fundamental point I'd also like to mention in

8    this regard, Your Honor.  In their opening brief and again

9    here today, defendants stated that it was after the

10   acquisition that the purchase accounting began.

11         Simply not true.  It's contradicted by the

12   complaint, contradicted by their own SEC statements,

13   statements to the SEC in their public filings.  They were

14   doing purchase accounting estimates as early as August and

15   September of 2015, and it was in that early period when

16   they cautioned investors about that they didn't have full

17   access yet, but then they removed those cautions, giving

18   the investors more certainty when the class period began.

19         THE COURT:  But, of course, access differs from

20   analysis.

21         MR. MARSH:  Analysis is certainly facilitated by

22   access.

23         THE COURT:  Absolutely.  And lack of access is

24   going to make reliable analysis dubious, but access does

25   not equate with analysis, does it?

1           MR. MARSH:  I think that's a fair statement, but

2    we must add to that the understanding that defendants have

3    stated that they had conducted analysis even before the

4    merger was announced.  Remember they had weeks of intensive

5    due diligence prior to --

6           THE COURT:  What tells us that they knew what was

7    contained in April -- in March was wrong?

8           MR. MARSH:  They knew that there were material

9    misstatements.  Now, as to whether they knew it was exactly

10   390 million.  Two points, one --

11          THE COURT:  I'm not suggesting that you need to

12   show that they knew it was exactly 390 million, but what

13   shows that they knew that it was materially misstated?

14          MR. MARSH:  Several facts.  The facts that, in

15   particular that CEO Neidorff was very vocal about stating

16   how early he had been pushing these changes and that

17   allegation, Your Honor, is at I believe it's 72.  Yes, they

18   were working with states at the highest levels to redesign

19   these policies.  He said there were major flaws in it.  It

20   was so obvious to some of us doing -- who have been doing

21   this for a long time.  It was obvious to him, but it wasn't

22   obvious to investors who were not informed about these

23   problems.

24          He said he had several meetings personally with

25   Commissioner Jones, and the list goes on and on about what

1    they said that they knew at the time.  And that they

2    conducted -- that they had this intense analysis even

3    before announcing the merger is very telling.  And, so we

4    think those statements by themselves are revealing as to

5    scienter, and does that answer the Court's question?

6            THE COURT:  If that's your answer, yes.  I do

7    want to just warn you, I'm trying to give you close to

8    equal time with the defendants here, but I will tell you I

9    must be somewhere else at 3:30 today.  So, I'm going to ask

10   you to wrap up your presentation in about, you know, the

11   next eight to ten minutes, if you would.

12           MR. MARSH:  Absolutely.  And in thinking about

13   what we were just discussing as to what they knew when, I

14   think it's important to reflect on the Green Tree case

15   because the District Court in Green Tree said something

16   very interesting.  And as Your Honor will recall, this case

17   was about accounting assumptions, one assumption of many in

18   a complex accounting situation, and the District Court said

19   the plaintiffs had not pleaded enough particular facts.

20   The District Court said that defendants -- I'm going to

21   quote here, defendants knowledge of higher than assumed

22   prepayment rates, that's the one assumption issue, however,

23   does not give rise to a strong inference that they knew or

24   recklessly disregarded that the company's earnings were

25   overstated.

1       That's essentially defendants' argument here.

2   They claimed in their reply brief that we waived an

3   argument as to this effect because they claim that -- they

4   basically admit that they knew the causes of these

5   liability misstatements, but that they didn't know the

6   particularities and exactly what that number was.

7       Well, that was the reasoning that the District

8   Court employed.  The Eighth Circuit disagreed and again the

9   Eighth Circuit said that the central inquiry is whether

10  they omitted material facts, omitted facts that if they had

11  stated would have given investors an adequate and complete

12  picture of what was going on.  In that case the Eighth

13  Circuit surveyed other circuit courts around the country

14  and one citation was particularly interesting to me.  It

15  was of a Tenth Circuit case where the Eighth Circuit

16  characterized that case as holding.  In case of omissions,

17  scienter is proved by knowledge of an omitted fact, plus

18  knowledge that the omission is likely to mislead.  That's

19  exactly our case here.  The omitted facts were all about

20  these Health Net policies, that the defendants recognized

21  were already losing heavy amounts of money in 2015.  And

22  the Court may wonder how heavy were these losses that

23  Health Net was acquiring.  Well, that's spelled out in the

24  complaint, at least partially.  It's spelled out as to the

25  California substance abuse policies starting I believe

1  around paragraph 21.  Yes, in 2013 and 2014 Health Net's

2  PPO plans saw a 6359 percent increase here over a year.

3  And then in 2014 it was a 2674 percent increase -- I'm

4  sorry, from 2014 to 2015.  And then we have further details

5  about how severe these claims continued to be.

6       Another illustration of how severe these

7  undisclosed problems were, was Health Net's efforts to

8  artificially suppress these claims, these payments, its

9  losses in the period precisely when Centene was overseeing

10  Health Net, when Centene was integrating with Health Net

11  and conducting its due diligence.  There's a very suspect

12  series of facts that developed starting around September

13  2015, and continuing at least through January of 2016, as

14  these merger negotiations continued.  What did Health Net

15  do?  Health Net tried to suppress its cost by engaging in

16  essentially a fake audit where it sent threatening letters

17  to the health care facilities that were sending it bills.

18  This is a key allegation in a couple of respects, Your

19  Honor.  First of all something like this does not fly under

20  the radar.  These were very high loss producing policies

21  that Health Net knew about and defendant Neidorff admitted

22  they knew about, too.  And so they instituted this drastic

23  program of basically forbidding these service providers

24  sending them claims.  It's interesting that defendants say

25  the story doesn't make sense regarding their attempts to

1  get regulatory approval.  I think their argument misses the

2  broader picture.  They got regulatory approval in March.

3  They had expected to get it earlier.

4      One benefit of -- well, two points here.  First

5  of all, I want to make clear that while there was some

6  public news about Health Net and its service providers

7  having some kind of disputes, it was not revealed publicly

8  that Health Net was suffering these debilitating

9  liabilities.  This wasn't public knowledge.  It was

10 knowledge to the defendants at the time, but investors

11 weren't informed.

12      Secondly, let's look at what happened in here.

13 Wasn't it in Centene's benefit during this time period in

14 late 2015 and early 2016 to try to hide some of these facts

15 from regulators, from investors as they try to do two

16 things.  They tried to conclude the regulatory approvals

17 and they also tried to paint a rosy picture for investors.

18 Investors had approved the deal in October of 2015.  Would

19 they really have liked to hear at that time that the

20 company they were acquiring was having these massive

21 problems that they were going to end up having to pay for?

22 The same goes for the beginning of the class period.

23 That's another reason why they didn't want to disclose this

24 right at the beginning of the class period.  If the merger

25 closes on March 24, how does it look when you come and say

1  just a few weeks later, actually, you know, there's 390
2  million dollars that we didn't tell you about.
3          I'd also point out that when the Department of
4  Insurance actually found out about Health Net's suspect
5  activities in California, what did it do?  On May 31st 2016
6  it began an investigation.  There are now several lawsuits
7  pending, all of which we allege in the complaint.
8          So it stands to reason that if they had known
9  earlier they might have taken a very different course of
10 action and not have approved this merger.  This is a point
11 I wanted to make in response to some of the defendant's
12 statements today.
13         One important point, defendants' counsel stated
14 here today that we don't contest that these accounting,
15 these April 26th accounting statements are opinions.  We
16 actually do contest that.  It's in the brief and
17 furthermore defendants have starkly mischaracterized the
18 test that is to be applied, even if these were considered
19 to be opinions.  As we know from Joseph Kagan's 2015
20 opinion in Omnicare, even if you're dealing with an
21 opinion, a securities issue such as defendant Centene here,
22 can be held liable under a number of circumstances.
23         First of all, yes, they can be held liable if the
24 defendants at the time they made the statements didn't
25 subjectively believe them.  That's for sure.  But the

1    Omnicare Court went on for various pages to explain that

2    defendants can also face a securities fraud claim if they

3    knew of embedded material facts, or omitted facts that

4    would have been important to an investor listening to them

5    speak, and that's the actual test, not the test the

6    defendants are arguing for in this case.

7            Now, our complaint alleges both subjective

8    disbelief and that they omitted facts, not those

9    allegations in particular where we isolate the false and

10   misleading statements, they start at paragraph 81 and they

11   go on.

12           And so even if the Court were to consider these

13   opinions, they would still be liable to face claims against

14   them and proceed to the merits.

15           THE COURT:  Now, tell me where you allege that

16   there was subjective disbelief.

17           MR. MARSH:  Yes.  I'll point to a few allegations

18   starting at paragraph 82, the last sentence, defendants

19   omitted Centene's valuation -- I'm sorry.  Defendants also

20   admitted that Centene's valuation of Health Net's business

21   materially understated Health Net's liabilities and the

22   defendants had known of such issues since before the merger

23   closed on March 24, 2016.  Subjective knowledge is also

24   alleged at paragraph 84.  I'd also like to focus on

25   paragraph 93 which deals -- when Your Honor is ready.

1        THE COURT:  I'm still looking for it in paragraph

2   84.

3        MR. MARSH:  Eighty-four, Your Honor?

4        THE COURT:  Yes.

5        MR. MARSH:  I would point the Court to the top of

6   page 38, the second line where it says that they omitted --

7   that the due diligence by defendants that identified

8   numerous issues with Health Net's policies, that as

9   defendants knew, required that Health Net's policies be

10  redesigned in order to avoid losing money, and that the

11  company make material changes to the valuation of Health

12  Net report on April 26.  There's one allegation of

13  knowledge, explicit allegation of knowledge that they knew

14  that the statements on April 26 were wrong.

15        Another one is at paragraph 93.  And page 43, if

16  I may, towards the middle, there's a line that starts with

17  the word "issues" and it says that as defendants knew, they

18  required both material changes to the valuation of Health

19  Net report on April 26 including to the Health Net reserves

20  for Health Net's losses prior to March 24 as well as the

21  PDR for the periods after March 24.  And that's another key

22  point, and I apologize if I omitted this earlier, but Your

23  Honor asked for further evidence of scienter and one of the

24  key facts is a very simple one.  Ninety million dollars of

25  this 390 million dollars regarded liabilities for a period

1  that extended 27 months before the merger even closed.

2          It is simply implausible that defendants didn't

3  know about these material charges.  Defendants pretend that

4  this case is all about predictions, but really it's about

5  their knowledge of facts at the time.

6          THE COURT:  Can I get you to wrap it up in the

7  next minute?

8          MR. MARSH:  Yes.  I'll just say one or two more

9  sentences if I may.  I mean, I think in sum that we are

10  very heartened by the knowledge that the Court will take a

11  key look at the complaint and not rely on defendants'

12  characterizations of what the claims are here.

13          As stated before, there are only two elements at

14  issue, falsity and scienter.  For falsity, it's the typical

15  Rule 12 standard in addition to the modest requirement of

16  the PSLRA that we, you know, for instance identify the

17  speaker of the misstatement and the time and date, and that

18  we state the reasons that we believe the statements were

19  misleading.  And as for scienter, we would like to keep in

20  mind the governing precedent from the Supreme Court in the

21  cases I've named as really as the Rand-Heart and Green Tree

22  decisions where knowledge of an omitted material fact is a

23  firm basis for a securities fraud claim.  So, with that,

24  Your Honor, if there are no further questions.

25          THE COURT:  Thank you.  I can give you four

1 | minutes.  Honestly, folks, I must be somewhere at 3:30,

2 | luckily it's downstairs.

3 | MR. MORRISON:  Will you not hold it against me if

4 | I speed talk, then, Your Honor.

5 | THE COURT:  Well, but my reporter will.  If she

6 | holds it against you then I hold it against you.

7 | MR. MORRISON:  Fair enough.  I will try to take

8 | off some very brief responses.  Let me first start with the

9 | pleading standard that's not accurate.  The PSLRA requires

10 | heightened pleading, and I cited cases earlier.  Your

11 | Honor's K-V Pharma case specifically says that the PSLRA

12 | dictates special heightened pleading rules for securities

13 | cases.

14 | So, this plausibility 12B standard is completely

15 | wrong.  Number two, still no answer to that motive

16 | question, Your Honor.  They don't have a single compelling

17 | idea about why anybody at Centene would engage in this

18 | fraud, nothing.  He says, well, they lied because they

19 | wanted regulatory approval in the fall of 2015.  The class

20 | doesn't start until April 2016.  There's not a single

21 | alleged lie in this case before April of 2016.  If they got

22 | regulatory approval before March 24, 2016.  Already --

23 | THE COURT:  I don't think they are claiming that

24 | there were lies before that date.  I think the plaintiffs

25 | are claiming there was some knowledge before that date, but

1  that the defendants did not want to disclose that in

2  March.

3              MR. MORRISON:  Two different issues, Your Honor,

4  two different issues.  One is a falsity issue and one is a

5  scienter issue.  In terms of motive there has to be a

6  reason for the lie.  If the lie doesn't take place until

7  April, the reason can't be to convince the regulators to

8  approve the deal, if the deal has already been approved by

9  that time, because the regulators have already approved it.

10  There'd be no reason to lie after the fact, doesn't make

11  any sense at all.  It's super important.  I want to make

12  sure I spend a minute on that.

13              Now with respect to the knowledge part of it,

14  Your Honor, that there was some knowledge earlier on.  Two

15  responses to that, number one, Your Honor hit on it.

16  Health Net is a public company.  Anybody knew what Health

17  Net public financial statements were prior to the merger by

18  reading their 10Ks and 10Qs, like every investor.  Not only

19  that plaintiffs' counsel says it's not in the record.

20  There's a chart in paragraph 24 that identifies Health

21  Net's liabilities for the substance abuse claims.  Unless

22  they had inside, nonmaterial public information about

23  Health Net's activities, which I highly doubt, there's no

24  question they got that from publicly available materials,

25  just like anybody else could.

1          Green Tree.  Completely inapposite for two

2     reasons.  Number one, Green Tree involved, it's a subprime

3     mortgage lender essentially, Your Honor, and in order to

4     produce their publicly available financial statements, they

5     had to make assumptions about prepayment rates.  If

6     somebody prepays a mortgage Green Tree doesn't get as much

7     interest and therefore it's a liability, and they had to

8     make assumptions about that to put out their statements.

9     And they made a whole bunch of assumptions.

10          Well, it turns out that in the complaint in Green

11     Tree it was alleged that the individual defendants got

12     quarterly actuals in terms of prepayment of mortgages.  So,

13     they had the actual numbers from internal reports and

14     because they had the actual numbers, when they made

15     assumptions for the public financial statements that didn't

16     foot with the actuals, that case involves direct internal

17     reports of contradictory evidence at the time the false and

18     misleading statements are made.  Those types of internal

19     reports are completely absent from this complain.  Not a

20     single allegation that anybody at Centene knew that their

21     estimates in April were incorrect.  That makes Green Tree

22     completely different.  In fact, in Green Tree there's an

23     allegation of a phone call from a money manager to one of

24     the individual defendants in which the allegation is, the

25     individual defendant says, yeah, we knew our assumptions

1    were wrong, but we thought it would blow over.

2            There's no specific phone calls alleged in this

3    complaint.  It's just silent.  That doesn't remotely meet

4    the PSLRA pleading standard.  Second point about Green

5    Tree, Your Honor, is Green Tree had a significant motive

6    allegation.  In Green Tree the CEO compensation every year

7    was 2.5 percent of earnings, and so if he jacks up the

8    assumptions so that the books look better, he makes more

9    money and the pleadings said he made 102 million dollars

10   through the fraud.  He had a personal incentive to do so.

11           There's no insider sales in this case.  There's

12   no allegations of personal motive in this case.  It's

13   completely different.  With respect to this idea that we

14   admitted we had information, that's apples and oranges.

15   The statements that were made after the class period that

16   counsel refers to, says we knew that there were certain

17   product design flaws, which means we knew certain products

18   had to get fixed, but knowing the cause of the potential

19   liabilities, Your Honor, doesn't mean that we had any

20   information about the impact or value of those potential

21   products until we went through our purchase price

22   accounting exercise, which couldn't begin until the deal

23   closed in March.  Your Honor got it right.  You said it

24   yourself, what is the evidence for the allegations that we

25   knew that the accounting and the purchase price accounting

1　was wrong.  There's zero.  This whole idea about as of

2　March 24th, I think Your Honor is right on there.  As of

3　March 24th doesn't mean that the company had full

4　information as of March 24th in connection with its

5　purchase price accounting.  It just means it now has access

6　to those facts by virtue of acquiring Health Net.  But Rule

7　805 itself gives Centene a full year to interpret that

8　data, and once it does it adjusts the balance sheet as of

9　the acquisition date which was March 24.  That's all that

10　means.  It doesn't mean it's an admission that we had full

11　information and we had done our full evaluation as of March

12　24th.  That's nonsense.

13　　　　　　　THE COURT:  Okay.  You got one sentence and then

14　you're done.

15　　　　　　　MR. MORRISON:  I would just come back to this,

16　Your Honor, and I'll rest on the papers.  Compare the

17　compelling inferences here.  Follow the rules of

18　complicated accounting procedure and update our financials

19　along the way, or believe that we engage in this fraud for

20　absolutely no reason whatsoever that can be articulated.

21　And I submit to you, Your Honor, if this is a case where

22　the securities fraud is allowed to proceed here, Centene

23　would be penalized for its transparence and that's not what

24　the securities laws are about, Your Honor, and with that I

25　thank you for your time.

1    THE COURT:  Let me just ask the plaintiffs one

2    final question.  It's just to satisfy my own curiosity.  It

3    really doesn't have very much to do with the issue before

4    me, but is there any belief on plaintiffs part that as of

5    the close of the class period that those disclosures still

6    were not properly made?  In other words, by the second

7    quarter reporting, do you believe that the proper

8    disclosures were made?

9    MR. MARSH:  In terms of the quantity of the

10   additional liabilities recognized, we don't have

11   allegations that these are inaccurate.  We do allege the

12   way it was accounted for was inappropriate.

13   THE COURT:  But the disclosures with respect to

14   the magnitude of the liabilities, and do you believe that

15   that disclosure was in fact made by the end of your class

16   period?

17   MR. MARSH:  We don't have a personal belief.  We

18   don't want to go on the record saying it was full

19   disclosure and in discovery find out it's wrong.

20   THE COURT:  But as of this moment there are no

21   allegations that even that disclosure was incomplete; is

22   that a fair statement?

23   MR. MARSH:  Well, it was incomplete in the sense

24   that there was so much more that they arguably disclosed as

25   well about what they knew, but the monetary value --

1          THE COURT:  Monetary value is what I'm talking

2    about.

3          MR. MARSH:  Yes, yes.

4          THE COURT:  As I said, it doesn't have a lot to

5    do with what's before me, but I was just curious.  All

6    right.  Thank you all.  I'm sorry.  I'm late.  I've got to

7    go and we will take the matter under submission and get you

8    a ruling as soon as we can.  Thank you.

9               (COURT ADJOURNED AT APPROXIMATELY 3:30.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        REPORTER'S CERTIFICATE

2

3        I, Patti Dunn Wecke, Registered Merit Reporter,

4   hereby certify that I am a duly appointed official court

5   reporter of the United States District Court for the

6   Eastern District of Missouri.

7        I further certify that the foregoing is a true

8   and accurate transcript of the proceedings held in the

9   entitled cause, and a true and correct transcription of my

10  stenographic notes.

11       I further certify that this transcript,

12  containing pages 1 - 75 inclusive, was delivered

13  electronically and that this reporter takes no

14  responsibility for missing or altered pages of this

15  transcript when same transcript is copied by any party

16  other than this reporter.

17       Dated at St. Louis, Missouri, this 16th day of

18  March, 2018.

19                      /s/Patti Dunn Wecke, RMR, CRR, CMRS
                             Official Reporter
20

21

22

23

24

25