UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ISRAEL SANCHEZ, Individually and on Behalf of All Others Similarly Situated, et. al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | Case No. 4:17CV00806 AGF |
| CENTENE CORP., MICHAEL NEIDORFF, and JEFFREY SCHWANEKE, | ) ) ) | |
| Defendants. | ) ) | |
| SUNIL CHAND, et al., | ) ) ) | |
| Movants. | ) ) | |

## MEMORANDUM AND ORDER

This putative class action was filed under the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA)," in federal district court in California and transferred to this Court.   The case is now before the Court on Defendants' motion (ECF No. 71) to dismiss Plaintiffs' amended consolidated class action complaint (ECF No. 66) for failure to state a claim.   Oral argument was held on February 22, 2018.   For the reasons set forth below, the motion to dismiss will be granted in part and denied in part.

## BACKGROUND

Plaintiffs bring this action on behalf of all persons and entities that purchased or acquired Centene Corporation ("Centene") stock between April 26, 2016, and July 25, 2016 (the "Class Period").   Defendants are Centene and two of its top officers: Michael

Neidorff and Jeffrey Schwaneke.   For purposes of the motion before the Court, the record establishes the following.   Centene sells health insurance.   On July 2, 2015, Centene announced its intention to acquire Health Net, Inc., a company that sold health insurance primarily in California and Arizona, for about $6.8 billion.   Under the terms of the agreement, upon completion of the merger, Centene shareholders would own approximately 71% of the combined entity, with Health Net shareholders owning approximately 29%.   The merger closed on March 24, 2016.

During the nine months leading up to the merger, Centene conducted due diligence of Health Net's business.   In 2014 and throughout 2015, Health Net incurred rising liabilities related to claims for substance-abuse treatment.   Health Net began denying such claims and asked California regulators for permission to redesign its policies.   In filings with the Securities Exchange Commission ("SEC") dated September 17, 2015, September 21, 2015, and January 26, 2016, made in anticipation of the merger, Centene added to its valuation of Health Net the following language: "At this time, Centene does not have sufficient information as to the amount, timing and risk of cash flows of all of Health Net's identifiable intangible assets to determine their fair value."

On April 26, 2016, (one month after the merger and the start of the Class Period) Centene published a required purchase price accounting (SEC Form 10-Q) listing Health Net's assets and liabilities that Centene acquired.   The April 2016 accounting did not include the language that Centene did not have sufficient information regarding Health Net's fair value; but was labeled, "preliminary" and "subject to change."   According to Plaintiffs, the April 2016 statement, using "purchase accounting," violated Generally

Accepted Accounting Principles ("GAAP") and SEC regulations, and this resulted in about $300 million of Health Net's liabilities not being reported as of that date.

Plaintiffs assert in the amended complaint that in this accounting, Defendants made "positive statements about Health Net's business in Arizona and California that omitted the deep flaws and losses on [Health Net's] policies that were known internally at Centene at the time." Plaintiffs assert that this accounting also omitted the required disclosures of "known trends or uncertainties" and "known uncertainties reasonably likely to have material future effects on the Company's financial condition." ECF No. 66 ¶ 110.

Plaintiffs contend that on July 26, 2016, "the truth was revealed" when Defendants disclosed that Health Net's liabilities were $390 million higher than Defendants had represented in April 2016. On that day, in response to this disclosure, Centene's stock price declined by about 8.5%, erasing over $1 billion in shareholder value. The gravamen of the amended complaint is that Defendants knew during the Class Period about this level of Health Net's liabilities, but concealed it, and "Defendants' materially false and misleading statements and omissions artificially inflated the price of Centene common stock and maintained inflation in the stock price. The disclosures on July 26, 2016 revealed the relevant truth and removed the artificial inflation from the stock price." *Id*. ¶ 119.

In the amended complaint, Plaintiffs note the following statements by Centene that Plaintiffs assert were misleading because they omitted Health Net's increased liabilities on its California substance-abuse policies, the measures Health Net was taking to avoid

payments to treatment facilities, and the efforts to redesign the flawed policies that were

losing money; all matters that were known to Defendants when the statements were

made:

> 1.   On April 26, 2016, during a Centene quarterly investor conference call, Neidorff stated that there were "no surprises" during "the regulatory process in California."   Another Centene executive stated that "the exchange business at . . . Health Net has been profitable.   The one area of challenge with respect to the exchange business at Health Net has been Arizona," and Health Net has pursued "a strategy . . . [t]hat has worked well for them" in California.

> 2.   On May 24, 2016, at a healthcare conference, in response to an analyst's question regarding whether there had been any surprises or challenges associated with the merger, Neidorff responded that everything had gone as "expected" because Centene spent nine months working on the integration before the merger was completed.   Neidorff also indicated that Centene had not taken any other action to bring Health Net "up to snuff in [Centene's] accounting and balance sheets."

> 3.   On June 17, 2016, Schwaneke made statements at an Investor Day event highlighting the adequacy of Centene's medical claims reserves, stating that "[a]s of May 31, 2016, there has been no unfavorable development on the acquired Health Net medical reserves."[1]

ECF No. 66 ¶¶ 81, 83, 85-88.

Plaintiffs emphasize that Health Net's liabilities reported by Centene on July 26,

2016, were not due to new information obtained since the April 26, 2016 financial

statements.   Rather, according to Plaintiffs, Centene knew as of April 26, 2016, about the

level of Health Net's liabilities that were due to claims from California substance-abuse

treatment centers.   ECF No. 66 ¶¶ 66, 109, 112.

---

[1]      "Reserves" was defined in Plaintiffs' complaint as "monies that insurance companies earmark for payment of insurance policy claims."   ECF No. 66 ¶ 55 n. 1.

The amended complaint also includes a section entitled, "Additional Allegations of Defendants' Scienter," that points to evidence of Defendants' admissions that they had knowledge during the due diligence period of Health Net's rising substance-abuse treatment liabilities and its efforts to control these costs. ECF No. 66 ¶¶ 112-14. The amended complaint has two counts: Count I against all Defendants claims violations of §10(b) of the Exchange Act and SEC Rule 10b-5 by making false statements Defendants knew were misleading; and Count II against Centene officers Neidorff and Schwaneke for violations of §20(a) of the Act (control-person liability). Plaintiffs seek "all damages and other remedies available under the Exchange Act." ECF No. 66 ¶ 150(b).

## ARGUMENTS OF THE PARTIES

In support of their motion to dismiss, Defendants argue that Plaintiffs have failed to plead facts showing that the "Preliminary Estimates" of April 26, 2016, were false at the time they were made, by not alleging "any facts that would show Defendants knew—or even could have known—the precise value of the liabilities created by [Health Net's insurance products] until Centene had completed a full valuation of those liabilities post-closing [of the merger]." ECF No. 72 at 17. Defendants note that Plaintiffs cite no internal report or confidential witness showing that Defendants knew the true value of Health Net on April 26, 2016. Defendants argue that the post-merger valuation provided new information on which Centene based its "Updated Estimates" of July 26, 2016. Defendants rely heavily on *Elam v. Neidorff*, 544 F.3d 921 (8th Cir. 2008), in which the Eighth Circuit affirmed the dismissal of a securities fraud complaint because the plaintiffs

failed to allege information that the defendant, an officer of a company, knew at the time he projected the company's quarterly earnings that indicated the projections were wrong.

Defendants also argue that the Preliminary Estimates were not statements of fact, but rather of opinion that were not subjectively false.   ECF No. 72 at 18.   Defendants state that Plaintiffs do not allege any facts that show that Defendants did not sincerely believe the Preliminary Estimates.   Defendants highlight the fact that they advised investors that the Preliminary Estimates were subject to change.   Defendants also argue that Plaintiffs have not adequately alleged that Defendants' accounting for the Health Net acquisition violated GAAP, and further, that pleading a GAAP violation is not enough to state a securities fraud claim.   *Id.* at 19-22.   Defendants argue that the April 26, 2016, SEC Form10-Q did not violate SEC regulations because Centene's purchase price accounting estimates "were a mere accounting adjustment that had no impact on Centene's present or future income statement."   *Id*. at 20.

Turning to the above-described oral statements made by Defendants in April, May, and June 2016, Defendants argue that the April 26, 2016 statement that Health Net has "pursued a strategy . . . that's worked well for them" in California is taken out of context, and is a "vague, soft, puffing statement" that is immaterial and not actionable under the law.   *Id.* at 23-24.   Defendants state that "many of the facts Plaintiff claims Defendants omitted" had been public before the merger, such as "the remedial measures that Health Net took to avoid payments to substance-abuse treatment facilities."   *Id*. at 24-25.   Defendants rely on media reports published between January and June 2016, which publicize how Health Net was investigating treatment centers for potential fraud

and treatment centers' claims that Health Net was improperly withholding claims payments. *See* ECF Nos. 73-10 to 73-12.

Defendants argue that Plaintiffs fail to explain how the May 24, 2016, statement that Centene conducted due diligence was rendered false or misleading by the omitted matters. Defendants contend that Centene did conduct due diligence and that Plaintiffs fail to allege facts demonstrating Centene knew, by May 24, 2016, that its previously-disclosed Heath Net liabilities estimates were inaccurate, and therefore, would have needed adjustment by that time. ECF No. 72 at 25. Similarly, Defendants argue that Plaintiffs have failed to allege any facts demonstrating that Centene knew the Preliminary Estimates were not accurate as of May 31, 2016 – the date referenced in Schwaneke's comment at the June 17, 2016, Investor Day event. According to Defendants, Plaintiffs ignore the cautionary language following Schwaneke's allegedly misleading comment, which states that the comment "[did] not take into account any potential adjustment in the second quarter." ECF No. 73-7 at 8. Defendants argue that this cautionary language is sufficient to make any alleged misrepresentation or omission immaterial as a matter of law. ECF No. 72 at 26.

Defendants then argue that even if Plaintiffs have alleged any actionable misstatement or omission, the complaint should still be dismissed because Plaintiffs fail to plead the required strong inference of scienter. Defendants contend that Plaintiffs have failed to show concrete and personal benefit to the individual Defendants resulting from the alleged fraud; and that Plaintiffs' speculation that Defendants were motivated to conceal the truth from California regulators while seeking approval for the merger is

implausible because (1) the merger was completed a month before the Class Period began, and (2) Plaintiffs have failed to show how misleading investors could have increased the likelihood of regulatory approval. *Id.* at 27-27. Further, Defendants argue that Plaintiffs' theory of scienter is not "cogent" and less compelling than obvious competing inferences of nonfraudulent intent. Defendants argue that Plaintiffs do not and cannot "explain ***why*** Defendants would intentionally acquire a flawed company, briefly conceal those flaws from investors but then voluntarily disclose them—all without personally profiting from the alleged scheme." *Id.* at 28-29. Lastly, Defendants argue that, because Plaintiffs have failed to alleged a primary violation under §10(b) and Rule 10b-5, the complaint also fails to state claims for control-person liability under §20(a). *Id.* at 30.

In response, Plaintiffs argue that the complaint adequately alleges false and misleading statements and omissions. Specifically, Plaintiffs cite Defendants' oral statements on April 26, May 24, and June 17, 2016; as well as the accounting statements. Plaintiffs also argue that the complaint adequately alleges scienter. ECF No. 77 at 16-31. Plaintiffs contend that Defendants' admissions that they knew, during the due diligence period, about Health Net's rising liabilities and the effort to control costs, raise a strong inference of scienter. *Id.* at 28. Plaintiffs distinguish *Elam*, 544 F.3d 921, on the ground that, here, Plaintiffs allege that Defendants had information *when they made* certain statements that rendered the statements misleading. *Id.* at 27.

Plaintiffs also argue that they need only allege reckless or knowing misstatements or omissions, rather than motive, to sufficiently allege scienter. Plaintiffs further

8

contend that, in any event, scienter is sufficiently alleged because Defendants were motivated to conceal Health Net's liabilities from regulators and investors so that the merger could be closed. *Id.* at 30-31. And Plaintiffs argue that, because Plaintiffs have adequately alleged a primary violation under §10(b) and Rule 10b-5, the complaint states claims for control-person liability under §20(a). *Id.* at 31.

At oral argument, the parties essentially reaffirmed their positions set forth in their written memoranda. Defendants noted that this case has no "hallmarks" of securities fraud, such as an SEC investigation or allegations of insider trading. ECF No. 81 at 6-7. They emphasized that Plaintiffs have presented no allegation of motivation, and they opined that Plaintiffs' theory of fraud "makes no sense." *Id.* at 5. According to Defendants, the only rationale Plaintiffs presented – that Defendants concealed Health Net's true value to convince regulators to approve the merger – is not reasonable because the April 26, 2016, accounting came after the merger closed. *Id.* at 11. And, Defendants argue, in the absence of a plausible motivation, scienter allegations must be particularly strong, which they are not. *Id.* at 30-31. Defendants maintain that Plaintiffs' case is one of "fraud by hindsight" – improperly faulting Defendants for liability estimates that later proved to be incorrect. *Id.* at 9.

## DISCUSSION

## Count I: Exchange Act and SEC Rule Violations against All Defendants

To state a private securities fraud claim under §10(b) and Rule 10b-5, as asserted in Count I, a plaintiff must allege: "(1) a material misrepresentation (or omission); (2) scienter, *i.e.*, a wrongful state of mind; (3) a connection with the purchase or sale of a

security; (4) reliance ... (5) economic loss; and (6) loss causation, *i.e.*, a causal connection between the material misrepresentation and the loss." *Horizon Asset Mgmt. Inc. v. H & R Block, Inc*., 580 F.3d 755, 760 (8th Cir. 2009) (citations omitted).

> The [PSLRA] modifies the ordinary Rule 12(b)(6) dismissal mechanism in two limited ways. First, whereas under Rule 12(b)(6), [a court] must assume all factual allegations in the complaint are true, under the [PSLRA], [the court] disregard[s] "catch-all" or "blanket" assertions that do not live up to the particularity requirements of the statute. Second, under Fed. R. Civ. P. 12(b)(6), the plaintiff is entitled to all reasonable inferences that may be drawn from the allegations of the complaint. However, under the [PSLRA], a securities fraud case cannot survive unless its allegations collectively add up to a strong inference of the required state of mind.

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp*., 270 F.3d 645, 660 (8th Cir. 2001) (internal citations omitted).

Thus, in order for a securities fraud claim to survive a Rule 12 motion to dismiss under the PSLRA's heightened pleading requirements, "the complaint must: 1) specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading, and 2) state with particularity facts giving rise to a strong inference that the defendant acted with [scienter]." *Elam*, 544 F.3d at 926-27 (quoting 15 U.S.C. § 78u–4(b)(1)–(2) (citations and internal quotations omitted) (brackets in original). Here, Defendants argue that Plaintiffs have failed to adequately allege both (1) a material misrepresentation or omission; and (2) scienter.

## Material Misrepresentation or Omission

Section 10(b) and Rule 10b-5 make it "unlawful to, among other things, make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made,

not misleading." *Rand-Heart of N.Y., Inc. v. Dolan*, 812 F.3d 1172, 1176 (8th Cir. 2016) (citations and internal quotations omitted). A statement is misleading if it "create[s] an impression of a state of affairs … that materially differ[s] from the one that actually exist[s]." *In re Medtronic Inc., Sec. Litig.*, 618 F. Supp. 2d 1016, 1031 (D. Minn. 2009). A complaint need not prove falsity; instead it need only allege facts "sufficient to support an inference" that statements were false or misleading when made. *Lustgraaf v. Behrens*, 619 F.3d 867, 874 (8th Cir. 2010).

Here, Plaintiffs allege that three sets of statements made by Defendants in April, May, and June 2016 were false and misleading. Plaintiffs also allege that Defendants' April 26, 2016, SEC Form 10-Q filing violated GAAP and SEC regulations, and was false and misleading. The Court agrees with Defendants that the allegations as to Defendants' April statements and SEC 10-Q filing are not adequate to meet the PSLRA heightened pleading standard. However, Plaintiffs have pled sufficient facts to meet the PSLRA standard with respect to Defendants' May and June statements.

### *April SEC Form 10-Q Financial Statement*

Plaintiffs allege that Defendants' April 26, 2016, SEC Form 10-Q was false, misleading, and violated GAAP. The 10-Q stated the "fair value" of Health Net liabilities as of the March 2016 merger. However, it qualified that "[t]he valuation of assets acquired and liabilities assumed ha[d] not been finalized" and that, therefore, the estimates were "preliminary," "subject to change," and would be "finalized within one year" from the date of the merger. ECF No. 73-5 at 14. The statement further noted that "[d]ue to the timing of the acquisition date, [Centene] has performed limited

valuation procedures, and the valuation of nearly all assets and liabilities assumed is incomplete." *Id.*

As discussed below, Plaintiffs have sufficiently alleged Defendants' knowledge of understated Health Net reserves by the time they made their May and June 2016 statements. But there are inadequate facts indicating such knowledge as of the March merger date. Plaintiffs provide no basis to support Defendants' knowledge of different financials that Plaintiffs allege should have been reported at that time. *See In re K-Tel Int'l Inc. Sec. Litig.*, 300 F.3d 881, 889-93 (8th Cir. 2002) (holding plaintiff class failed to satisfy PSLRA's particularity requirement when pleading GAAP violations where they did not provide source or basis for support other than later financial disclosures by defendant). As such, and especially in light of the specific cautionary language accompanying the valuation, there are not sufficient allegations pled with particularity to find this April 10-Q statement a material misrepresentation or omission.

*See Rand-Heart*, 812 F.3d at 1177–78

("Cautionary language which relates directly to that which the Plaintiffs claim to have been misleading, if sufficient, renders the alleged misrepresentation or omissions immaterial as a matter of law.") (citation omitted).

### *April 2016 Investor Conference Call Statements*

Plaintiffs point to the following statements that Defendants made in the April 26, 2016, investor conference call that Plaintiffs allege were false and misleading: (1) that there were "no surprises" concerning "the regulatory process in California;" (2) that "the exchange business at . . . Health Net has been profitable"; (3) that the "one area of

challenge with respect to the exchange business at Health Net has been Arizona"; and (4) that Health Net had pursued "a strategy . . . [t]hat has worked well for them."  ECF No. 66 ¶ 81.  Assuming that these statements are more than puffery (a particularly questionable assumption with respect to the last statement), they are not "necessarily inconsistent" with Defendants' later announcement of $390 million dollars in additional Health Net liabilities.  *In re Cerner Corp. Sec. Litig.*, 425 F.3d 1079, 1084 (8th Cir. 2005).  These statements do not specifically mention Health Net reserves, and it is conceivable that, for instance, Health Net's exchange business could have been generally profitable despite the large California substance-abuse claims.  Moreover, as Defendants note, during the April 2016 call, Defendant Schwaneke specifically cautioned that, in light of the timing of the merger, Defendants had only made "high-level estimates" with respect to the Health Net reserves, that Defendants "ha[d]n't completed the analysis," and that Defendants "look[ed] to complete the bulk of that analysis in the second quarter." ECF No. 73-6 at 15.  Plaintiffs' allegations concerning the April 2016 statements simply are not sufficient to demonstrate that they were false or misleading when made.

### May 2016 Healthcare Conference Statements

Considering the conference transcript as a whole and the context in which statements were made, the Court considers the following to be an accurate description of the relevant May 24, 2016, statements.  During a 'Question and Answer' session with Defendant Neidorff at the conference, Neidorff was asked about whether there were any "surprises or challenges" with the Health Net merger.  Neidorff answered that it had "all been where we expected."  ECF No. 73-20 at 5.  He was then asked if – besides the

"steps to strengthen the balance sheet" that were taken when Health Net was brought on –
"there [were] any other things that you've had to do to bring [Health Net] into – up to
snuff in your accounting and balance sheet?" *Id.* at 6. Neidorff answered "No" and
then he briefly discussed the purchase accounting method and cautioned that they have a
year to make adjustments to reserves. "But in reality, after about 60 days," Neidorff
continued, "you have significant development of reserves in the 90s. So everything
we're seeing says it's fine." *Id.*

Two months later, on July 26, 2016, Defendants filed a Form 10-Q with the SEC
that increased Health Net's medical claims liability reserves by approximately $90
million, and a Form 8-K showing approximately $300 million dollars of additional
liabilities in the Health Net business. ECF No. 66 ¶¶ 66-67. In a Second Quarter
Earnings Conference Call on the same day that the updated numbers were released,
Defendant Schwaneke attempted to explain these changes: "Although we have not
experienced any unfavorable development on the medical claim liabilities established at
March 24, 2016, we have increased reserves by approximately $90 million during the
quarter associated with disputed substance abuse treatment center claims." ECF No. 73-
9 at 6. Schwaneke goes on to explain that the company has already "taken steps to
mitigate the substance abuse treatment center cost in the individual commercial business
in California including modifications to plan design." *Id.* at 7. Neidorff later added that
it is a "plan design which we've been working on for the past several months." *Id.*

So, as of July 26, 2016, Defendants knew about the California PPO plan losses
from substance-abuse center claims, had already filed for rate adjustments in California,

and had been working on product re-design for "several months." Yet, two months earlier, when asked whether changes were required to get Health Net reserves "up to snuff … on the balance sheet," Neidorff said "No." Even considering the context in which this statement was made, a reasonable fact-finder could conclude that the statements were misleading and created an impression of a state of affairs that materially differed from the one that actually existed.

Defendants argue that they sufficiently couched their statements in cautionary language so as to render them immaterial and therefore not misleading. As noted above, cautionary language may render an alleged misrepresentation or omission material if it is "*meaningfully* cautionary," in the form of a "company-specific warning[] based on a realistic description of the risks applicable to the particular circumstances." *Rand-Heart*, 812 F.3d at 1177-78 (emphasis in original). Although Neidorff cautioned in this May statement that Centene had a year to update their numbers, he then suggested that within 60 days of the merger they have "significant development" in knowing the accurate reserve numbers. ECF No. 73-20 at 6. Given that this statement was made approximately 60 days following the close of the merger with Health Net, Neidorff's statement implied that as of the time he was speaking, Health Net's reserves required no changes to get them "up to snuff … on the balance sheet." Yet, at this same time, Defendants were aware of the California substance-abuse center losses and had begun re-designing the plan. Any cautionary language around Neidorff's May statements was not sufficiently meaningful to render the omission or misrepresentation immaterial as a matter of law.

Also during the July 26 Earnings Conference call, when asked about the "pretty big number" of $300 million in additional premium deficiency reserves, Defendant Schwaneke explained that "it was based on information as of the 24th of March and using that information and fair valuing those liabilities effectively as of the acquisition date [of March 24, 2016]." ECF No. 73-9 at 7. If the increase in reserves was based on information known at the time of the merger and "significant development" had been made in knowing the reserves numbers over the past two months, it could be reasonably inferred that it was misleading for Neidorff to report in May that no changes were needed to get Health Net "up to snuff … on the balance sheet." Plaintiffs have alleged facts with sufficient particularity to support an inference that Defendants' May 2016 statements were false and misleading when made.

Defendants attempt to equate Plaintiffs' arguments here to those that failed in *Elam v. Neidorff*, 544 F.3d 921 (8th Cir. 2008). In *Elam*, plaintiffs alleged that defendants "must have known" about additional medical costs earlier than when they actually reported them, because of defendants' representations as to their ability to accurately predict costs. *Id.* at 927. The Eighth Circuit affirmed that "fraud by hindsight" does not meet the PSLRA's particularity pleading requirement where the pleading "fails to point to any contemporaneous reports, witness statements, or any information that had actually been provided to defendants" as of the time of the allegedly false statements. *Id.*

*Elam* is distinguishable. Here, Plaintiffs allege that Defendants had information when they made the statements at issue that rendered those statements misleading.

Plaintiffs point to statements made by Defendants indicating that Defendants knew about the substantial substance-abuse center claims as of the date of the merger and after 60 days of significant reserve development, Neidorff reported that the reserves were "fine." *See* ECF No. 73-9 at 7, 8. Thus, Plaintiffs sufficiently support their claim that, by the time the May 2016 statements were made, Defendants had in their possession facts concerning Health Net reserves that they omitted from their May 2016 statements, which rendered those statements materially false or misleading.

*June 2016 Investor Day Statements*

Considering the Investor Day transcript as a whole and the context in which statements were made, the Court considers the following to be an accurate description of the relevant statements. Centene held its 14th Annual Investor Day on June 17, 2016, with one planned objective being "to update [investors] on what's involved with the Health Net integration." ECF No. 73-7 at 5. Defendant Schwaneke's comments that day were intended to "help mitigate any concerns [investors] have regarding Health Net's reserves prior to the March 24 closing date." *Id.* In order to do so, Schwaneke spent a portion of his presentation discussing how Centene ensures the "adequacy of medical claims reserves." *Id.* at 8. As part of his "quick update on the Health Net finance transition," he explained that "[o]n a monthly basis, Centene's finance team has been reviewing and monitoring the medical claims reserves and development. As of May 31, 2016, there has been no unfavorable development on the acquired Health Net medical reserves." Directly following these statements, Schwaneke added: "This comment is

based on the provisional amounts recorded in the first quarter and does not take into account any potential adjustment in the second quarter." *Id.*

Although Schwaneke added this clarifying statement about potential second quarter adjustment, in the actual "no unfavorable development" sentence, he said it was "[a]s of May 31, 2016." Also, the slide he displayed during his presentation had a large box with the wording: "No unfavorable development on the acquired Health Net medical reserves through May." ECF No. 66 ¶ 88. Later, when clarifying his "no unfavorable development" statement during the 'Question and Answer' session, Schwaneke explained that: "when I said there was no unfavorable development on the opening balance sheet reserves, there's also a slide I had showed, 2 months out, you're roughly 85% complete on a pay basis, meaning you've paid 85% of the claims that you ultimately think you're going to pay. So obviously, there's still a piece left, but 2 months out you have 85% of the claims already paid and out the door. And so I'd say the variability gets smaller and smaller as the months go on." ECF No. 73-7 at 20.

Schwaneke's statement about the reliability of reserve numbers two months post-merger – a statement he made two months post-merger – conveyed that Defendants knew nothing at that time that would require changes to their Health Net medical reserves numbers. After all, according to his statements, 85% of claims had been paid. However, statements made on July 26, 2016, when the new liability reserve numbers were released, indicate otherwise. *See* ECF No. 73-9 at 7 (When answering a question about the $300 million PDR, Schwaneke stated that "it was based on information as of the 24th of March and using that information and fair valuing those liabilities effectively

as of the acquisition date."); at 8 (When answering a question about the $90 million added to medical claims liability, Schwaneke states that it was "as of March 24" and "really is for the prior issues.").

Investor concern about the Health Net reserves is evident from the transcript of the June Investor Day, where many of the questions related to reserves. At one point a questioner said "final question on the Health Net reserves, I'm sorry to beat up on it, but it's something that's really on people's minds." ECF No. 73-7 at 27. Subsequently Schwaneke was questioned about whether there was any negative development in 2015 and he replied that "in aggregate, because the March 24 reserves includes all dates of service prior to the 24th, so that would include '15 and '16. So I don't have the split, but in total, we haven't seen any development on anything prior to the 24th, in total." *Id.*

"It is substantially likely that a reasonable investor would have viewed" the omitted information on Health Net's reserves "as having significantly altered the 'total mix' of information made available." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 47 (2011). Reading the transcript from Investor Day as a whole in order to consider the context of all statements, there is insufficient cautionary language to render immaterial as a matter of law Defendants' omissions or misstatements.

Defendants also argue that their admission of the need to redesign the California individual PPO product at the June Investor Day was actually a disclosure of the information that Plaintiffs claim was omitted, therefore, undermining Plaintiffs' claim of fraud. *See* ECF No. 73-7 at 15 ("[W]e're investing to revitalize our products in the individual space, including in the individual PPO product in California."). According to

19

Defendants, the public knew of the Health Net California substance-abuse center claims as early as January 2016 – three months before the merger – based on multiple media releases concerning claims disputes with Health Net.   ECF No. 72 at 25 (citing ECF Nos. 73-10 to 73-12).   The investor concern about Health Net liability reserves shown at the June Investor Day indicates the widespread nature of this public knowledge.   The reaction to such knowledge was the repeated questioning of Defendants on the topic of Health Net reserves – questions which prompted the allegedly misleading answers at issue here.   Plaintiffs allege that Defendants omitted the *impact* of the rising claims on reserves in statements made at the June Investor Day, and that such omission was misleading.   The Court agrees that this allegation is sufficient under the PSLRA.

In sum, although statements made by Defendants in April 2016 are not sufficient to meet the heightened pleading requirements of the PSLRA, statements made in May and June of 2016 are pled with sufficient particularity.   Plaintiffs' May and June 2016 allegations are not catch-all or blanket assertions but instead point to specific statements made by Defendants that could be found to be misleading.   Plaintiffs have satisfied the PSLRA by alleging "facts or further particularities that … demonstrate that the defendants had access to, or knowledge of, information contradicting their public statements when they were made."   *K-Tel*, 300 F.3d at 891.   This is particularly so with regard to Defendants' June 2016 statement that Centene's reserves were adequate.   *See In re Wilmington Trust Sec. Litig.*, 29 F. Supp. 3d 432, 447 (D. Del. 2014) ("[I]f a defendant characterizes . . . reserves as 'adequate' or 'solid' even though it knows they

are inadequate or unstable, it exposes itself to possible liability for securities fraud.")
(citation omitted).

### **Inference of Scienter**

Defendants also argue that Plaintiffs' Count I should be dismissed for failure to
allege scienter, or a wrongful state of mind. Scienter can be established in three ways:
"(1) from facts demonstrating a mental state embracing an intent to deceive, manipulate,
or defraud; (2) from conduct which rises to the level of severe recklessness; or (3) from
allegations of motive and opportunity." *Elam*, 544 F.3d at 928 (citations omitted).
"The inquiry … is whether *all* of the facts alleged, taken collectively, give rise to a strong
inference of scienter, not whether any individual allegation, scrutinized in isolation,
meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23
(2007) (emphasis in original). A court must "engage in a comparative evaluation" to
determine whether the inference of scienter is "more than merely plausible or reasonable
– it must be cogent and at least as compelling as any opposing inference of nonfraudulent
intent." *Id.* at 314.

First, Plaintiffs allege that Defendants were motivated to conceal the truth of the
size of the Health Net liabilities from California regulators while seeking approval for the
merger. ECF No. 66 ¶ 118. Defendants contend that this motive is implausible because
the merger was completed 30 days prior to the start of the Class Period. Plaintiffs
counter that Defendants had been expecting merger approval much earlier than when it
was actually received. ECF No. 81 at 64 ln. 3.

The timing of the merger and the alleged misrepresentations here certainly

weakens Plaintiffs' motive theory, and the lack of another rational motive for the alleged fraud is troubling.   But caselaw indicates that a defendant's motive need not always be pled in a securities fraud case to survive a motion to dismiss.   *Green Tree*, 270 F.3d at 656-60.   Because the complaint's allegations must be considered collectively, "the absence of a motive allegation is not fatal." *Tellabs*, 551 U.S at 325.   Nor are Plaintiffs required to plead a "concrete and personal benefit" to the individual Defendants.   *Green Tree*, 270 F.3d at 656-60.   Without such allegations, the "other allegations tending to show scienter would have to be particularly strong in order to meet the [PSLRA] standard." *Id.* at 660; *K-tel*, 300 F.3d at 894.   However, the inference of scienter "need not be irrefutable, *i.e.* of the 'smoking-gun' genre, or even the 'most plausible of competing inferences." *Tellabs*, 551 U.S. at 324 (citations omitted).

Plaintiffs plead that Defendants knew, or were severely reckless in disregarding, the omitted facts about Health Net's liabilities, resulting in false and misleading statements.   "Severe recklessness is defined as highly unreasonable omissions or misrepresentations involving an extreme departure from the standards of ordinary care, and presenting the danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it." *Rand-Heart*, 812 F.3d at 1177 (internal quotations and citations omitted).

In *Rand*, the Eighth Circuit evaluated the impact of omitted disclosures on the interference of scienter with respect to a severe recklessness argument where there was no showing of motive.   812 F.3d 1172.   The appellate court found cautionary language concerning the company's financial problems sufficient to defeat the interference of

22

scienter where the defendant never "publicly spoke" on the omitted topics. *Id.* at 1177. On the other hand, the Court found the defendant's failure to disclose the loss of its biggest client (given the resulting impact on the defendant's financial instability) sufficiently obvious to the defendant that he must have been aware. *Id.* at 1178. As a result, the Court of Appeals reversed the district court's finding of failure to allege scienter under the PSLRA's heightened pleading standard. *Id.*

Taking Plaintiffs' allegations as true, Defendants' failure to disclose relevant information in their May and June 2016 statements "created a material omission," providing evidence of a strong inference of fraudulent intent. *K-tel*, 300 F.3d at 896. A person has a "duty to speak fully and truthfully" when providing "information with respect to the subjects *on which he undertakes to speak.*" *Id.* at 898 (internal citation omitted) (emphasis in original). At the June 2016 Investor Day, Defendants chose to discuss "concerns" on Health Net's reserves and the "adequacy" of such reserves. *See* ECF No. 73-7 at 5, 8. Their statements on the subject could be found to be misleading because they omitted material information. The statements were not "vague, soft, puffing statements"; nor were the misstatements rendered immaterial by surrounding cautionary language, as alleged by Defendants. *Compare K-Tel*, 300 F.3d at 896-99 (finding strong inference of fraudulent intent but the immateriality of the statements creates no strong inference of scienter). Unlike in *Rand-Heart*, where the defendant did not publicly speak on the omitted subjects, Defendants here chose to speak and were extensively questioned on the Health Net reserves.

Plaintiffs' allegations here regarding Defendants' May and June 2016 statements, establish a "classic fact pattern giving rise to a strong inference of scienter" in that they allege that "defendants published statements when they knew facts or had access to information suggesting that their public statements were materially inaccurate." *Green Tree*, 270 F.3d at 665. Taking as true the alleged extent of due diligence conducted, knowledge of Health Net claims being denied to California substance-abuse centers, and progress already taken to change the failing California PPO product, it was "at the least, so obvious that [Defendants] must have been aware" of the increased Health Net liabilities when they spoke on the subject in May and June 2016. *Rand-Heart*, 812 F.3d 1178. And Defendants' remedial actions could evidence undisclosed knowledge about Health Net reserves sufficient to indicate that their statements were "knowingly false when made." *See Green Tree*, 270 F.3d at 662 (where plaintiffs alleged that "defendants knew facts that showed the assumptions were materially inadequate, but the defendants recklessly attempted to sweep the problem under the rug hoping a change in the economy would ameliorate the problem."). Defendants' statements about the reserves were material and Plaintiffs' complaint sufficiently alleges Defendants had actual knowledge that the statements were, at least, misleading. *See Rand-Heart*, 812 F.3d at 1178.

Additional facts pled here by Plaintiffs also contribute to the finding of a strong inference of scienter. Although the sheer size of the Health Net liabilities that were eventually disclosed –approximately $390 million – is not enough alone to establish scienter, it does contribute to the belief that Defendants were aware of the undisclosed liabilities yet intentionally did not disclose the information. *Green Tree*, 270 F.3d at 666

24

(finding that the magnitude of the write-down adds to the inference of Defendants knowledge); *but see In re Ceridian Corp. Sec. Litig.*, 542 F.3d 240 (8th Cir. 2008) (affirming district court finding that the sheer magnitude of accounting errors and restatements alone cannot give rise to inference of severe recklessness).

Defendants argue that this case has none of the hallmarks of a securities fraud case – no insider trading, no SEC investigation, and no personal financial benefit to individual Defendants – but instead it just involves complex accounting in Defendants' regularly-updated financial statements. The Court finds that when the allegations of Plaintiffs' complaint are accepted as true and taken collectively, a reasonable person would deem the inference of scienter at least as strong as any opposing inference. *See Tellabs*, 551 U.S at 325. Plaintiffs' allegations support a finding of severe recklessness in Defendants' failure to disclose material information on Health Net's reserves and instead reassuring investors on the stability and adequacy of such reserves on multiple occasions. Besides these material omissions, a strong showing of scienter is supported by other factors, including the magnitude of the accounting discrepancy, the long duration of due diligence, and the remedial actions already undertaken in California. Based on a comparative analysis, Plaintiffs have sufficiently pled facts of a strong inference of scienter regarding Defendants May and June 2016 statements.

## Count II: Control-Person Liability against Neidorff and Schwaneke

Section 20(a) of the Securities Exchange Act provides for a companion claim, establishing "liability of those who, subject to certain defenses, 'directly or indirectly' control a primary violator of the federal securities laws." *Lustgraaf*, 619 F.3d at 873

(quoting 15 U.S.C. § 78t(a)). Section 20(a) has been interpreted "as requiring only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Id.* at 873 (internal citation and quotation marks omitted). "The plain language of the control-person statute dictates that, absent a primary violation, a claim for control-person liability must fail." *Id.* at 874.

Defendants argue in their motion to dismiss that this count fails due to the failure of the primary violation count. However, because the Court finds that the Count I primary violation survives dismissal under Rule 12 as to Defendants' May and June 2016 statements, Count II also withstands dismissal as to those statements.

## CONCLUSION

Based on the Court's findings as outlined above, Defendants' motion to dismiss will be denied in part and granted in part. Because Plaintiffs' allegations are insufficient to state a PSLRA claim with particularity as to Defendants' statements and financials released in April 2016, Defendants' motion to dismiss will be granted as to these allegations. Therefore, Plaintiffs' definition of the term "Class Period" must be appropriately adjusted. *See* ECF No. 66 ¶ 1 (defining the "Class Period" as "purchasers of Centene common stock between April 26, 2016 and July 25, 2016."). The "Class Period" will now be limited to the time period of May 24, 2016 to July 25, 2016. Accordingly,

**IT IS HEREBY ORDERED** that Defendants' motion to dismiss Plaintiffs' amended complaint is **GRANTED in part and DENIED in part**. ECF No. 71.

Plaintiffs' "Class Period" will now be limited to the time period of May 24, 2016 to July 25, 2016.

**IT IS FURTHER ORDERED** that a Rule 16 scheduling conference will be set by separate Order.

_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 30th day of August, 2019.